IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

REVEREND GREG LEWIS, SOULS TO THE POLLS, VOCES
DE LA FRONTERA, BLACK LEADERS ORGANIZING FOR
COMMUNITIES, AMERICAN FEDERATION OF
TEACHERS LOCAL, 212, AFL-CIO, SEIU WISCONSIN
STATE COUNCIL, and LEAGUE OF WOMEN VOTERS OF
WISCONSIN,

        Plaintiffs,

        v.                                  20-cv-284

DEAN KNUDSON, JULIE M. GLANCEY, ROBERT F.
SPINDELL, JR., MARK L. THOMSEN, ANN S. JACOBS,
MARGE BOSTELMANN, in their official capacity as members
of the Wisconsin Election Commission, MEAGAN WOLFE, in
her official capacity as the Administrator of the Wisconsin
Elections Commission,

        Defendants.

_____

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Greg Lewis, Souls to the Polls, Voces de la Frontera, Black Leaders Organizing

for Communities, American Federation of Teachers, Local 212, AFL-CIO, SEIU Wisconsin State

Council, and League of Women Voters of Wisconsin (collectively, "Plaintiffs") state as follows

as their complaint against Dean Knudson, Julie M. Glancey, Robert F. Spindell, Jr., Mark L.

Thomsen, Ann S. Jacobs, Marge Bostelmann, In Their Official Capacity As Members Of The

Wisconsin Election Commission and Meagan Wolfe, In Her Official Capacity As The

Administrator Of The Wisconsin Elections Commission (collectively, "Defendants" or the

"Commission"):

## Nature Of Action

1.      Plaintiffs seek an order from this Court directing Defendants to postpone the current April 7, 2020 election to a date no earlier than the expiration of Emergency Order #12 issued by Wisconsin Governor Tony Evers on March 24, 2020, and to extend from April 7, 2020 to June 2, 2020 the deadline by which municipal clerks must have counted all returned mailed ballots for the Wisconsin spring election. While Plaintiffs are seeking extraordinary relief, three points bear emphasizing at the outset:

2.      **First,** COVID-19 presents truly unprecedented electoral challenges.  COVID-19 has spread to 190 countries and territories, including the United States, and there have been more than 333,000 confirmed cases—and more than 14,500 related deaths – worldwide. The pandemic has caused a state of crisis across the United States, including here in Wisconsin, where, as of March 25, at least 585 people have been infected and at least six have died as a result of COVID-19.  The number of cases here and abroad continues to grow at an alarming rate every day, prompting local, state, federal, and international health officials and organizations to issue directives and recommendations that all individuals practice social distancing and refrain from meeting in large groups, with the aim of slowing the spread of the disease throughout communities.

3.      At the same time that local governments in Wisconsin are attempting to deal with the unprecedented crisis caused by COVID-19, municipal clerks have been working diligently to prepare, organize, and administer the spring election scheduled for April 7, 2020. However, local governments are finding it functionally impossible to comply with both the Wisconsin Election Commission's established procedures for administering the election, the directives of health officials to maintain social distancing, and Governor Evers's Emergency Order #12, issued on March 24, ordering Wisconsin residents to remain confined to their homes, except as provided in the order.

4.      *Second,* "common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 2063, 119 L. Ed. 2d 245 (1992) (quoting *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974)). And for many Wisconsin voters, being forced to vote by April 7, 2020 will be impossible, or require risk to life and limb, along with the possibility of fine or imprisonment for violating the Governor's "Safer At Home" Order. Thus, only by acting—rather than abstaining—can this Court "ensure orderly, fair, and honest elections rather than chaos." *U.S. Term Limits*, 514 U.S. at 834. Here, "[c]ommon sense, as well as constitutional law" compels the conclusion that the April 7, 2020 election cannot proceed in the manner planned. *Burdick*, 504 U.S. at 433.

5.      *Third,* state and local government have no overriding interest in adherence to all aspects of the current election schedule. The interests of ensuring that we conduct a safe, meaningful, and fair election without disenfranchising significant sections of the electorate can be reasonably balanced. Some suggest local government positions will become vacant if the election were postponed. However, many cities and villages have charters that permit incumbents to continue in office pending the selection of their successor (*see, e.g.*, Milwaukee City Charter § 2.3), and even in the absence of such a charter provision, incumbents will continue as de facto fully valid office holders pending the completion of the election process. *See* League of Wisconsin Municipalities, THE MUNICIPALITY, "Post-Election Issues: Oaths, Bonds, Vacancies, and Organizational Meetings," Vol. 108, No. 4 at p. 112 (April 2013); *State ex rel. Reynolds v. Smith*, 22 Wis. 2d 516, 522, 126 N.W.2d 215, 218 (1964); *State v. Sherman*, 163 Wis. 34, 157 N.W. 553

3

(1916).   Moreover, the two higher profile races —the Wisconsin Supreme Court and the Democratic Primary—would be unaffected by a reasonable postponement.   The winner of the Wisconsin Supreme Court election does not take the bench until August 1, 2020, and the primary's certification of convention delegates can wait, as many states are doing, until sometime in June.

6.      Moreover, as of March 25, 2020, Connecticut, Delaware, Georgia, Indiana, Kentucky, Louisiana, Maryland, Ohio, Puerto Rico and Rhode Island have postponed their presidential primaries due to the coronavirus outbreak.[1] As of March 25, 2020, ten states and the District of Columbia plan to have their primaries on June 2, 2020, and the latest-scheduled Democratic Primary Election is June 23, 2020. *Id.* Therefore, delaying the election would ensure that Wisconsin voters' constitutional rights are not unnecessarily curtailed, while causing no delay in the selection of a nominee.

## Jurisdiction And Venue

7.      Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of a right secured by the United States Constitution.

8.      This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this case arises under the United States Constitution and seeks equitable and other relief for the deprivation of constitutional rights under color of state law.

9.      This Court has jurisdiction to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

10.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

---

[1] https://www.nytimes.com/article/2020-campaign-primary-calendar-coronavirus.html (last accessed March 26, 2020).

11.     This Court has personal jurisdiction over Defendants Dean Knudson, Julie M. Glancey, Mark L. Thomsen, Ann S. Jacobs, Marge Bostelmann, and Robert F. Spindell, Jr., the members of the Commission, and Meagan Wolfe, the Administrator of the Commission, who are sued in their official capacities.  Defendants Knudson, Glancey, Thomsen, Jacobs, Bostelmann, Spindell, Jr. and Wolfe are state officials who reside in Wisconsin and work in Madison, Wisconsin.

12.     Venue is appropriate in the Western District of Wisconsin, under 28 U.S.C. § 1391(b)(1), because Defendants are state officials working in Madison, Wisconsin.  A substantial part of the events giving rise to these claims occurred and continues to occur in this district, making venue also proper under 28 U.S.C. § 1391(b)(2).

## Parties

13.     Plaintiff Greg Lewis is Assistant Pastor at St. Gabriel's Church of God in Milwaukee, Wisconsin.  Reverend Lewis is an eligible and registered Wisconsin voter, who resides in the City of Milwaukee.  Reverend Lewis is an adult United States citizen and has never been convicted of a felony.  He also has never had a court take away his right to vote.  Reverend Lewis has been diagnosed with COVID-19 and is currently suffering from the disease's serious symptoms.  Reverend Lewis is the Founding President of Plaintiff Souls to the Polls.

14.     Plaintiff Souls to the Polls ("STTP") is an alliance of pastors working with over 300 predominantly African-American church leaders and their parishioners in the Milwaukee area. STTP educates and mobilizes parishioners to register and exercise their right to vote.  Since 2018, STTP has assisted thousands of voters in procuring their photo ID to vote, registering to vote, and mobilizing voters to participate in in-person absentee voting and in-person voting on election day.

15.     STTP was established as a non-partisan voter education and mobilization organization in 2018 at a convention of approximately 120 church leaders in the central city of

Milwaukee.  STTP's leadership came largely from the organization Pastors United ("PU"), a non-profit corporation, established in 2014, uniting approximately twenty Pastors of churches in Milwaukee's African-American community.  SSTP estimates it reached approximately 20,000 parishioners in 2018 as part of its voter education, registration, and mobilization efforts though the churches affiliated with STTP.  Declaration of Reverend Greg Lewis ("Lewis Decl.") ¶ 4.

16.     SSTP involved thousands of African-American parishioner at their churches and via door-to-door canvassing in the community to generate increased participation of African-Americans in the voting process.  STTP volunteers provided transportation to DMV sites to procure photo IDs for voting; to in-person absentee voting sites; and to in-person voting on election day during the 2018 primary and general election.  Lewis Decl. ¶ 5.

17.     During the current 2020 election campaign, STTP accelerated its activities by hiring a team of paid staff to assist in conducting its voter education, registration, and mobilization efforts in the African-American community.  STTP has worked this year to stop the voter purge of hundreds of thousands of voters by the Wisconsin Elections Commission; set up voter kiosks at churches to register parishioners and community residents to vote; partnered with faculty and staff at Milwaukee Area Technical College to register students to vote and participate in in-person absentee voting; planned a candidate forum; and trained organizers to assist other voters in how to access the MyVote website of the Wisconsin Elections Commission.  Lewis Decl. ¶ 6.

18.     Plaintiff Voces de la Frontera ("Voces") is a nonpartisan, nonprofit, non-stock corporation organized under the laws of the State of Wisconsin with its principal office located at 515 S. 5th St., in the City of Milwaukee, Milwaukee County, Wisconsin.

19.     Voces, a nonpartisan community-based organization currently with over one thousand dues paying members, was formed in 2001 to advocate on behalf of the rights of

immigrant and low-income workers. Voces currently has chapters in Milwaukee, Racine, Waukesha, Sheboygan, Walworth County, Madison, West Bend, Manitowoc, and Green Bay. In addition, Voces has a youth arm, YES (Youth Empowered in the Struggle) with high school and college chapters in Milwaukee and Racine, that is heavily involved in same day voter registration and in-person absentee voting. Declaration of Christine Neumann-Ortiz ("Neumann-Ortiz Decl.") ¶ 2.

20.    Since 2004, Voces has been active continuously in voter education, voter registration, voter mobilization, and get-out-the vote campaigns to increase the voice and influence of the Latino community in Milwaukee and across the state. Voces has mobilized hundreds of thousands of Latinos and other Wisconsin residents to lobby the legislative and executive branches of Wisconsin state government around a wide range of issues related to the rights of immigrants including driver's licenses, in-state tuition, and immigration reform, police collaboration with federal immigration authorities, voter access issues, and sanctuary city legislation. Voces provides a wide range of services to the immigrant community including citizenship classes, legal clinics, and workers' rights advocacy. *Id.*

21.    Voces is dedicated to educating and organizing its membership and community members to exercise their right to vote as protected by the Constitution and the Voting Rights Act of 1965. Voces has sought legal redress in multiple cases to protect the voting rights of Wisconsin's Latinos in litigation challenging discriminatory legislative districts, and voter registration and photo ID requirements. Voces seeks to maximize eligible voter participation through its voter registration efforts and encourage civic engagement through registration and voting. *Id.* ¶ 3.

22.     In this election Voces has created a voter network of over 10,000 predominantly Latino voters across the state, and for the first time has created a new network of over 600 volunteers called "Voceros," who build out a personal network of volunteers to participate in canvassing, phone banking and conduct neighborhood meetings to ensure that Latino voters across the state of Wisconsin register to vote, participate in in-person absentee voting and in-person voting at the polls on April 7.  Voces has incurred substantial expenses and expanded its staff to finance its voter registration, education, and mobilization activities for the 2020 election cycle.  *Id.* ¶ 4.

23.     The majority of the voters Voces works with are either new or infrequent voters who require significant attention and assistance to ensure they exercise their right to vote.  In the event the Wisconsin spring elections, currently scheduled to be held on April 7, 2020, are not postponed, many Latino voters with whom Voces works will be unable to vote in-person in the election, due to fear of contracting the COVID-19 virus. Accordingly, Voces will need to divert its efforts from directing voters to in-person absentee voting and in-person voting on April 7, to a campaign to direct Latino voters to go online to request their absentee ballot and returning it via regular mail prior to the April 7 deadline.  *Id.* ¶ 5.

24.     In addition, if these elections are not postponed, many voters will not vote because they are either unfamiliar or unwilling to go to the polls on Election Day and risk COVID-19 infection.   A significant number of Latino voters have historically participated in same-day registration at the polls on Election Day, and will be unable to do this year due to the COVID-19 pandemic.  *Id.* ¶ 6.

25.     In addition, many Latino voters are on the wrong side of what is called the digital divide, in that they are unfamiliar with or lack internet access.  Many of these voters with whom

Voces has contact are also entirely unfamiliar with the mail-in absentee balloting process and the online process to register to vote.  Many of the Latino voters with whom Voces works are predominantly Spanish-speaking and have difficulty navigating the Wisconsin Elections Commission website and are unfamiliar with the myVoteWI site to request a mail-in absentee ballot.  Such voters will both be unable to register to vote online and even amongst those who are registered, they will not be inclined to request a mail-in absentee ballot.   This will require Voces to divert and expend substantially more resources for each voter in educating them how to exercise the franchise in the upcoming election.  Unless the Wisconsin Election Commission postpones the April 7 election to allow such voters to register and cast their ballots over a reasonable period of time past April 7, thousands of Latino voters in Milwaukee and across the state will be functionally disenfranchised.  *Id.* ¶ 7.

26.     Plaintiff Black Leaders Organizing for Communities ("BLOC") was established in 2017 to work to ensure a high quality of life and access to opportunities for members of the Black community in Milwaukee and throughout Wisconsin.  Declaration of Angela Lang ("Lang Decl.") ¶ 4.

27.     BLOC is a year-round civic engagement organization that has a robust field program to get out the vote and do civic education on doors and through its fellowship program. During 2018 BLOC made 227,000 door attempts in Milwaukee, targeting Black residents to exercise their right to engage in civic participation including voting.  *Id.* ¶ 5.

28.     2020 is a busy year for BLOC to ensure people have access to participate in democracy and can get involved in every election. BLOC expands the idea of civic engagement so everyone can participate in other civic activities even if they don't have the ability to vote. BLOC currently has 50 Ambassadors (folks who knock on doors and engage with the community)

who have gone through more than 30 hours of civics training before knocking on doors. BLOC trains its folks on the civics process, and different ways to make their voice heard including (but not limited to) voting in each election.  BLOC is seen as a resource for the community to get plugged into civic engagement.  *Id.* ¶ 6.

29.     In the event the Wisconsin spring elections, currently scheduled to be held on April 7, 2020, are not postponed, many African-American voters with whom BLOC has had contact will be unable to vote in-person in the election.  African-American voters are some of the most disenfranchised and are disproportionately impacted by voter suppression efforts.  Consequently, BLOC has had to already uproot its effective field program and move to a more digital space. Since BLOC isn't able to be in the field like they usually are, BLOC must expand and augment its resources to reach African-American voters.  BLOC has diverted resources for such a texting and phone-banking campaign to get out the message about how its voters can cast mail-in only absentee ballots. BLOC battles dealing with disconnected phone numbers, and struggles to walk each person though their scenario on where they are in the voting process to request a ballot. This requires more training for BLOC's Ambassadors on the new technological tools as well as keeping them up to date on the ever-changing deadlines when it comes to registering to vote and requesting a ballot. Additionally, BLOC is battling through misinformation, uncertainty, and an overwhelming amount of questions about the election.  *Id.* ¶ 7.

30.     Plaintiff American Federation of Teachers, Local 212, AFL-CIO ("Local 212") is a labor organization representing approximately 1,500 teachers, counselors, and professional staff employed by the Milwaukee Area Technical College.  In addition to its advocacy regarding wages, hours and conditions of employment for its members, Local 212 has been actively involved in voter education and mobilization for its members ("member to member") and for the

10

approximately 40,000 students attending MATC and the families of those students, approximately 70% are low-income voters and it is the only college in the state of Wisconsin where minority students constitute a majority of the student population. Declaration of Kevin Mulvenna ("Mulvenna Decl.") ¶ 2.

31.     In the current and in many previous elections, Local 212 has mobilized its members and students to register to vote, participate in in-person absentee balloting, and educated its members and students about candidates and how to request and cast a mail-in absentee ballot. *Id.* ¶ 3.

32.     During this current election period, from January 27, 2020 to March 10, 2020, Local 212 conducted regularly scheduled voter registration and voter education activities on three (3) of MATC's campuses several days each week, using both student and faculty (retired and active) volunteers. At MATC's Downtown campus, Local 212 conducted voter registration every day Monday through Thursday, 11 am to 1:30 pm, on the West Allis campus Tuesday and Wednesdays between 11 am and 1 pm, and on the South Campus on Tuesdays and Thursdays between 11 am and 1 pm. During this period, Local 212 conducted educational presentations to over 3,000 students about the voting process to 40 different classes of students, registered approximately 200 students. *Id.* ¶ 4.

33.     For at least ten years, Local 212 coordinated early vote campaigns to assist students to participate in in-person absentee voting at the City of Milwaukee's downtown voting site. *Id.* ¶ 5.

34.     In terms of member-to-member activity during the period after January 20, 2020 to the present, Local 212 did mailings to all of its members and conducted regular phone banking

activities encouraging members to vote, including via absentee ballots, and educating them about the issues and candidates in the election.  *Id*. ¶ 6.

35.     During the 2018 election periods, MATC's downtown campus served as an in-person absentee voting site, and Local 212 assisted in registering approximately 1400 students.  In addition, Local 212 conducted a similar member-to-member campaign for its members, communicating via emails, texts, and regular mail.  *Id*. ¶ 7.

36.     The cancellation of in-person absentee voting in Milwaukee, plus the likely cancellation of in-person voting at polling locations on April 7, will make it exceedingly difficult for Local 212 to continue its voter education, registration, and mobilization efforts for the Spring election.  *Id*. ¶ 8.

37.     Local 212 will have to divert resources towards explaining to its members and to students with whom it has worked that their only option to vote will now be via mail-in absentee ballots which must be received by the Milwaukee Election Commission on April 7.  *Id*. ¶ 9.

38.     Such a restrictive means of voting will also result in the functional disenfranchisement of many of Local 212's members but also students with whom Local 212 works, who are unfamiliar with the mail-in absentee ballot process and will likely not vote if the current election schedule and requirements are maintained.  *Id*. ¶ 10.

39.     Plaintiff SEIU Wisconsin State Council ("SEIUWI") is a labor organization with its address at 33 Nob Hill Road, Madison, WI 53713. SEIUWI comprises SEIU local unions with approximately 4,500 members throughout Wisconsin who provide home healthcare services, work in hospitals and long-term care facilities, provide janitorial services, and work in stadiums and the catered food service industry.  Declaration of Paul Sickel ("Sickel Decl.") ¶ 3.

40.     SEIUWI is dedicated to encouraging its members and other individuals in Wisconsin to exercise their right to vote. SEIUWI seeks to maximize voter participation through voter registration efforts, door-to-door canvassing, and issue education. For example, SEIUWI members and field staff personally visit voters to notify them of upcoming elections and ask them to commit to voting in the upcoming elections and to evaluate candidates based on their positions on particular issues.  *Id.* ¶ 4.

41.     SEIUWI invests significant time and resources in registering, educating, and mobilizing its members and other voters to participate in local, state, and national elections. SEIUWI's resources come ultimately from dues paid by SEIUWI members —members who often work very hard for relatively low pay but who have nonetheless made the decision to dedicate part of their regular pay to supporting the union's political work.  *Id*. ¶ 5.

42.     If the Wisconsin spring elections, currently scheduled to be held on April 7, 2020, are not postponed, at least some voters with whom SEIUWI has had contact will be unable to vote in-person in the election. Consequently, SEIUWI will need to divert efforts from reaching more voters to revisiting voters it has already contacted and helping them to obtain mail-in ballots. This duplicative outreach would impair SEIUWI's ability to reach as many Wisconsin voters as possible in the limited time before upcoming elections.  *Id*. ¶ 6.

43.     In addition, if these elections are not postponed, some voters with whom SEIUWI has had contact will be unable to vote at all. For example, SEIUWI staff have in recent days spoken with elderly voters who prefer to and have planned to vote in person; they will not be able to do so now because of the threat to their health. Many of those same voters do not have the technical access or facility to obtain, complete, and return absentee ballots. Further, it is SEIUWI's experience that Wisconsin voters who try to use online or phone systems they have never used

before often encounter unexpected obstacles or difficulties in the process. Many would, in ordinary circumstances, try to address those issues or obstacles by going to an election official's office in person—a step they will not now feel safe taking.  Wisconsin residents will inevitably be denied the right to vote, and SEIUWI's use of its resources will have been wasted.  *Id.* ¶ 7.

44.     Plaintiff League of Women Voters of Wisconsin ("LWVWI") is a nonpartisan, nonprofit, non-stock corporation organized under the laws of the State of Wisconsin with its principal office located at 612 West Main St., Suite 200, in the City of Madison, Dane County, Wisconsin.  LWVWI is an affiliate of The League of Women Voters of the United States, which has 750 state and local Leagues in all 50 states, the District of Columbia, Puerto Rico, the Virgin Islands, and Hong Kong.  LWVWI works to expand informed, active participation in state and local government, giving a voice to all Wisconsinites.

45.     LWVWI, a nonpartisan community-based organization, was formed in 1920, immediately after the enactment of the Nineteenth Amendment granting women's suffrage.  The LWVWI is dedicated to encouraging its members and the people of Wisconsin to exercise their right to vote as protected by the Constitution and the Voting Rights Act of 1965. The mission of LWVWI is to promote political responsibility through informed and active participation in government and to act on selected governmental issues. The League seeks to maximize eligible voter participation through its voter registration efforts and encourage civic engagement through registration and voting.  Declaration of Debra Cronmiller ("Cronmiller Decl.") ¶¶ 2-3.

46.     The LWVWI impacts public policies, promotes citizen education, and makes democracy work by, among other things, removing unnecessary barriers to full participation in the electoral process. Currently LWVWI has 20 local Leagues and approximately 2,200 members. LWVWI works with and through 20 local Leagues in the following cities, counties, and areas

throughout Wisconsin: Appleton, Ashland/Bayfield Counties, Beloit, Dane County, Door County, the Greater Chippewa Valley, Greater Green Bay, Janesville, the La Crosse area, Manitowoc County, Milwaukee County, the Northwoods, Ozaukee County, the Ripon area, Sheboygan County, the Stevens Point area, the Upper St. Croix Valley, the Whitewater area, Winnebago County, and the Wisconsin Rapids area. *Id.* ¶ 4.

47.    LWVWI began as an organization focused on the needs of women and training women voters. It has evolved into an organization concerned with educating, advocating for, and empowering all Wisconsinites. With members in nearly every county in the State, the LWVWI's local Leagues are engaged in numerous activities, including hosting public forums and open discussions on issues of importance to the community. Individual League members invest substantial time and effort in voter training and civic engagement activities, including voter registration and get-out-the-vote ("GOTV") efforts.   LWVWI has developed the statewide Election Observation Program and the Vote411 voter guide for Wisconsin. *Id.* ¶ 5.

48.    LWVWI also devotes substantial time and effort to ensuring that government at every level works as effectively and fairly as possible. This work involves continual attention to and advocacy concerning issues of transparency, a strong and diverse judiciary, fair and equal nonpartisan redistricting, and appropriate government oversight. *Id.*

49.    In 2017, 2018, and 2019, to fulfill its mission to foster civic engagement and encourage voter participation, LWVWI made substantial investments in voter registration activities and voter education statewide.  In each of these years, LWVWI has incurred expenses to finance voter registration and voter education activities, and it has already incurred expenses for the 2020 election cycle.  Since the Wisconsin Legislature eliminated special registration deputies, a designation that previously allowed League volunteers to review and verify proof of residence

documents for voter registration, the League's work has shifted from actually registering and educating voters about voting requirements and absentee voting to assisting voters with their registration. This legal change forced LWVWI to rethink and change its approach to and practice of registering voters. *Id.* ¶ 6.

50.     In 2018, the last general election year, LWVWI collectively hosted a total of 1,057 election-related events in 2018, including voter registration drives, candidate events, etc. LWVWI estimated that it collectively registered or updated the registration for 12,582 voters total. Eighteen of LWVWI's 20 local Leagues noted they do voter registration and education at area community colleges, technical schools, and/or universities. All 20 local Leagues noted that they do voter registration and education at their area high schools. Additionally, in 2018, 949 of LWVWI's members and volunteers participated in election activities, and 6,580 hours of volunteer time were spent on election activities. LWVWI's local Leagues direct voters to use MyVote.wi.gov to register to vote, assist with changes of address and navigating MyVote and the DMV's website, direct voters to Vote411.org to find candidate information, and ensure voters have a valid form of photo ID to obtain and cast their ballots. If anything, these figures are undercounted or under-reported. *Id.* ¶ 7.

51.     In 2019, LWVWI spent approximately $10,385 on voter registration activities statewide, including work on registration form revision ($980), voter registration social media ($294), National Voter Registration Day ($588), Disability voter registration week ($196), voter registration trainings ($980), print materials for local Leagues ($4,326), mailing tablets to local Leagues ($21), and additional staff ($3,000). *Id.* ¶ 8.

52.     For 2020, LWVWI has made substantial expenditures for voter registration activity. Its budget provided for the following estimated costs: voter registration day ($980), Disability

Voter Registration Week ($588), voter registration trainings ($1,568), print materials for local Leagues ($4,000), voter registration social media ($784), and additional estimated expenses ($6,000).  The total will be $13,920.  *Id.* ¶ 9.

53.    LWVWI is the umbrella organization for 20 local Leagues across Wisconsin, including in Ozaukee, Waukesha, Milwaukee, and Dane counties, and works with and through these 20 local Leagues.  Members of the local Leagues are members of LWVWI, as well as the national League of Women Voters, and their efforts and work are part of local, state, and national operations and done on behalf of the state and national Leagues.  LWVWI offers guidance, resources, materials, trainings, and financing in support of the local Leagues and their activities, which include voter registration drives and, as can be seen from the above information on expenditures, other voter registration-related activities.  LWVWI serves tens of thousands of voters, through in-person voter registration assistance to complete online and paper registrations. LWVWI distributes voter information in the form of thousands of flyers, infocards, guides, and stickers. LWVWI engages hundreds of thousands of individuals through its website and social media platforms in the months prior to the November elections. LWVWI believes that these efforts contribute to the high voter engagement and turnout for elections.  *Id.* ¶ 10.

54.    The League of Women Voters of Dane County has conducted 182 voter registration events in the 2018-2019 period, registering 6,956 voters and answering 6,745 questions regarding voter registration or the state's voter ID law.  This election cycle, the Dane County League continued voter registration efforts at college campuses, high schools, apartment complexes, libraries, food pantries, meal sites, neighborhood events, community centers, senior centers, medical centers, and area places of business.  *Id.* ¶ 11.

55.     The League's high school voter registration team, one of several voter services teams in the League of Women Voters of Milwaukee County, focuses only on high schools in Milwaukee County and Waukesha County.  It has been to date a team of five outreach coordinators but it aims to expand.  They have been assisting high school students to register to vote for about 4 school years.  For the last two school years, this team has helped between 900 and 1000 students complete and submit voter registration forms. The team is active in about 25 public schools in the two counties.  Additionally, they teach students how to organize a voter registration event in their school and then support those students with expertise and educational materials.  The League's high school voter registration team interacts with principals, teachers, and staff to provide voting information.  They send out a newsletter to a list of about 300 school contacts and several hundred community members.  Once a voter registration event is scheduled, the team will recruit volunteers to assist, and those requests go out to a list of over 500 people.  This team expects to register between 1000 and 1500 students in 2020.  *Id.* ¶ 12.

56.     In the 2016-2017 period, the League of Women Voters of Appleton visited 42 locations, had 119 volunteers, completed 153 mail-in registrations, completed 31 on-line registrations, and provided 173 people with information on registration, absentee voting and/or the voter ID requirement.  In 2017-18, the Appleton League visited 23 locations, had 74 volunteers, completed 84 mail-in registrations, completed 100 on-line registrations, and provided 159 people with information on registration, absentee voting and/or the voter ID requirement.  For 2018-19, the Appleton League visited 44 locations, had 136 volunteers, completed 50 mail-in registrations, completed 84 on-line registrations, and provided 257 people with information on registration, absentee voting and/or the voter ID requirement.  And finally, from June 2019 through the beginning of the 2020 election cycle, the Appleton League had 202.5 volunteer hours, 43 on-line

registrations, 44 mail-in registrations, 169 people were provided with information on registration and/or ID needed for voting.  *Id.* ¶ 13.

57.     The LWVWI believes that the health and safety of its members and Wisconsin's communities is paramount. As the COVID-19 coronavirus continues to affect more and more communities across the country and in the State of Wisconsin, LWVWI has been forced to divert its resources and develop new guidelines and resources for volunteer workers. Providing guidelines for the prevention of coronavirus through the promotion of absentee ballots for all voters has forced LWVWI to divert from its traditional election strategic plans and create new, untested messages for voters. Asking all voters to vote using an absentee ballot has exasperated existing voter access issues putting the LWVWI in the untenable situation of knowingly disenfranchising voters who do not have the means to request, receive and submit an absentee ballot.  *Id.* ¶ 14.

58.     Collectively, Plaintiffs STTP, Voces, BLOC, Local 212, SEIUWI, and LWVWI are referred to herein as the "Organizational Plaintiffs."

59.     As part of their missions, the Organizational Plaintiffs work to ensure that their members and constituents are able to effectively exercise their right to vote. Plaintiffs are directly harmed by the challenged provisions, which by making it more difficult for Plaintiffs' members and constituents to vote, will require Plaintiffs to expend additional resources to assist their members and constituents to overcome these burdens to exercise their right to vote.  These are resources that the Plaintiffs otherwise could spend educating voters about core issues and preparing for the general election. *See, e.g.*, *Crawford v. Marion Cty. Election Bd*., 472 F.3d 949, 951 (7th Cir. 2007) (political party had standing because of its diversion of resources "to getting to the polls those of its supporters who would otherwise be discouraged by the new law from

bothering to vote"), *aff'd,* 553 U.S. 181, 189 n.7 (2008); *One Wisconsin Institute v. Thomsen,* 198

F. Supp. 3d 896, 908-10 (W.D. Wis. 2016).

60.     The Organizational Plaintiffs are further harmed because in the current crisis

caused by the COVID-19 pandemic, the challenged provisions will ultimately prevent some of

their members and constituents from voting at all. Under the current circumstances, the very

heavy burden placed on the Organizational Plaintiffs' members and constituents is a denial of

those citizens' right to vote.  But it also means that the resources the various Organizational

Plaintiffs have spent to invest in voter education, registration, and mobilization will have been

wasted.

61.     Defendants Dean Knudson, Julie M. Glancey, Mark L. Thomsen, Ann S. Jacobs,

Marge Bostelmann, and Robert F. Spindell, Jr. are sued in their official capacities as the members

of the Wisconsin Elections Commission.

62.     Defendant Meagan Wolfe is sued in her official capacity as the Administrator of

the Wisconsin Elections Commission.

## Statement of Facts and Law

63.     Unfortunately, the timing of the April 7, 2020 election could not be worse; the

COVID-19 pandemic is ramping up in the United States with no expectation that the number of

cases will begin to diminish before the election. While efforts are in place across the country, state,

county, and city to "flatten the curve," it is abundantly clear that the outbreak in Wisconsin is just

beginning. *See, e.g.*, Declaration of Lester A. Pines ("Pines Decl."), Ex. A. (Kara Garvin,

*Flattening the Curve for COVID-19: What Does It Mean and How Can You Help?*, University Of

Michigan Health Blog (March 11, 2020, 1:47 PM), https://healthblog.uofmhealth.org/wellness-

prevention/flattening-curve-for-covid-19-what-does- it-mean-and-how-can-you-help); *Id.*, Ex. B

20

(Wis. Dep't of Health Servs., Outbreaks in Wisconsin, https://www.dhs.wisconsin.gov/outbreaks/index.htm (last visited March 26, 2020)).

64.     Health care professionals caution repeatedly that the outbreak is going to get worse. *See, e.g., Id.* (quoting Dr. Howard Markel, M.S., Ph.D.: "An outbreak anywhere can go everywhere."). Health care professionals and epidemiologists forecast that more than 60% of the U.S. population could be infected by the virus.  *Id.*, Ex. C (Lawrence O. Gostin, et al., *Presidential Powers and Response to Covid-19*, JAMA (March 18, 2020), https://jamanetwork.com/journals/jama/fullarticle/2763423).  National trends from the Centers for Disease Control show that the curve is climbing rapidly. *Id.*, Ex. D (*COVID-19 cases in the United States by date of illness onset*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited March 25, 2020)). Domestically, during the one-week period between March 17, 2020 and March 24, 2020, confirmed cases of COVID-19 identified across the United States grew from 7,038 to 54,453. *Id.*

65.     In Wisconsin, the number of confirmed cases more than quintupled from 106 cases in 14 counties on March 18, 2020, to 585 cases in 33 counties on March 25, 2020. *See Id.*, Ex. B (Wis. Dep't of Health Servs., Outbreaks in Wisconsin, https://www.dhs.wisconsin.gov/outbreaks/index.htm (last visited March 26, 2020)). Health officials estimate that the number of cases is actually higher, however; a shortage of testing supplies prevents us from knowing the true number. *See, e.g.*, *Id.*, Ex. E (Adam Duxter, *Lack of test kits leads to low number confirmed COVID-19 cases in Rock County*, Channel3000 (March 19, 2020 10:24 PM)); *Id.*, Ex. F (Interview by WBAY News Anchors with Dr. Ashok Rai (March 20, 2020, 5:37 AM), viewable at https://www.wbay.com/content/news/Status-of-testing-sites-supply-shortages-and-how-to-safely-support-local-business-568959781.html).

66.     Community spread has been identified in eight Wisconsin counties, causing officials to take extreme measures such as closing schools indefinitely, prohibiting gatherings of 10 or more people, closing bars and restaurants to dine-in service, closing personal provider services such as salons, and directing all persons to stay at home.  *See* Pines Decl., Ex. G (Wis. Dep't of Health Servs., Order for Statewide School Closure, (March 13, 2020)); *Id.*, Ex. H (Wis. Dep't of Health Servs., Emergency Order #5 Prohibiting Mass Gatherings of 10 People or More, (March 17, 2020)); *Id.*, Ex. I (Wis. Dep't of Health Servs., Emergency Order #6 Restricting the Size of Child Care Settings, (March 18, 2020)); *Id.*, Ex. J (Wis. Dep't of Health Servs., Emergency Order #8 Updated Mass Gathering Ban (March 20, 2020)); *Id.*, Ex. K (Wis. Dep't Health Servs., Emergency Order #12 Safer at Home Order (March 24, 2020)).

67.     Emergency Order #12 is enforceable by the police, with violations subject to up to 30 days imprisonment and a $250 fine.

68.     Furthermore, as of March 25, 2020, the counties encompassing the five most populous metropolitan statistical areas in Wisconsin – Milwaukee County (Milwaukee), Dane County (Madison), Brown County (Green Bay), Outagamie County (Appleton), and Racine County (Racine) – have identified community spread of COVID-19. *See Id.*, Ex. B (Wis. Dep't of Health Servs., Outbreaks in Wisconsin, https://www.dhs.wisconsin.gov/outbreaks/index.htm (last visited March 26, 2020)).

69.     The CDC recommends putting "distance between yourself and other people if COVID-19 is spreading in your community." *Id.*. Ex. L (CDC, How to Protect Yourself, https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html (last visited March 26, 2020)).

70.     The response to the pandemic is fluid, with data and directives changing multiple times daily.  One thing that has remained constant, however, is the strong medical advice to practice social distancing, which has been articulated with increasing urgency as the virus has spread. *See e.g. Id.*, Ex. G (Wis. Dep't of Health Servs., Order for Statewide School Closure, (March 13, 2020)); *Id.*, Ex. H (Wis. Dep't of Health Servs., Emergency Order #5 Prohibiting Mass Gatherings of 10 People or More, (March 17, 2020)); Wis. Dep't of Health Servs., Emergency Order #6 Restricting the Size of Child Care Settings, (March 18, 2020); *Id.*, Ex. J (Wis. Dep't of Health Servs., Emergency Order #8 Updated Mass Gathering Ban (March 20, 2020)); *Id.*, Ex. M (Press Release, Office of the Governor, Governor Evers Urges Wisconsinites to State Home (March 21, 2020); *Id.*, Ex. K (Wis. Dep't Health Servs., Emergency Order #12 Safer at Home Order (March 24, 2020)).

71.     In addition, the CDC identifies older adults as having a higher risk of developing more serious complications from COVID-19, and recommends that older adults stay home as much as possible during times of spread. *Id.*, Ex. N. (CDC, Are You at Higher Risk for Severe Illness?,                     https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html (last visited March 26, 2020)).

72.     Nevertheless, the Wisconsin Department of Health Services cautions that "[y]ounger people, and particularly those who are 18 to 30 years old, aren't immune to COVID-19.  Anyone can contract COVID-19. So it's important for everyone, including young and healthy people, to practice social distancing."  *Id.*, Ex. B (Wis. Dep't of Health Servs., Outbreaks in Wisconsin, https://www.dhs.wisconsin.gov/outbreaks/index.htm (last visited March 26, 2020)). News accounts in recent days have identified serious disease and even deaths resulting from COVID-19 in the younger population.

73.     The World Health Organization advises that "around 1 in every 5 people who catch COVID-19 needs hospital treatment." *Id.*, Ex. O (WHO, Getting Your Workplace Ready for COVID-19 (March 3, 2020), available at https://www.who.int/docs/default-source/coronaviruse/getting- workplace-ready-for-covid-19.pdf?sfvrsn=359a81e7_6).  Hospitals do not generally operate with significant extra bed space or expensive equipment, which means that healthcare facilities facing a surge of seriously ill COVID-19 patients can easily become overwhelmed, as is already happening in New York City.  Press stories repeatedly describe scenarios where medical professionals must be forced (and have been forced in some areas) to choose which COVID-19 patients will receive lifesaving treatment.  That is true in Wisconsin, where the media has reported that "health care providers have warned of a scenario in which too many seriously ill patients overwhelm too few crucial supplies like ventilators to care for them as the virus spreads.  This fear is what is driving the governor and other officials to keep people at home." Sarah Hauer, *Coronavirus cases rise above 100 in Wisconsin as day care capacity is limited and election lawsuit filed* (Milwaukee Journal Sentinel, March 18, 2020), available at https://www.jsonline.com/story/news/2020/03/18/coronavirus-wisconsin-hospital-bed-shortage-election-lawsuit/2868842001/ (last accessed March 26, 2020).  This is naturally a very frightening prospect for Wisconsinites, particularly those in high-risk groups, and it makes avoiding illness even more important, especially for the elderly and people with underlying health issues.

74.     There is no dispute that "[t]he best way to prevent illness is to avoid being exposed to this virus." Pines Decl., Ex. L (CDC, How to Protect Yourself, https://www.cdc.gov/coronavirus/2019- ncov/prepare/prevention.html (last visited March 26, 2020)).

75.     In fact, local health officials, including Dr. Ashok Rai, President and CEO of Prevea Health in Green Bay, caution against all gatherings.  In regard to the California order for the state to shelter-in-place, Dr. Rai stated, "I think the governor's doing a great job there by getting everybody to stay at home. I kind of wish every governor—including ours—would follow suit. We need to take this seriously. The only way to take it seriously right now is to socially isolate, which means in your home. We want everybody to stay at home; so Florida, California, Texas, Wisconsin, it doesn't matter." *Id.*, Ex. F ("Interview by WBAY News Anchors with Dr. Ashok Rai (March 20, 2020, 6:32am), viewable at https://www.wbay.com/content/news/Status-of-testing-sites-supply-shortages-and-how-to-safely- support-local-business-568959781.html.")

76.     Furthermore, even though publicly opposed to changes to the April 7, 2020 election process, Governor Evers has recommended that Wisconsinites "follow the guidance provided by the Centers for Disease Control and Prevention (CDC) and the Wisconsin Department of Health Services (DHS), urging the public to stay home as much as they are able to help protect the health and safety of Wisconsin's healthcare workers." *Id.*, Ex. M (Press Release, Office of the Governor, Governor Evers Urges Wisconsinites to State Home (March 21, 2020), available at https://content.govdelivery.com/accounts/WIGOV/bulletins/2827da9).

77.     On March 24, 2020, Governor Evers took the next step by issuing an order for all persons in Wisconsin to stay at home or their place of residence; the order is enforceable by local police, with potential criminal penalties for violation. *Id.*, Ex. K (Wis. Dep't Health Servs., Emergency Order #12 Safer at Home Order (March 24, 2020)).  This is an extraordinary and needed directive, and it makes clear that the current crisis situation is incompatible with the running of a free and fair election in which all Wisconsinites, no matter their resource level, are able to exercise their precious right to vote.

A.     **Wisconsin Election Law**

78.     The Wisconsin Constitution provides that, "Every United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district." WIS. CONST. art. III, § 1; see also WIS. STAT. § 6.02(1) ("Every U.S. citizen age 18 or older who has resided in an election district or ward for 28 consecutive days before any election where the citizen offers to vote is an eligible elector.").

79.     Wisconsin law requires an eligible elector to register in order to cast a ballot. *Id.* § 6.27.  Eligible electors may register to vote in person or by mail until 5:00 p.m. on the third Wednesday before Election Day, or online until 11:59 p.m. on the third Wednesday before Election Day. *Id.* § 6.28(1).  Eligible electors who miss this deadline may register at the municipal clerk's office until close of business on the Friday before Election Day, *id.* § 6.29(a)(2), or at the polls on Election Day. *See generally id.* § 6.55.  Documentary proof of residence is required to register to vote at municipal clerk's offices during the early voting period and on Election Day at the polls. *Id.* § 6.34.

80.     Thus, according to statute, to use those forms of registration for the April 7, 2020 primary election, voters would have had to register by March 18, 2020.  However, in an Opinion and Order entered on March 20, 2020, Judge William Conley, U.S. District Court Judge for the Western District of Wisconsin, extended electronic voter registration through March 30, 2020. *Democratic National Committee, et al. v. Bostelmann, et al.*, No. 20-249 (W.D. Wis. March 20, 2020).  Unfortunately, organizers contacting voters for SEIUWI have found that most are unaware of this extension and that many voters, especially among the elderly population, cannot complete registration online.

81.     Individuals registering to vote electronically or by mail must provide a copy of an "identifying document that establishes proof of residence," which means they must not only have

the document but must be able to upload or photocopy it and present it successfully.  *Id.* § 6.34(2). The only exception to this rule is for individuals registering electronically who do not have to provide such documentation if they provide "the number of a current and valid operator's license [or] identification card." Id. § 6.34(2m).

82.     Electors in Wisconsin must present an approved voter ID in order to vote. Wis. Stat. § 6.79.  If an otherwise eligible voter wishes to obtain a voter ID to vote in the April 7, 2020 election, he or she must make an in-person visit to the Wisconsin Department of Motor Vehicles. As stated by the previous Commission Administrator: "If you don't have one of those or another acceptable photo ID, you can get one for free after just one visit to a Wisconsin DMV office." https://elections.wi.gov/node/5596 (last accessed March 25, 2020). According to the Department of Transportation's guidance, the first step for individuals seeking a voter ID is: "Go to the DMV to apply[.]"  https://wisconsindot.gov/Pages/dmv/license-drvs/how-to-apply/petition-process.aspx (last accessed March 25, 2020).

83.     Historically, Wisconsin voters rely heavily on same-day voter registration. Since 2008, ten to fifteen percent of all registrations have occurred at a polling place on election day. Wis. Elections Comm'n, General Election Voter Registration and Absentee Statistics 1984-2016.xlsx, available at https://elections.wi.gov/elections-voting/statistics?q=elections-voting/statistics&page=2 (last visited March 26, 2020).

84.     Wisconsin's absentee voting process allows all registered voters to vote by absentee ballot. *See id*. § 6.20.  Requests for absentee ballots may be made by mail; in person at the municipal clerk's office; by signing a statement and requesting to receive an absentee ballot under special procedures for voters who are indefinitely confined; by an agent, under special procedures for voters who are hospitalized; by delivery to a special voting deputy; or by e-mail or fax. Wis.

Stat. § 6.86(1)(a). However, the statutes also provide deadlines for voters to request absentee ballots. For example, requests made by mail to vote absentee must be received by 5:00 p.m. on the fifth day before an election, and in-person requests must be made at the municipal clerk's office by the Sunday preceding an election. *Id.* § 6.86(1)(b).

85.     All voters are required to present a copy of their proof of identification with their absentee application. *Id.*(1)(ac).

86.     All absentee ballots must be witnessed and signed by an adult U.S. citizen (other than military and overseas voters, whose absentee ballots may be witnessed by an adult who is not a U.S. citizen. Wis. Stat. § 6.87(4)(b)1. The witness signature requirement applies to all absentee voters, regardless of the particular method by which they cast their ballots. *Id.* The absentee ballot certificate contains both a voter certification and a witness certification, which the voter and witness must respectively sign under penalty of perjury.

87.     Because Wisconsin law requires that mail-in absentee ballots' certifications be signed by the voter and by a witness who is an adult U.S. citizen, this requirement constitutes an insurmountable hurdle for many eligible Wisconsin voters under quarantine or in isolation. All eligible Wisconsin voters under self-quarantine who live alone or who do not have an adult U.S. citizen in their household will be unable to satisfy the state's witness signature requirement and cast a mail-in absentee ballot. For example, one 87-year-old voter contacted earlier this week will not be able to satisfy this requirement (even assuming she can obtain an absentee ballot) because she lives alone and is concerned about contact with a younger relative, who she worries is not adequately protecting himself from the virus.

88.    Once a voter has received and completed his or her ballot, he or she must return it so that "it is delivered to the polling place no later than 8 p.m. on election day." Wis. Stat. § 6.87(6). Absentee ballots mailed but not physically received by that time are not counted. *Id*.

89.    Under normal circumstances, the process of mailing absentee ballots to voters and receiving them back in the mail can take up to two weeks. This time period is likely to be even longer under the current circumstances, particularly since the number of registered Wisconsin voters submitting requests for the April 7 spring election and Presidential preference primary had already reached 626,837 as of March 25, 2020.  *See* https://elections.wi.gov/node/6765 (last accessed March 26, 2020).

90.    For in-person voting, the process requires closer and potentially direct contact.  The following procedures are taken from the City of Green Bay Election Inspection Training Manual, but they are similar to the procedures used in other municipalities throughout the state, including the cities of Milwaukee, Madison, and Racine.

91.    Polls open on election day at 7:00 am and close at 8:00 pm.

92.    Two (2) identical lists of the registered voters in each ward, known as "poll books," are provided to each ward. A minimum of two (2) poll workers are assigned to each ward table and are responsible for checking voters' photo IDs, locating names and addresses in the poll book, assigning sequential voter numbers, and issuing ballot to the voters. *See* City of Green Bay Election Inspector Training Manual at 12 (Updated January 2020).

93.    There must always be two (2) poll workers at each ward table whenever a voter is being issued a ballot for the purpose of cross checking each other's work and avoiding errors. *Id*. at 23.

94.     Poll workers work closely together the entire election day to ensure the integrity of the election by confirming the information recorded on each voter list is accurate and identical. See *id*. at 12.

95.     State law requires that each eligible voter state their full name and address when appearing at a ward table to vote. *Id*. at 13 (citing Wis. Stat. § 6.79(2)(a)).

96.     Voters must then present a photo ID. *Id*.

97.     Notably, verification of name, address, and photo ID is completed by two (2) poll workers at the voting location. *See generally id*.

98.     After the information is validated, the voter is required to sign the poll book used by the poll workers, and poll workers frequently have to assist the voter in finding their name. *Id*. at 14.

99.     A ballot must be initialed by two (2) poll workers and is then issued to the voter, along with a voter number. *Id*. at 15.

100.    After the voter completes the ballot, the voter number is returned to the poll workers when the voter feeds their ballot into the voting machine. *Id*.

101.    Poll workers provide further assistance to voters who require additional help in voting, such as through the express vote machine. *See generally id.*

102.    Same-day registration is also available to the public on election day. *Id*. at 22.

103.    If a person fills out their ballot incorrectly, the ballot is considered spoiled and returned to the poll workers for issuance of a new ballot. *Id*.

104.    In addition to poll workers and voters, election observers and the media have a right to be present during voting hours at all polling locations. *Id*. at 73.

105.    Notably, observers may examine the poll books, but the books must remain under the control of the poll workers at all times. The poll books may not be handed to the observers. *Id*. at 74.

106.    Throughout the entirety of this process, there are multiple instances in which voters and poll workers alike are closer to one another than the recommended six feet of separation for proper social distancing—and that does not even take into account the predicted lack of ability to maintain social distancing among voters in line at their polling places.

**B.    Commission Directives relative to COVID-19 and the April 7, 2020 Election**

107.    In light of the COVID-19 pandemic and related public health orders, municipal clerks throughout the State of Wisconsin have expressed concerns about safe procedures for administering the April 7, 2020 election. In response, the Commission has issued several communications concerning the clerks' responsibilities relative to the administration of the election.

108.    In a memorandum prepared for the Commission's March 18, 2020 telephonic meeting, titled "Update Regarding COVID-19 Election Planning," the Commission forthrightly identified several concerns about the April 7, 2020 election as a result of the COVID-19 pandemic, such as shortages of absentee ballot envelopes, polling locations, poll workers, and even hand sanitizer and cleaning products. *See generally* Wis. Elections Comm'n, Update Regarding COVID-19 Election Planning ("March 18, 2020 WEC COVID-19 Planning Update") (March 18, 2020).

109.    The proffered solutions for the problems identified in the memo are impractical and insufficient—and in some cases no solutions are offered at all.

110.    The memo suggests that, in response to absentee ballot envelope shortages, clerks be prepared to print their own. *Id*. A subsequent memo from the Commission indicated that it has

placed an order for additional envelopes and that it "is expected to begin to receive a large portion of the envelopes on March 25, 2020." Wis. Elections Comm'n, Absentee Envelope Order Status and Delivery Details, 1 (March 19, 2020). However, the memo lacks specificity as to precisely when and how many envelopes municipalities can expect to receive. *Id.*

111.    In response to the critical shortage of hand sanitizer and other sanitation wipes for polling places, the memo merely acknowledges that "there appears to be no hand sanitizer or sanitation wipes available through local, state or federal channels," and that while federal security funds may be used to procure sanitation supplies, "those resources do not seem to be available at this time." March 18, 2020 WEC COVID-19 Planning Update, 3. The Commission issued another memo about sanitizing products on March 22, 2020, with suggestions for alternative options for locations without sufficient supplies; however, the possible alternatives identified therein are inadequate and most would require municipalities to expend additional funds to attempt to employ measures that may only be partially effective. Wis. Elections Comm'n, FAQ: Hand Sanitizer Issues and Options ("March 22, 2020 WEC FAQ: Hand Sanitizer") (March 22. 2020).

112.    With respect to shortages of poll workers and election inspectors, the Commission's March 18, 2020 memo suggests that clerks should create backup lists of election inspectors in case poll workers are not able or do not show up to work during the election. March 18, 2020 WEC COVID-19 Planning Update at 4. It suggests recruiting from "high school students, college students, teachers, other municipal, county, and government employees and to private employers in the community." *Id.*

113.    The Commission also advises clerks "to develop backup plans if they personally are unable to serve in the days leading up to and on Election Day. Clerks should be in the position to deputize other members of their staff or other individuals within their local municipal

government that could step in and run the election should it become necessary in an emergency. Clerks should be mindful that additional training of these individuals will be needed." *Id.*

114.     Notwithstanding the drastic orders and recommendations issued by government officials and health care providers alike, Defendants have continued to insist that municipal clerks must continue in-person voter registration, which necessarily requires that there be fewer than six feet between the registrant and the member of the clerk's staff. *See, e.g.*, Wis. Elections Comm'n, COVID Planning – In-Person Absentee Voting Hours (March 18, 2020); Wis. Elections Comm'n, Update Regarding COVID-19 Election Planning (March 18, 2020); Wis. Elections Comm'n, Memorandum, Emergency Order #12 Does Not Eliminate In-Person Absentee Voting (March 24, 2020)                    https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Clerk%20comm%20re%20Emergency%20Order%2012%203.24.20.pdf (last accessed March 26, 2020).

115.     The Commission also acknowledges that the fluid nature of the pandemic response is problematic, stating "It is also important to note that the guidance from public health officials changes daily. Because the guidance may continue to change dramatically in the coming days, WEC staff has been focusing efforts on advising clerks on the processes before them today relevant to today's guidance." *Id.*

116.     Furthermore, the Commission has admitted that given the dynamic and continually evolving nature of this crisis, "we do not know what the guidance will be as we get closer to Election Day." *Id.*

117.     The Commission has also stated that it "does not have the authority to change these statutory deadlines or cancel or postpone the election, and that any change may require court intervention, an act of the Legislature, or an order of the Governor." *Id.* at 1.

118.     In addition, Governor Evers has publicly opposed changes to the election process, including exempting election operations from his executive orders intended to protect the public health. *See e.g.* Pines Decl., Ex. J (Wis. Dep't of Health Servs., Emergency Order #8 Updated Mass Gathering Ban (March 20, 2020)).

119.     Governor Evers has also stated he does not have the authority to postpone the election. *See* Memorandum from Joseph T. Kreye, Legal Services Manager, Wisconsin Legislative Reference Bureau, to Wisconsin State Assembly Minority Leader Gordon Hintz (March 18, 2020).

**C.     Election Preparations in Wisconsin's Largest Municipalities.**

*Election Preparations in the City of Milwaukee*

120.     The City of Milwaukee will be functionally unable to comply with the Wisconsin Election Commission's directives to conduct an in-person election in its 325 wards and 180 polling sites.

121.     On March 15, 2020, the Mayor of the City of Milwaukee declared an emergency in the City of Milwaukee under Wisconsin Statutes s. 323.14(4)(b) and Milwaukee City Charter s. 6-07-3 due to the public health emergency associated with the COVID-19 pandemic. The Common Council of the City of Milwaukee ratified that declaration in file number 191881 on March 18, 2020.  Declaration of Neil Albrecht ("Albrecht Decl.") ¶ 2.

122.     The City of Milwaukee has an approximate total population of 592,000 residents (439,000 of voting age) and approximately 298,000 currently registered voters. The City of Milwaukee has 327 electoral wards and 180 polling stations.  As of March 20, 2020, 18 previous polling stations are unavailable due to the risk of cross contamination of sensitive polling sites. Albrecht Decl. ¶ 4.

123.     In the 2016 spring presidential primary, the Milwaukee Election Commission documented 167,765 total ballots cast and processed 14,321 absentee ballots.  In the 2012 spring

presidential primary election, the Milwaukee Election Commission documented 84,641 total ballots cast and processed 5,690 absentee ballots.  Albrecht Decl. ¶ 6.

124.   In preparation of the April 7, 2020 election, the City of Milwaukee's Election Commission requires 300 staff members to assist in the processing of absentee ballots at central count and 1,500 for polling location operations across the city. Due to the public health emergency, trained staff numbers are decreasing to less than 1,000 election workers and less than 50 central count workers.  Albrecht Decl. ¶ 7.

125.   The City of Milwaukee's Election Commission has received 400 notices that previously trained elections staffs are unavailable to work the election. In-person training of new poll workers and central count staff is growing increasingly difficult to perform while still practicing social distancing.  Given the inability to train new poll workers, it is virtually certain that the City of Milwaukee will lack sufficient poll workers to staff the polling locations across the city, and will likewise lack the requisite number of staff members to process absentee ballots at the central count location.  Albrecht Decl. ¶ 8.

126.   Whether imposed *de jure* or *de facto*, the City of Milwaukee likely will be unable to conduct in-person voting in its 327 wards on April 7, leaving mail-in absentee voting as the only means currently by which Milwaukee voters will be able to vote for the Spring Election scheduled to occur on April 7.  Albrecht Decl. ¶ 9.

127.   As of March 25, 2020, the City of Milwaukee's Election Commission has processed approximately 52,468 requests for an absentee ballot.  It is estimated that the City of Milwaukee's Election Commission will continue to receive approximately 5,000 absentee ballot requests per day for the next eight (8) days until the last day such requests may be received, Thursday, April 2. Assuming there is a 5% drop-off in ballots mailed and ballots returned, that would be an additional

38,000 absentee ballots processed, for an estimated total of 90,000 absentee ballots returned and cast for this Spring Election.  Assuming it is impossible to conduct an in-person election at its polling locations on April 7, such a turnout would then be approximately 70,000 votes less than the voter turnout Milwaukee ordinarily would have for this Spring Election, or an approximate 44% turnout reduction from originally anticipated.  Albrecht Decl. ¶ 10.

*Election Preparations in the City of Madison*

128.    The City of Madison is finding it functionally impossible to comply with both the Wisconsin Election Commission's established procedures for administering the election and the directives of health officials.

129.    The election-related responsibilities of the Madison City Clerk's Office include providing absentee ballots to voters and receiving and processing completed absentee ballots.  The office is currently in the process of sending and receiving absentee ballots for the Spring Election scheduled for April 7 ("Spring Election").  Declaration of Maribeth Witzel-Behl ("Witzel-Behl Decl.") ¶ 2.

130.    The coronavirus epidemic that is sweeping the world is having direct and severe consequences for the Spring Election.  The epidemic has led to declarations of emergencies by the national, state, and local governments.  Orders issued by the Director of Public Health for Madison and Dane County greatly restrict the ability of persons to travel to the polls to register and vote in-person.  On March 25, 2020, a new "Safer At Home Order" from Wisconsin Governor Tony Evers took effect, which orders "All individuals present within the State of Wisconsin . . . to stay at home or at their place of residence . . . ."  With limited exceptions, the Order requires individuals in the Wisconsin to stay at home through April 24, 2020.   Anyone who violates the Order is potentially subject to 30 days imprisonment or a fine up to $250.  *Id.* ¶ 3.

131.     Due to the above orders and concerns that people have about their health, many voters and poll workers are reluctant to go to the polls out of concern they may contract COVID-19 or infect others.  For example, as of March 24, 2020, the City has had 666 poll workers cancel their assigned shifts at the polls for the Spring Election.  That is about 32% of the poll workers invited to work for the Spring Election.  The City offers two shifts for poll workers on Spring Election day.  As of March 24, 2020, 774 of 1,500 morning shifts and 716 of 1,500 evening shifts were vacant.  In addition, about 67% of the City's poll workers are in the "at risk" category for COVID-19, being over 60 years of age.  The City of Madison anticipates more poll workers deciding not to work for the Spring Election.  *Id.* ¶ 4.

132.     The City of Madison has an approximate total population of 255,650 residence (213,725 of voting age) and approximately 179,648 registered voters.  The City has 152 voting wards and 92 polling stations.  As of March 20, 2020, 14 previous polling stations are unavailable due to COVID-19 concerns, and the Madison Metropolitan School District is considering not allowing the City to use the 21 school facilities that usually serve as polling locations.  *Id.* ¶ 5.

133.     Attempting to meet the extraordinary demand for absentee ballots and other requests from voters has strained the capabilities of the Clerk's office.  Some of the employees have been working 12-17 hour days for more than a week, with no end in sight.  This is true even with the reassignment of dozens of other employees of the City of Madison to assist the City Clerk. *Id.* ¶ 6.

134.     The health emergency and the fear of contracting COVID-19 has led to an unprecedented number of requests for absentee ballots.  As of March 24, the Clerk's Office had sent 40,275 absentee ballots by mail and 1,273 by e-mail.  In the 2016 spring presidential primary, Madison voters cast 118,219 ballots, including 10,272 absentee ballots.  In the 2012 spring

presidential primary, Madison voters cast 46,452 ballots, including 5,190 absentee ballots.  The City is anticipating as many as 118,000 absentee ballots to be cast in the April 7 Spring Election. *Id.* ¶ 7.

135.    The ever-increasing volume of requests for absentee ballots is threatening to overwhelm the staff available to the City Clerk and raises the distinct possibility that thousands of voters will be unable to exercise the franchise, despite their best efforts to do so.  *Id.* ¶ 8.

136.    As of Friday, March 20, 2020, the City of Madison had a backlog of over 16,000 email requests for absentee ballots.  On March 25, the backlog was still over 12,000.  By law, the Clerk's Office is required to respond to send an absentee ballot to a voter within 48 hours of receiving the voter's request for a ballot.  With the backlog and the deluge of continuing requests for absentee ballots, it is now taking the Clerk's Office approximately one week to send a voter an absentee ballot after receiving his or her request for one.  The City does not have the resources to meet the 48-hour requirement.  *Id.* ¶ 8.

137.    As noted, the Clerk's Office has already issued over 41,000 absentee ballots and only a few thousand have been returned to the Clerk's office.  Many of the email requests for absentee ballots contain so much data that the City's computer system is unable to download the information.  *Id.* ¶ 10.

138.    In addition to the above problems, the Clerk's office now receives numerous requests daily from individuals who have received an absentee ballot, but live alone and have no person to witness the ballot.  Due to the coronavirus outbreak and the Governor's Safe At Home order, these persons are afraid to leave their homes in search of a witness.  *Id.* ¶ 11.

139.    The City Clerk expects thousands of voters will not be willing to go to the polls for the Spring Election. These voters and any citizen struggling to obtain and complete an absentee

ballot face the impossible task of choosing between possibly contracting a fatal illness, or exercising their right to vote. Poll workers for the City of Madison and other election officials are facing the same dilemma: Do they perform their obligations to run a full and fair election and risk contracting a possibly fatal illness, or do they decline to assist in the election to stay healthy? *Id.* ¶ 12.

140. The circumstances described above makes the 8:00 p.m. election day deadline for receipt of absentee ballots completely unworkable. The combination of the volume of requests for absentee ballots, the ever-increasing backlog the City has, and the fact that it now takes about a week to send voters an absentee ballot means that a very large number of absentee ballots from lawful voters will not arrive until after election day. The Clerk estimates that the City will receive more than 1,000 absentee ballots after 8:00 p.m. on April 7. Under the current law, all of those voters will be disenfranchised -- their votes won't count. *Id.* ¶ 13.

141. The City also is beginning to receive calls from voters who are currently overseas and unable to return their absentee ballot via mail because the country in which they are located is no longer offering mail service due to COVID-19. The City Clerk's Office contacted the Wisconsin Elections Commission about this issue, and was informed that the only option for these voters is to return their ballot through the mail. The City has issued absentee ballots to over 500 voters who are currently overseas. *Id.* ¶ 14.

142. In addition to the above issues, the unprecedented requests for absentee voting is hampered at times by shortages of mailing labels and envelopes. *Id.* ¶ 15.

***Election Preparations in the City of Green Bay***

143. The City of Green Bay is finding it functionally impossible to comply with both the Wisconsin Election Commission's established procedures for administering the election and the

directives of health officials.  Indeed, on March 24, 2020, the City of Green Bay and the City Clerk filed a verified complaint in the United States District Court for the Eastern District of Wisconsin against the Wisconsin Elections Commissioners (as well as other defendants), case no. 20-cv-479 (the "Green Bay Complaint"), seeking relief from the April 7 election date, based on the City's inability to provide voters casting ballots in Green Bay with a safe and fair election.

144.    As attested in that complaint, the City and its Clerk cannot adequately prepare to conduct an election amidst the current crisis, or to create adequate policies and safeguards to protect both public health and the validity of the election, when the Commission itself cannot provide the necessary direction, as it has admitted that even it does not know what the guidance will be as the election draws closer.   *See* Green Bay Compl. ¶ 17, citing March 18, 2020 WEC COVID-19 Planning Update at 1.

145.    The City is experiencing all of the issues identified by the Commission as obstacles to the election, and it is abundantly clear that the proffered solutions are both impractical and insufficient—and in some cases in direct opposition to sound public health advice.  Green Bay Compl. ¶¶ 50-85.

146.    To address absentee ballot envelope shortages, the Commission directs clerks to be prepared to print their own. *Id.* at 66. Such a suggestion, however, fails to take into account staffing shortages caused by COVID-19 as well as the fact that current clerks' staffs are already stretched too thinly while they attempt to process the overwhelming backlog created by unprecedented demand for absentee ballots. As of March 24, 2020, the City Clerk's Office was handling a backlog of over 4,000 absentee ballots with six staff members, including staff from outside of the department. *Id.* ¶ 66.

40

147.    The City Clerk's Office does not have the resources to adequately handle all of the requests for absentee ballots plus these new directives from the Commission. Notably, the Clerk's office is attempting to address the new directives in addition to its day-to-day duties, all of which have been assigned to other departments to the extent they can be at this time.  *Id*. ¶ 67.

148.    In response to the critical shortage of hand sanitizer and other sanitation wipes for polling places, the Commission's March 18, 2020 memo merely acknowledges that "there appears to be no hand sanitizer or sanitation wipes available through local, state or federal channels." *Id*. Problematically, the City has also been unable to acquire any additional sanitizing products. As a result, the City has moved many of its operations to remote access to decrease the number of employees and members of the public who are required to be present in its facilities.  *Id*. ¶ 68.

149.    The City has determined that the alternative suggestions offered in the Commission's March 22, 2020 memo, *see* March 22, 2020 WEC FAQ: Hand Sanitizer, are not adequate substitutes to compensate for its lack of sanitizing products, which are necessary to ensure the cleanliness of polling places and limit potential exposure to COVID-19. *Id*. ¶ 69.

150.    Accordingly, there is no way to protect poll workers or voters if basic sanitizing wipes are unavailable for the 13-hour election day, particularly since the voting process requires people to make direct contact and operate in close proximity to each other.  *Id*. ¶ 70.

151.    With respect to shortages of poll workers and election inspectors, the Commission suggests that clerks should create backup lists of election inspectors in case poll workers are not able or do not show up to work during the election. March 18, 2020 WEC COVID-19 Planning Update at 4. It suggests recruiting from "high school students, college students, teachers, other municipal, county, and government employees and to private employers in the community." *Id*. ¶ 70.

152.    The City has 278 poll workers. Problematically, 72% of these poll workers are age 65 years or older, and 90% are age 60 years or older. No data is available for other COVID-19 risk factors for poll workers, such as underlying medical conditions, and no consideration has been given to the availability of child care for younger workers or potential exposure for high-risk family members.  *Id.* 72.

153.    In Green Bay, only 54 of the City's 278 poll workers have agreed to work the April 7, 2020 election as of March 20, 2020. Only 11 of those 54 are Chief Inspectors.  *Id.* ¶ 73.

154.    This staggering deficit cannot be addressed by creating a backup list of election inspectors as the Commission recommends. Finding poll workers has been an on-going challenge for the City for many years, leading to already creative solutions to meet poll worker needs under normal circumstances.  *Id.* ¶ 74.

155.    Readying an election scheduled in a matter of two weeks with only 54 of 278 confirmed poll workers, with staff shortages, extreme backlogs of absentee ballot requests, and no additional methods or funding to carry out these directives is not only impractical, it is wholly irresponsible given that the integrity of the election will be jeopardized.  *Id.* ¶ 75.

156.    In addition, this ignores the directives from the Wisconsin Department of Health Services advising that "younger people, and particularly those who are 18 to 30 years old, aren't immune to COVID-19. Anyone can contract COVID-19. So it's important for everyone, including young and healthy people, to practice social distancing." *Id.* ¶ 76 (citing Wis. Dep't of Health Servs., Outbreaks in Wisconsin, https://www.dhs.wisconsin.gov/outbreaks/index.htm (last visited March 26, 2020)).

157.    Furthermore, in the event of staff shortages or clerk unavailability, the recommendation by the Commission is for clerks "to be in the position to deputize other members

of their staff or other individuals within their local municipal government that could step in and run the election should it become necessary in an emergency. Clerks should be mindful that additional training of these individuals will be needed." *Id.* ¶ 77.

158.    Even assuming the City Clerk is able to identify someone who can proceed in her place, the Commission is asking the City to operate an election under unprecedented conditions, with unprecedented staffing shortages, with new and untrained staff and poll workers, and potentially headed by someone who's primary job function is not to run elections, and is therefore less familiar with the election process. This is a downright reckless request.  Green Bay Compl. ¶ 78.

159.    Difficulties and delays with respect to voter registration continue to be a significant issue for this election. "The WEC strongly recommends that anyone planning to vote should request to have an absentee ballot mailed to them as soon as possible." *Id.* ¶ 79 (citing Wis. Elections Comm. website (last visited March 26, 2020), https://elections.wi.gov). However, the Commission also notes that "[y]ou must be registered to vote to request an absentee ballot" and that "[t]he deadline to register by mail to vote has passed." *Id*. The Commission also notes that the online registration deadline has been extended through March 30 as a result of Judge Conley's order.  *Id*.

160.    While a step in the right direction, the order of the federal court only addresses registration. It is deficient as to the in-person requirements as a whole. *Id.* ¶ 82.

161.    These conflicting messages, coupled with the failure of the Commission or other state officials with the authority to act to provide adequate alternatives for administration of the election, are forcing both election workers and the electorate to choose between the fundamental

right to vote, and the clear directives of medical professionals during a pandemic with significant fatalities. *Id*. ¶ 83.

162.    It is irresponsible to conduct an in-person election knowing not only that older Americans are at higher risk of mortality from COVID-19 during times of community spread, but that they are also are the backbone of the election process. *Id.* ¶ 84.

163.    There is no way the election can be held in-person on April 7, 2020 in Green Bay without adequate poll workers and Chief Inspectors, and without also jeopardizing both the integrity of the election and the electorate's fair and equal access to the polls.  *Id.* ¶ 85.

***Election Preparations in the City of Racine***

164.    In connection with the election scheduled for April 7, 2020 ("Spring Election"), The City of Racine Clerk's Office is currently struggling to deal with the impact of the coronavirus pandemic.

165.    For instance, the Clerk's Office is extremely burdened with processing the record number of absentee ballot requests that they have received. Of Racine's more than 34,000 registered voters, they typically mail ballots to 1,500 voters. That number is now over 4,500. However, that is still a small percentage of Racine's voters.  Declaration of Tara Coolidge ("Coolidge Decl.") ¶ 6.

166.    The City's in-person, early absentee voting process at this point is heroic. Voters are greeted by two public health officials wearing lab coats, gloves, masks, and protective eyewear. They ask voters to take their temperature. They then ask a series of questions about symptoms and the voter's ability to climb two flights of stairs.  *Id.* ¶ 7.

167.    If the voter has a fever or any complications, a member of the Clerk's Office staff conducts curbside voting. If the voter does not require curbside voting, they are directed to climb

the stairs and stand in squares taped to the floor that are six feet apart. They then vote in one of the City Clerk's large conference rooms and the Council Chamber to maintain social distancing. After citizens vote they are directed to exit a different door. *Id* ¶ 8.

168.    The only operation in City Hall that has not been closed to person-to-person contact is in-person, early absentee voting. All other City Hall operations are being conducted via telephone and email.  *Id.* ¶ 9.

169.    Social distancing for in-person, early absentee voting is easier to maintain than it will be on Election Day, because the City only gets on average 12 to 15 voters an hour.  *Id.* ¶ 10.

170.    In Racine's in-person, early absentee voting process, voters and staff are encouraged to wash their hands at the start and finish of this process. None of the staff inside the City Hall wear personal protective equipment; they simply do not have the supplies available to equip such City Hall staff.  *Id.* ¶ 11.

171.    As imperfect as the City's in-person, early absentee voting process is, despite the extraordinary efforts being taken, the City cannot offer anything close to that level of protection from spread of the coronavirus to workers and voters on Election Day.  *Id.* ¶ 12.

172.    The City has 14 polling locations on Election Day, all with two to four wards voting at them. They are held in schools, community centers, and churches. Each polling location requires an election chief, a greeter, and three election officials (together, "poll workers") to staff each ward. In a lower-turnout election, the City needs approximately 135 poll workers, at minimum, to run the election effectively and to comply with the law. Based upon the anticipated voter turnout, the City Clerk will need 180 to 200 poll workers comfortably to staff the April 7, 2020 election. *Id.* ¶ 13.

173.     Of the 135 poll workers that the City used in the February 2020 primary election, fewer than 25 of them were under the age of 60. The City Clerk does not know if there will be sufficient numbers of lower-risk poll workers available on April 7, 2020. Even before the Department of Health Services' "Stay at Home" Executive Order #12, the City was losing poll workers. Many of the chief election officials previously scheduled to work have notified the City Clerk that they have chosen not to work the polls on April 7, 2020. The City Clerk is concerned that the City will not be able to fully staff Racine's election locations.  *Id.* ¶ 14.

174.     As illness spreads to more and more people in Wisconsin, the City Clerk anticipates more and more poll workers will choose to protect against the risk of illness and death rather than to work the polls.  *Id.* ¶ 15.

175.     The City Clerk's Office cannot provide on Election Day the health screening that it is conducting during in-person, early absentee voting—they have neither the resources nor the personnel. Further, they do not have sufficient supplies of hand sanitizer and disinfecting cleaning supplies.  *Id.* ¶ 16.

176.     The City Clerk has never before been asked to choose between keeping democracy alive with an election and protecting the lives of the City's residents. The City Clerk fears for the safety of her staff, volunteers, members of the public, and the families they go home to.  *Id.* ¶ 17.

**D.      Precautions taken by Wisconsin government generally to protect against the spread of COVID-19.**

177.     In the face of the rapid community spread of COVID-19 throughout Wisconsin and the severe health risks it presents, some branches of Wisconsin government are taking unprecedented steps to protect health and safety – their own health and safety, that is.

178.     For example, the Wisconsin State Senate, which is made up of a total of 33 State Senators, has ceased meeting in person at the Wisconsin State Capitol, and now is meeting by

teleconference.   *See*   https://madison.com/wsj/news/local/govt-and-politics/state-senate-holds-dress-rehearsal-in-anticipation-of-wisconsin-s/article_dd3e87c6-14f4-5b04-9ce1-146e29621f5f.html (last accessed March 26, 2020).

179.   The Wisconsin State Capitol was closed to the public as of 8:00 AM on March 26. *See*   https://madison.com/wsj/news/local/state-capitol-to-close-to-the-public-after-tony-evers/article_4a478b1f-40ad-57a3-950e-765a24f25e50.html (last accessed March 26, 2020).

180.   On March 20, the Wisconsin Supreme Court issued orders postponing jury trials and temporarily suspending in-person proceedings statewide "[i]n an effort to protect the public, attorneys, court staff and judges from the health risks associated with COVID-19." https://wicourts.gov/ (last accessed March 26, 2020).

181.   Yet, despite the other branches of government suspending activities that would allow the public to physically access the State Capitol, the Senate chambers, and the courts, the Elections Commission continues to insist that municipal clerks provide in-person voter registration, and that the polls be open for in-person voting on April 7.  In a stunning memorandum that goes against the recommendations of health professionals and the practice of the Wisconsin Supreme Court and Wisconsin State Senate, on March 24, the Commission's Administrator, Defendant Wolfe, issued a memo with the subject line, "Emergency Order #12 Does Not Eliminate In-Person Absentee Voting," which states the following in its opening paragraph:

> As you may know, this afternoon the Governor and the Department of Health Services issued Emergency Order #12 entitled "Safer at Home Order" related to public and private activity permitted due to the COVID-19 pandemic.  The Wisconsin Elections Commission (WEC) has received several inquiries as to whether the order requires the termination of in-person absentee voting for the Spring Election and Presidential Preference Primary.  The short answer is no, the Order does not require or authorize municipalities to terminate in-person absentee voting.

Wis. Elections Comm'n, Memorandum, Emergency Order #12 Does Not Eliminate In-Person

Absentee Voting (March 24, 2020) https://elections.wi.gov/sites/elections.wi.gov/files/2020-

03/Clerk%20comm%20re%20Emergency%20Order%2012%203.24.20.pdf (last accessed March

26, 2020).

       **E.**      **The disproportionate impact and unconstitutionally heavy burden on minority voters of proceeding with the April 7 election.**

182.     In the event the Wisconsin spring elections, currently scheduled to be held on April

7, 2020, are not postponed, many African-American voters with whom STTP has had contact will

be unable to vote in-person in the election. Consequently, STTP will need to divert efforts from

reaching more voters to revisiting voters it has already contacted, and helping them to obtain a

mail-in ballot. This duplicative outreach would impair STTP's ability to reach as many Wisconsin

voters as possible in the limited time before upcoming elections.  Lewis Decl. ¶ 7.

183.     In addition, if these elections are not postponed, many voters will not vote because

they are either unfamiliar or unwilling to go to the polls on election day and risk COVID-19

infection.   A significant number of African-American voters have historically participated in

same-day registration at the polls on election day, and will be unable to do this year due to the

COVID-19 pandemic.  Lewis Decl. ¶ 8; Lang Decl. ¶ 8.

184.     In addition, many low-income and African-American voters are on the wrong side

of what is called the digital divide, in that they are unfamiliar with or lack internet access.  These

voters will not be able to register to vote online and will not be inclined to request a mail-in

absentee ballot.  Lewis Decl. ¶ 9; Lang Decl. ¶ 9.

185.     Many would-be voters with whom STTP has had contact will not be inclined to

register online and vote absentee, compelling STTP to divert and expend substantially more

resources for each voter in educating them how to exercise the franchise in the upcoming election. Lewis Decl. ¶ 9.

186.    Unless the Wisconsin Election Commission postpones the April 7 election to allow such voters to register and cast their ballots over a reasonable period of time past April 7, many African-American voters will be disenfranchised.  Lewis Decl. ¶ 9; Lang Decl. ¶ 9.

187.    The COVID-19 virus has struck hard in the African-American community, and extending the deadline to vote in the Spring General Election will enable thousands of voters to participate in the election who otherwise will be disenfranchised.

188.    The ability to request an absentee ballot is mainly Internet-based.  During the COVID-19 crisis, it is almost entirely internet-based.  If Milwaukee conducted an election where ballot access was regulated by who accessed their ballot electronically, the "digital divide" will inflict its greatest impact on voters residing in low-income and impoverished communities.  And in Milwaukee, communities in poverty are disproportionately represented by African-American and Hispanic residents.  Thus, the 44% estimated turnout reduction which is forecast if no in-person voting occurs on April 7 will disproportionately include such African-American and Hispanic residents.  Albrecht Decl. ¶ 4.

189.    Same-day registrants at Milwaukee's polling locations constitute approximately 20% of total turnout in any given Spring Election.  Due to a wide range of factors, those same-day registrants are disproportionately African-American and Hispanic residents. The cancellation of same day registration will again cause a turnout reduction that disproportionately impacts African-American and Hispanic residents.  Albrecht Decl. ¶ 12.

190.    The majority of the voters Voces work with are either new or infrequent voters who require significant attention and assistance to ensure they exercise their right to vote.  In the event

the Wisconsin spring elections, currently scheduled to be held on April 7, 2020, are not postponed, many Latino voters with whom Voces works will be unable to vote in-person in the election, due to fear of contracting the COVID-19 virus.  Neumann-Ortiz Decl. ¶ 5.

191.    In addition, if these elections are not postponed, many voters will not vote because they are either unfamiliar or unwilling to go to the polls on Election Day and risk COVID-19 infection.  A significant number of Latino voters have historically participated in same-day registration at the polls on Election Day, and will be unable to do this year due to the COVID-19 pandemic.  Neumann-Ortiz Decl. ¶ 6.

192.    In addition, many Latino voters are on the wrong side of what is called the digital divide, in that they are unfamiliar with or lack internet access.  Many of these voters with whom Voces has contact are also entirely unfamiliar with the mail-in absentee balloting process and the online process to register to vote.  Many of the Latino voters with whom Voces works are predominantly Spanish-speaking and have difficulty navigating the Wisconsin Elections Commission website and are unfamiliar with the myVoteWI site to request a mail-in absentee ballot.  Such voters will both be unable to register to vote online and even amongst those who are registered, they will not be inclined to request a mail-in absentee ballot.  Unless the Wisconsin Election Commission postpones the April 7 election to allow such voters to register and cast their ballots over a reasonable period of time past April 7, thousands of Latino voters in Milwaukee and across the state will be functionally disenfranchised.  Neumann-Ortiz Decl. ¶ 7.

**F.    The disproportionate impact and unconstitutionally heavy burden on elderly voters of proceeding with the April 7 election.**

193.    On March 25, Bryan Boland, a Canvass Lead for SEIUW, called people aged 60 and older living in the western part of Wisconsin (in Assembly Districts 42, 50 and 51), to encourage them to request an absentee ballot on-line. Boland spoke with forty-three people.

Approximately half of those he spoke with told him that they are still planning on voting in-person, have always voted in-person, and would not vote absentee by mail.  Declaration of Bryan Boland ("Boland Decl.") ¶ 3.

194.    One person told Boland that they believe that the polls would only be open for in-person voting if it is safe to go in person, while others expressed a recognition that if the coronavirus risks continue to worsen, they might not be able to go in person to vote, but they did not feel comfortable voting absentee by mail.  *Id.* ¶ 4.

195.    An 87 year-old named Marilyn was terrified about voting in person and told Boland she had already determined that she would not go to her polling location to vote in person. She reported that she had tried twice to request a ballot on-line but was unable to do so. She was unsure whether the problems she had were user-error or problems with the website, her internet or other technical problems. She told Boland that she had not missed voting in an election in many years, but regretfully would miss voting if her only choice to vote was going in person. She expressed concern about both her personal risk as well as the risk of unwittingly exposing her neighbors to coronavirus, especially one neighbor who already has a respiratory condition. She told Boland she lives alone. Although she said her son might be able to help her with the computer, in order to request a ballot to vote by mail, she also said she was scared that this would put her at risk and could violate the "Safer at home" Executive Order.  *Id.* ¶ 5.

196.    Boland's discussion with Donna, an older lady, was a typical call. She told Boland that she did not have a computer or smart phone, so requesting a ballot on-line was not available to her.  *Id.* ¶ 6.

197.    Jane, age 63, who lives in Monroe, told Boland that she had just been laid off from two of her three jobs, and did not have a smart phone or digital camera to take a photo of her ID

as needed to request a ballot on-line. The only (burdensome) option Boland and Jane could think of is that she might be able to go to her third job, considered "essential," and ask a co-worker to take a photo of her ID and email it to her so she could request a ballot on-line.  *Id.* ¶ 63.

198.    Cynthia, also elderly, lives in Lodi. She told Boland she had no way to get her ID uploaded onto her computer. She cheerfully said she would go to her library for help; Boland unfortunately had to inform her that the library was closed due to the coronavirus.  *Id.* ¶ 8.

199.    Jolie Lizotte, a Regional Field Director doing canvassing for SEIU Wisconsin State Council, has received similar reactions from voters with whom she has spoken.

200.    On Tuesday, March 17, SEIUWI halted canvassing in the field (knocking on doors) and shifted to a phone bank model, due to the coronavirus.  Declaration of Jolie Lizotte ("Lizotte Decl.") ¶ 3.

201.    In general Lizotte finds that every day she does canvassing work, she encounters a significant number of people, especially those in older age brackets, who strongly prefer to vote in person, who do not want to vote in a different way, and who do not feel comfortable with or capable of navigating the absentee ballot process. In some cases, these are people who do not have a smartphone or computer and who, as a result, do not have access to or the ability to request and submit ballots online.  *Id.* ¶ 4.

202.    On March 24 and 25, 2020, Lizotte and her SEIUWI colleagues focused on calling likely voters to encourage them to obtain absentee ballots for voting in the April 7, 2020 election. They called an older population, 60 and older.  *Id.* ¶ 5.

203.    On March 25, Lizotte called people 60 and older living in the western part of Wisconsin, aiming to encourage them to request an absentee ballot on-line. Lizotte spoke with eleven (11) people. Of those eleven, three told her that they had no computer or smart phone to

use to request a ballot. Five said they strongly preferred to vote in person, and several of those people gave Lizotte the impression that they always vote in person and were not willing to change that practice.  *Id.* ¶ 6.

204.    On March 25, Lizotte spoke with an 82 year-old named Jerome. He told Lizotte that he will always vote at the polls on election day. He said he would not do absentee voting. Lizotte also spoke with 75 year-old William, who lives in Mauston. He indicated he has no computer or smart phone. He told Lizotte he was very worried about the coronavirus and the risk of becoming sick by leaving home. He did not know how he could get a ballot. He said he wanted to get ballots for himself and his wife, and that both wanted to vote.  *Id.* ¶¶ 7, 8.

205.    On March 24, Lizotte spoke with 22 voters in the eastern portion of the state; about 80% of them were in the Milwaukee area, all 60 and older. Five said they had no access to a computer or smart phone, so Lizotte was unable to help them with requesting an absentee ballot online.  *Id.* ¶ 9.

206.    Although it is Lizotte's understanding that online registration has been extended pursuant to a court order, Lizotte's experience has been that there is not widespread knowledge of that extension. Most voters Lizotte mentions it to have not heard of the extension.

## Claims for Relief

### Count I:  Violation of Section 2 of the Voting Rights Act of 1965

207.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

208.    Section 2 of the Voting Rights Act provides, in relevant part, that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race, color, or in contravention of the guarantees

set forth in section 4(f)(2) [42 U.S.C. § 1973b(f)(2)], as provided in subsection (b)." 42 U.S.C. § 1973(a). 29. Private litigants may enforce their rights under 42 U.S.C. § 1973 by bringing a suit under 42 U.S.C. § 1983.

209.   The challenged voting procedures, if employed during the current election to preclude the opportunity for in-person voting or relaxed standards of schedules and timelines for voters to request and submit their mail-in absentee ballots imposes requirements for voting that, if not declared illegal and enjoined, will continue adversely and disproportionately to affect African-American and Latino voters.

210.   Under the current scheme, African-American and Latino voters will have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice because they are less likely to be able to vote via mail in absentee ballot under the current election schedule and requirements, when compared with other members of the electorate, and they will be subject to greater burdens and more severe hurdles in attempting to cast their ballots than other members of the electorate.

211.   African-American and Latino voters will have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice because they are less likely to be able to submit their mail in absentee ballots under the current statutory schedule, when compared with other members of the electorate, and they will be subject to greater burdens and more severe hurdles in attempting to request and submit such mail-in absentee ballots obtain than other members of the electorate.

212.   African-Americans and Latinos have suffered from, and continue to suffer from, discrimination in the electoral and political processes in the State of Wisconsin and its political subdivisions, including through the use of practices or procedures that exacerbate discrimination

against African-American and Latino voters, the use of racial appeals in campaigns, and/or the levels at which African-Americans and Latinos have been elected to public office. Racially polarized voting in Wisconsin has only exacerbated the adverse affects of such discrimination against African-American and Latino voters.

213.    By virtually every measure, African-Americans and Latinos in Wisconsin have suffered from, and continue to suffer from, the effects of discrimination in areas such as employment, housing, and education that affect their ability to participate in the political process and result in their disproportionately being able to access the mail-in absentee voting process. One consequence of the historic discrimination against African-Americans and Latinos in Wisconsin is that they fall on the wrong side of the "digital divide" and lack the requisite resources and information to participate equally in the current mail-in absentee voting system.

214.    Defendants have failed and continue to fail to implement any changes to the election process to ensure a free and fair election that protects the voting rights of minority voters in light of the COVID-19 pandemic.

215.    The State's asserted justifications or state interest in maintaining the current electoral scheme – including the need to fill vacant local offices – is not supported by credible evidence. Nor are the statutory scheme's extreme, unduly harsh and restrictive, and arbitrarily and unevenly administered provisions necessary or appropriately tailored (or even obviously related) to the accomplishment of any legitimate state interest in administering a free and fair and safe election.

216.    When viewed in light of the circumstances described herein, the current election schedule and requirement for the Spring Election and Presidential Preference Primary is likely to disproportionately deny and abridge the rights of African-American and Latino voters in

Wisconsin to participate in the political process because they will be less likely than other members of the electorate to request and submit mail-in absentee ballots.

217.    The current election schedule and requirements for mail-in absentee voting, under the circumstances of the current COVID-19 crisis, violates Section 2 of the Voting Rights Act of 1965, and Defendants are liable to Plaintiffs for this violation, jointly and severally.

218.    If the current statutory scheme is not enjoined, Plaintiff Lewis and other minority citizens of Wisconsin will continue to have their rights to vote denied and abridged. The Organizational Plaintiffs and their constituent members, will face similar denial and abridgement of their rights to vote. And these organizations will be forced to continue to divert and augment substantial resources to assisting voters countering the effects of a discriminatory and invalid statutory scheme for the present election and to devoting additional resources to accomplishing their missions because the current statutory scheme makes it more difficult for African-American and Latino citizens to vote.

219.    In light of these violations, Plaintiffs are entitled to and request the relief specified herein.

### Count II:  First and Fourteenth Amendments
### U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202
### Undue Burden on the Right to Vote

220.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

221.    Under the Fourteenth Amendment, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV.

222.    Governor Evers's Emergency Order #12, issued March 24, 2020, does not make an exception for poll workers or for voters casting their votes in person at a polling place. Consequently, Emergency Order #12. bans the municipal clerks in Wisconsin municipalities, their

staff, and poll workers in those municipalities from conducting in-person absentee balloting, and an in-person election on April 7, 2020—all of which requires those individuals not only to be much closer to voters than the six feet of distance all Wisconsinites have been ordered to maintain between themselves, but to violate Emergency Order #12.

223.    At the same time, the Commission has instructed municipal clerks to continue to offer in-person registration and early absentee voting, and to plan to hold in-person elections on April 7. Wis. Elections Comm'n, Memorandum, Emergency Order #12 Does Not Eliminate In-Person Absentee Voting (March 24, 2020) https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Clerk%20comm%20re%20Emergency%20Order%2012%203.24.20.pdf (last accessed March 26, 2020).

224.    The Commission's directives to Wisconsin municipalities during this pandemic have denied and are denying Plaintiff Lewis and the Organizational Plaintiffs' members the equal protection of the law under the Governor's emergency declaration and the Department of Health Services's emergency orders.

225.    To conduct in-person voting as the Commission directs will subject Wisconsin voters to choosing whether to exercise their right to vote by undertaking actions that are unsafe and potentially detrimental to their own health and the health of their families, friends, and the community in direct contravention of state and national orders intended to protect their health, or to forego their right to vote.

226.    The Commission has neither a compelling interest, important interest, or even a legitimate interest for requiring an in-person election to be held on April 7 under the circumstances, especially in light of the challenges caused by such a request.

227.    Defendants have failed and continue to fail to implement any changes to the election process to protect the public health, safety, and welfare from the continued spread of COVID-19.

228.    Defendants have failed and continue to fail to implement any changes to the election process to ensure a free and fair election that protects the voting rights of all its constituents in light of the COVID-19 pandemic.

229.    Because of these failures, the municipalities are not able to adequately meet their obligation to protect the public health, safety, and welfare of Plaintiff Lewis or the Organizational Plaintiffs' members, or administer a free and fair election that protects their voting rights.

230.    Compliance with the Commission's directives concerning the April 7, 2020 election places Plaintiff Lewis and the Organizational Plaintiffs' members at an unreasonable risk of harm through exposure to COVID-19, especially given the lack of sanitation and cleaning supplies available for polling places.

231.    The Commission's directives will subject Plaintiff Lewis and the Organizational Plaintiffs' members to unequal treatment under the law, in violation of the Fourteenth Amendment to the Constitution, based on the actual circumstances in existence at the time of filing, and not based on any hypothetical state of facts.

232.    The Commission has violated and will continue to violate the Fourteenth Amendment equal protection rights of Plaintiff Lewis and the Organizational Plaintiffs' members if the April 7, 2020 election is not postponed.

233.    Under the *Anderson-Burdick* balancing test, a court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against "'the precise interests

put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

234.   Unless Plaintiffs are granted the relief requested herein thousands of Wisconsin voters' right to vote, including Plaintiff Lewis and the Organizational Plaintiffs' members and constituents, will be severely burdened (if not wholly eliminated) in the April 7, 2020 primary election.

235.   Because of COVID-19 and the unprecedented social distancing measures that Wisconsin citizens have to take to slow the spread of the virus and to ensure their safety as well as the safety of their friends, families, and neighbors, many Wisconsin voters who would have registered to vote in-person between the March 18, 2020 electronic and by-mail registration cut-off and/or on Election Day will no long be able to register to vote. Similarly, Wisconsin voters are less able and, in some cases, wholly unable to copy and scan documents required to complete their electronic and by-mail registration and absentee ballot applications. And, as absentee balloting becomes the only safe way to vote, Wisconsin voters are at a high risk of not receiving their ballots with sufficient time to mail it into the municipal clerk's office so that it is received prior to the Election Day Receipt Deadline. This too will lead to disenfranchisement.

236.   The State cannot provide any colorable justification as to why the current court-ordered March 30, 2020 deadline to request an absentee ballot online, the April 2, 2020 deadline to request an absentee ballot by mail, or the April 3, 2020 deadline to request an absentee ballot in person at the municipal clerk's office should not be further extended, or why ballots received after the Election Day Receipt Deadline should not be counted in light of this unprecedented crisis.

237.     The State also cannot justify why the April 7 in-person election should not be postponed to allow for the continuation of the online application for and submission of absentee ballots for a reasonable period of time to allow those voters who failed to do prior to the April 7 deadline.   Moreover, assuming that public health experts confirm that the pandemic has flattened out and subsided such that in-person voting can be conducted in a safe manner, that a new date be scheduled for regular in-person voting in the states 6,690 voting wards.

238.     In short, the challenged laws as applied-to and during the extraordinary conditions of the COVID-19 pandemic, are an unconstitutional infringement upon the voting rights of Plaintiffs, un-supported by a state interest sufficient to justify the resulting burdens on the right to vote, and thus, these laws violate the First and Fourteenth Amendments.

**Count III:  Due Process**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
**Denial of Procedural Due Process**

239.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

240.     The Due Process Clause of the United States Constitution prohibits the states from depriving "any person of . . . liberty . . . without due process of law." U.S. CONST. amend. XIV, § 1. Which protections are due in a given case requires a careful analysis of the importance of the rights and the other interests at stake. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976); *Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1192 (9th Cir. 2015). Courts must first consider "the nature of the interest that will be affected" by the government's action as well as the "degree of potential deprivation that may be created" by existing procedures. *Nozzi*, 806 F. 3d at 1192–93. Second, "courts must consider the 'fairness and reliability' of the existing procedures and the 'probable value, if any, of additional procedural safeguards.'" *Id.* at 1193 (quoting *Mathews*, 424 U.S. at 343). Finally, courts must consider "the public interest, which 'includes the administrative

burden and other societal costs that would be associated with' additional or substitute procedures. *Id.* (quoting *Mathews*, 424 U.S. at 347). Overall, "due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334, (quotation and citation omitted).

241.     Wisconsin's procedures for registering to vote and absentee voting must comport with due process. *See Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). "Such due process is not provided when the election procedures [for voting by mail]" do not adequately protect the right to vote or ensure that an "individual is not continually and repeatedly denied so fundamental a right." *Id.*; *see also Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted.").

242.     "When an election process 'reache[s] the point of patent and fundamental unfairness,' there is a due process violation." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183 (11th Cir. 2008) (quoting *Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir. 1995)).

243.     Under the current circumstances, there is little question that Wisconsin's election process is fundamentally unfair. The nature of the interest at stake in this case—the right to vote and to have that vote count—is the most precious liberty interest of all because it is preservative of all other basic civil and political rights.

244.     But the challenged laws threaten to deprive Wisconsin voters of this right in the election currently scheduled for April 7. Given the unprecedented situation at hand, Wisconsin must establish adequate procedures to ensure that voters have a reliable, fair, effective and safe method to cast their ballots in the April 7, 2020 election. Because the challenged laws, as applied under the extraordinary conditions of the COVID-19 pandemic, are markedly inadequate in all of these

respects, and substitute procedures are readily available to protect voters' rights with minimal burden to the State, the challenged laws violate Wisconsin voters' procedural due process rights.

**Count IV: Declaratory Judgment**
**28 U.S.C. §§ 2201, 2202**
**Authority of Defendants to Act**

245.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

246.    Defendants have stated publicly that they do not have the authority to change the statutory deadlines for voter registration or postpone the election.

247.    Notwithstanding that position, however, the Commission has also, on its own authority, ordered that "Municipalities shall not use the Special Voting Deputy process [established by Wis. Stat. § 6.875] to serve residents in care facilities for these two elections and instead shall transmit absentee ballots to those voters by mail." Wis. Elections Comm'n, Guidance Regarding Election Procedures and COVID-19 Public Health Emergency ("March 12, 2020 WEC Guidance Regarding Election Procedures"), 1 (March 12, 2020).

248.    Wisconsin Statutes section 6.875 provides for absentee voting in certain residential care facilities and retirement homes through the use of special voting deputies, who are tasked with visiting the facilities to supervise the in-person absentee voting procedure.

249.    On March 12, 2020, Governor Evers had issued Executive Order #72, declaring a public health emergency and designating the Department of Health Services as the lead agency to respond to said emergency, but the Department had not issued any specific guidance relevant to COVID-19 and long-term care facilities and assisted living facilities.1 Wis. Dep't of Health Servs., DPH Communicable Diseases Memos, https://www.dhs.wisconsin.gov/dph/memos/communicable-diseases/index.htm (last visited March 26, 2020).

250.   Accordingly, at the time that the Commission ordered that municipalities "shall not" use Special Voting Deputies, March 12, 2020 WEC Guidance Regarding Election Procedures at 1, it was acting upon its own authority, and not pursuant to any "require[d] court intervention, an act of the Legislature, or an order of the Governor." March 18, 2020 WEC COVID-19 Planning Update.

251.   Although Wisconsin Statutes section 6.875 sets out specific procedures by which in-person absentee voting is to occur in residential care facilities and retirement homes, the Commission determined that it was within its authority to eliminate in-person absentee voting as an option for residents of such facilities based on information from the Department of Health Services concerning vulnerable populations and exposure to COVID-19. March 12, 2020 WEC Guidance Regarding Election Procedures at 1.

252.   The Commission's decision to abandon strict adherence to Wisconsin elections law is not unprecedented; earlier this year, on February 12, 2020, the Commission determined that although technically required by Wisconsin elections law, municipal clerks would not be required to send two separate primary ballots—both of which would provide an opportunity for the elector.

253.   On March 13, 2020, the Department issued a memo containing recommendations for preventing COVID-19 in long- term care facilities and assisted living facilities. Wis. Dep't Health Servs., Important Recommendations for Prevention of COVID-19 in Long-Term Care Facilities and Assisted Living Facilities (March 13, 2020). However, at the time of the Commission's decision to suspend the use of Special Voting Deputies, that memo had not yet been publicly issued. Furthermore, that memo contained recommendations for limitations on access to such facilities, rather than explicit orders.

254.    Despite having established precedent for changing election laws when situations dictate it is appropriate to do so, when asked to modify in-person absentee voting procedures for all other voters in light of COVID-19, the Commission has declined, instead reminding clerks that "directives to limit the number of people gathering in one location do not translate into the elimination of in-person absentee voting." March 18, 2020 WEC In-Person Absentee Voting.

255.    The Commission did not hesitate to suspend the customary operation of municipal clerks under Wisconsin Statutes section 6.875 as a result of information from the Department of Health Services that elderly populations are at increased risk of serious complications from COVID-19; however, it has balked at taking similar precautions to protect the entire voting population—which includes at-risk groups such as the elderly and those with serious underlying medical conditions.

256.    Additionally, the Commission's insistence on conducting in-person absentee voting and in-person election day voting likewise ignores the fact that densely populated areas of the state, including Brown County, are already seeing community spread of COVID-19.

257.    Similarly, the Governor and Secretary-designee Palm issued Emergency Order #12, Safer at Home Order, directing all individuals present within the State of Wisconsin to stay at home or at their place of residence, which conflicts with the prior orders in that there are no exemptions for voting. Pines Decl., Ex. K (Wis. Dep't Health Servs., Emergency Order #12 Safer at Home Order (March 24, 2020)).

258.    Requiring in-person appearance at an in-person absentee voting location or at a polling place on election day forces electors to make a burdensome and unacceptable choice between protecting their health and the health of their friends, families, and communities, and

exercising their most fundamental right as Americans: participating in democratic elections. In addition, if they do show up at the polls to vote, they do so potentially against an emergency order.

259.     Plaintiffs therefore seek a declaration from this Court that Defendants not only have the authority to suspend the application of Wisconsin's election laws given the extraordinary circumstances, but also have a duty to do so in order to simultaneously protect both the right to vote and the health of Plaintiff Lewis, the Organizational Plaintiffs' members, and every person living in the State of Wisconsin.

260.     Plaintiffs request this extraordinary remedy for the April 7, 2020 election only, given the unprecedented emergency caused by COVID-19 and the unanimous opinion of those in the health care community that the pandemic will not be over before election day, but will in fact continue to get worse up to and even after that time.

## **Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment as follows:

A.     Declaring that in the context of the current COVID-19 crisis, proceeding with the in-person election on April 7, 2020, is an undue burden on the right to vote of Plaintiff Lewis and the Organizational Plaintiffs' members and constituents, and directing Defendants to reschedule in-person voting so that it takes place on a date no sooner than the expiration of the time period set forth in Emergency Order #12, as it may be extended by Governor Evers;

B.     Declaring that in the context of the current Coronavirus crisis, Wisconsin's current electronic and by-mail registration deadline, Wis. Stat. § 6.28(1); requirements that copies of proof of residence and voter ID accompany electronic and by-mail voter registration and absentee applications, *id.* § 6.34, 6.86, respectively; and the requirement that polling places receive absentee ballots by 8:00 p.m. on election day to be counted, *id.* § 6.87, are unconstitutional in violation of the First and Fourteenth Amendments;

65

C.      Declaring that in the context of the current COVID-19 crisis, the Defendants have the authority—and duty—to suspend Wisconsin's election laws to permit changes to procedures that will more sufficiently protect municipal employees, poll workers, prospective voters, and the community from further spread of COVID-19;

D.      Enjoining the enforcement of Wis. Stat. § 6.34's proof of residency requirement for voter registrations until the COVID-19 crisis is over, and no sooner than the expiration of the duration of Emergency Order #12, subject to further extension;

E.      Enjoining the enforcement of Wis. Stat. §§ 6.86 - 87's photo identification requirements until the COVID-19 crisis is over, and no sooner than the expiration of the duration of Emergency Order #12, subject to further extension;

F.      Enjoining the enforcement of Wis. Stat. 6.86(4)(b) witness requirement until the COVID-19 crisis is over, and no sooner than the expiration of the duration of Emergency Order #12, subject to further extension;

G.      Ordering the Commission to supply envelopes and printed ballots to municipalities in sufficient numbers such that every registered voter who timely requests an absentee ballot by mail receives the mailed ballot in advance of the rescheduled election either pursuant to statute or as may be ordered by the Court;

H.      Enjoining Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting ballots that are postmarked on or before Election Day and arrive at the municipal clerk's office by June 2, 2020;

I.      Enjoining Defendants from enforcing the requirement that municipalities allow in-person voter registration and/or in-person absentee voting until after Emergency Order #12,

as it may be extended, has expired;

     J.     Ordering the Commission to permit municipal clerks to mail election ballots to all registered voters and to postpone in-person election in polling places on April 7, 2020, and reschedule it at such time within a reasonable period that the public health crisis is subsided, and no sooner than the expiration of the duration of Emergency Order #12, subject to further extension;

     K.     Ordering Defendants to extend the deadline for registration electronically or by mail to May 1, 2020;

     L.     Ordering Defendants to establish Tuesday, June 2, 2020 as the deadline by which municipal clerks must have counted all returned mailed absentee ballots;

     M.     Awarding Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and as otherwise permitted by law; and

     N.     Granting such other relief as the Court deems just and proper.

DATE: March 26, 2020          Respectfully submitted,

                           RATHJE WOODWARD LLC

                           */s/ Douglas M. Poland*
                           Douglas M. Poland
                           State Bar No. 1055189
                           David P. Hollander
                           State Bar No. 1107233

                           Mailing Address:
                           10 E Doty Street
                           Suite 507
                           Madison, WI 53703
                           (608) 960-7430 (telephone)
                           (608) 960-7460 (facsimile)
                           dpoland@rathjewoodward.com
                           dhollander@rathjewoodward.com

HAWKS QUINDEL, S.C.

*/s/ Richard Saks*
Richard Saks, SBN 1022048

Mailing Address:
222 E. Erie St.
Suite 210
Milwaukee, WI 53201
(414) 271-8650 (telephone)
(414) 331-4405 (cell)
(414) 271-8442
rsaks@hq-law.com

*Counsel for Plaintiffs Greg Lewis, Souls to the Polls, Voces de la Frontera, Black Leaders Organizing for Communities, American Federation of Teachers, Local 212, AFL-CIO, and League of Women Voters of Wisconsin*

PINES BACH LLP

*/s/ Lester A. Pines*
Lester A. Pines, SBN 1016543
Tamara B. Packard, SBN 1023111

Mailing Address:
122 West Washington Ave.
Suite 900
Madison, WI 53703
(608) 251-0101 (telephone)
(608) 251-2883 (facsimile)
lpines@pinesbach.com
tpackard@pinesbach.com

*Counsel for Plaintiff SEIU Wisconsin State Council*