# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

DEMOCRATIC NATIONAL COMMITTEE
and DEMOCRATIC PARTY OF WISCONSIN,

        Plaintiffs,

        v.                                     Case No. 20-cv-249-wmc

MARGE BOSTELMANN, JULIE M. GLANCEY, ANN S.
JACOBS, DEAN KNUDSON, ROBERT F. SPINDELL, JR.
and MARK L. THOMSEN,

        Defendants,

and

REPUBLICAN NATIONAL COMMITTEE
and REPUBLICAN PARTY OF WISCONSIN,

        Intervening Defendants.

---

SYLVIA GEAR, CLAIRE WHELAN, WISCONSIN
ALLIANCE FOR RETIRED AMERICANS, LEAGUE
OF WOMEN VOTERS OF WISCONSIN, KATHERINE
KOHLBECK, DIANE FERGOT, GARY FERGOT,
BONIBET BAHR OLSAN, SHEILA JOZWIK, and
GREGG JOZWIK,

        Plaintiffs,

        v.                                     Case No. 20-cv-278-wmc

MARGE BOSTELMANN, JULIE M. GLANCEY, ANN S.
JACOBS, DEAN KNUDSON, ROBERT F. SPINDELL, JR.,
MARK L. THOMSEN, and MEAGAN WOLFE,

        Defendants.

---

REVEREND GREG LEWIS, SOULS TO THE
POLLS, VOCES DE LA FRONTERA, BLACK LEADERS

ORGANIZING FOR COMMUNITIES, AMERICAN
FEDERATION OF TEACHERS LOCAL, 212, AFL-CIO,
SEIU WISCONSIN STATE COUNCIL, and LEAGUE
OF WOMEN VOTERS OF WISCONSIN,

       Plaintiffs,

      v.                                    Case No. 20-cv-284-wmc

MARGE BOSTELMANN, JULIE M. GLANCEY, ANN S.
JACOBS, DEAN KNUDSON, ROBERT F. SPINDELL, JR.,
MARK L. THOMSEN, and MEAGAN WOLFE,

       Defendants.

---

### *GEAR, ET AL. V. BOSTELMANN, ET AL., CASE NO.* 20-CV-278, PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

      Plaintiffs Katherine Kohlbeck, Diane Fergot, Gary Fergot, Bonibet Bahr Olsan, Sheila Jozwik, Gregg Jozwik, Claire Whelan, Sylvia Gear, League of Women Voters of Wisconsin ("LWVWI"), and Wisconsin Alliance for Retired Americans ("Wisconsin Alliance") (collectively, "Plaintiffs") seek declaratory and injunctive relief as follows:

### NATURE OF ACTION

      1.     The COVID-19 pandemic presents an unprecedented challenge to our nation, threatening millions of Americans' lives and livelihoods and severely straining health care systems, the economy, and all levels and branches of government.  It is wreaking havoc across all sectors and causing massive disruptions in election administration during this presidential election year.

      2.     COVID-19's high transmission rate and lethality pose a severe risk to in-person voters, particularly those in at-risk groups identified by the Centers for Disease Control and Prevention ("CDC"). The pandemic has already resulted in massive withdrawals by volunteer poll

workers who justifiably fear contracting the disease and the widespread closure of voting sites throughout Wisconsin. In the April 7, 2020 election, only five of the usual 180 polling places in Milwaukee were open.[1] In Green Bay, just two of the usual 31 were operational.[2]

3.      The threat of contracting COVID-19, particularly in confined spaces like polling sites and the long lines of voters who waited for their turn to access them on April 7, along with the precipitous reduction in election administration resources for in-person voting both on and before Election Day, have forced a seismic shift towards mail-in absentee voting in Wisconsin. According to the Wisconsin Elections Commission's ("WEC" or "the Commission") recently-released report on absentee voting in the April 7, 2020 election ("the Post-Election Absentee Voting Report"), mail-in absentee ballots have been cast by 4.8 to 8.1 percent of voters in spring and fall general elections going back to the 2016 fall general election, but in the April 7, 2020 election, they comprised a stunning 61.8 percent of votes cast.[3] In that election, voters submitted an unprecedented total of 1,239,611 absentee ballot requests to municipal clerks, clerks issued 1,282,097 absentee ballots (some of them replacement ballots), and voters returned 1,157,599 of those ballots, or 73.2 percent of the total turnout in the election, 1,555,263.[4] Only a fraction of these were in-person absentee ballots, as 964,433 or 83.3 percent of the 1,157,599 absentee ballots

---

[1] Alison Dirr and Mary Spicuzza, *What we know so far about why Milwaukee only had 5 voting sites for Tuesday's election while Madison had 66*, MILWAUKEE JOURNAL SENTINEL (Apr. 9, 2020), https://www.jsonline.com/story/news/politics/elections/2020/04/09/wisconsin-election-milwaukee-had-5-voting-sites-while-madison-had-66/2970587001/.
[2] *Id*.
[3] *See* Wisconsin Elections Commission, April 7, 2020 Absentee Voting Report ("Post-Election Absentee Voting Report"), at 6 (Table 4) (May 15, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-05/April%202020%20Absentee%20Voting%20Report.pdf.
[4] Absentee Ballot Report - April 7, 2020 Spring Election and Presidential Preference Primary (updated Apr. 21, 2020), https://elections.wi.gov/node/6862; *see supra* note 3, Post-Election Absentee Voting Report, at 4 (Table 2), 5 (Table 3).

were mail-in absentee ballots; and as noted, this was nearly 62 percent of the total turnout.[5] Based on these figures, 42,486 of the mail-in absentee ballots were replacement ballots, many chasing previously-requested ballots that were delayed or lost in the mail, and 124,498 mail-in absentee ballots were ultimately never returned.[6]

4.      Notwithstanding municipal clerks' heroic efforts to prepare and mail out an unprecedented volume of absentee ballots, voters in the April 7th election faced a systemic and catastrophic failure to timely prepare and deliver absentee ballots by mail. The total number of voters disenfranchised in this way is unknown, but as recounted by Defendants in their Post-Election Absentee Voting Report, at least several thousand voters never received their ballots in the mail. According to Defendants' own rolling absentee ballot reports, as of the morning of April 7, the last day to postmark a ballot for delivery or drop it off, it appears that 9,388 ballots had not yet been mailed out.[7] Some voters received their ballots too late to cast and deliver or postmark them by April 7th, while some voters never received them at all, even weeks later. Absent any fail-safe alternatives for these voters who diligently and timely requested absentee ballots, their remaining options were to play Russian roulette with their health at the polls or lose their right to vote.

5.      This debacle was fueled by the Legislature's and Governor's inaction, Defendants', municipal clerks', and the U.S. Postal Service's ("USPS") systemic administrative incapacity to keep pace with the demand for absentee ballots, flaws or weaknesses in Defendants' computer systems and database management, and the burdens of enforcing Wisconsin's myriad legal

---

[5] *See supra* note 3, Post-Election Absentee Voting Report, at 4 (Table 1).
[6] Absentee Ballot Report - April 7, 2020 Spring Election and Presidential Preference Primary (updated Apr. 21, 2020), https://elections.wi.gov/node/6862.
[7] Absentee Ballot Report - April 7, 2020 Spring Election and Presidential Preference Primary (updated Apr. 7, 2020 at 7:30 a.m.),  https://elections.wi.gov/node/6825.

requirements, such as the photo ID requirement for absentee voters. All of these factors made it extremely difficult to process and deliver so many ballots to voters. Wisconsin's election administration system, from the processing of absentee ballot requests to the printing of address labels to information technology glitches, buckled under the strain of the surge in absentee ballot requests compared with the 2016 presidential primary and spring election. As Defendants put it in their post-mortem report, "The most fundamental challenge faced by election officials was simply meeting the unprecedented demand."[8] That same report notes that:

> Absentee voting remains a largely manual, labor-intensive process administered by each individual jurisdiction across the state. While voters can request a ballot and upload a photo ID on their smart phone in just a few minutes, behind the scenes clerks must still manually verify the IDs, stuff and seal envelopes by hand, apply postage, carry boxes of envelopes to the post office, and physically check off each request. . . . When mail volume is up to ten times higher than anticipated, clerks must complete the same tasks without the benefit of having more staff, additional supplies or more hours to meet statutory deadlines.[9]

Given the complex and labor-intensive procedures for processing and mailing out absentee ballots, Wisconsin election offices are simply not adequately staffed or funded to cope with an unprecedented shift to mail-in absentee voting by a vast majority of the electorate. Absent the kind of massive allocation of funding and resources to permit election officials to scale up staff and supplies to meet demand, which only Congress and/or the Wisconsin Legislature can provide, it is far more likely than not that Wisconsin election officials will remain unable to satisfy a much greater demand for mail-in absentee ballots in the fall.

6.     The April 7, 2020 election set the record for most mail-in ballots ever cast in any Wisconsin election ever.[10] The Commission reports that "[a]s the enormous quantity of absentee ballots began entering the mail system, voters began asking more questions and expressing

---

[8] *See supra* note 3, Post-Election Absentee Voting Report, at 13.
[9] *Id*. at 3.
[10] *Id*.

concerns about ballot deliveries. With nearly six times more ballots in circulation, the number of complaints and concerns increased by a similar amount. Some voters also reported not receiving their absentee ballots . . . ."[11] Voters who requested their mail-in absentee ballots weeks in advance of April 7th, such as Plaintiffs Katherine Kohlbeck, Diane Fergot, Gary Fergot, Bonibet Bahr Olsen, Sheila Jozwik, and Gregg Jozwik, never received their ballots in the mail—not before, on, or after Election Day. All of these Plaintiffs were in Wisconsin at the time of the election. Many voters like Plaintiffs Katherine Kohlbeck, Diane Fergot, and Gary Fergot contacted their municipal clerks' offices to inquire about their missing absentee ballots, all to no avail. One media report cited additional glitches:

> In Wauwatosa, one couple said they received envelopes with no ballots. In Milwaukee, three would-be voters said they received a form letter from Mayor Tom Barrett thanking them for requesting an absentee ballot — but not the ballot itself. . . . For some Wisconsin residents wintering in New Mexico and Florida, ballots simply never showed up. Nineteen Wisconsin citizens across eight cities — from New Auburn in the north to Bristol in the south — said they requested absentee ballots only to later be told the system had no record of their applications.[12]

7.      The Commission just recently released a report on absentee voting in the April 7, 2020 election, which recounts the multifarious and alarming failures to put absentee ballots in voters' hands. "Oshkosh and other Fox Valley communities all reported voters complaining that their ballots were arriving late or not arriving at all," but Defendants could not ascertain why this had occurred.[13] USPS notified WEC—the day after the election—that it had found three tubs of approximately 1,600 absentee ballots destined for Appleton and Oshkosh; no explanation was

---

[11] *Id*. at 12.

[12] Daphne Chen, Catharina Felke, Elizabeth Mulvey and Stephen Stirling, *'They should have done something': Broad failures fueled Wisconsin's absentee ballot crisis, investigation shows*, MILWAUKEE JOURNAL SENTINEL (Apr. 21, 2020), https://www.jsonline.com/story/news/2020/04/21/wisconsin-absentee-ballot-crisis-fueled-multiple-failures/5156825002/.

[13] *See supra* note 3, Post-Election Absentee Voting Report, at 16.

offered, and none has been discovered.[14] In the Village of Fox Point, USPS bizarrely and repeatedly returned absentee ballots to the clerk's office without explanation as to any defect precluding delivery, culminating in the return of 100 to 150 returned ballots *per day* in the week leading up to Election Day and 175 returned in a plastic mail bin on Election Day.[15] The WEC's report notes that "[r]esidents who did not receive an absentee ballot in the mail were advised to vote in person at their polling place on Election Day," but of course that was not a viable, safe option for at-risk voters.[16] Finally, in Milwaukee, as a result of human and computer error or delay, "2,693 requested ballots were never sent to City of Milwaukee residents. Of the affected voters, 52.5% voted in the election either on a replacement absentee ballot or at the polls on election day."[17] This shocking incident disenfranchised approximately 1,279 voters, who lost their right to vote through no fault of their own. They had timely requested their ballots more than two weeks before Election Day and, believing that the mail was delayed and that they had no other alternatives for ballot delivery, watched the days elapse and finally Election Day go by without receiving an absentee ballot in the mail. Absent any fail-safe, these voters, including Plaintiffs Katherine

---

[14] *Id*. at 16; Ashley Luthern, *Wisconsin Election Commission decides to dig deeper into unreturned absentee ballots from election*, MILWAUKEE JOURNAL SENTINEL (Apr. 18, 2020), https://www.jsonline.com/story/news/politics/2020/04/18/wisconsin-election-commission-look-into-unreturned-absentee-ballots/5159766002/; *see also* Nick Corasaniti & Stephanie Saul, *Inside Wisconsin's Election Mess: Thousands of Missing or Nullified Ballots*, N.Y. TIMES (Apr. 9, 2020), https://www.nytimes.com/2020/04/09/us/politics/wisconsin-election-absentee-coronavirus.html.

[15] *Returned To Sender: Postal Officials Investigating Wisconsin Absentee Ballots That Were Never Delivered*, WISCONSIN PUBLIC RADIO (Apr. 9, 2020) ("Returned to Sender"), https://www.wpr.org/returned-sender-postal-officials-investigating-wisconsin-absentee-ballots-were-never-delivered; *supra* note 2, Post-Election Absentee Voting Report, at 16-17. In response to these inexplicable failures, both of Wisconsin's U.S. Senators called upon the Inspector General of the U.S. Postal Service to investigate "absentee ballots not being delivered in a timely manner." *See* Letter from Senators Tammy Baldwin and Ron Johnson to U.S. Postal Service Inspector General (Apr. 9, 2020), https://www.wispolitics.com/wp-content/uploads/2020/04/200409LETTER.pdf.

[16] *See supra* note 3, Post-Election Absentee Voting Report, at 16-17.

[17] *Id*. at 19-20.

Kohlbeck, Diane Fergot, Gary Fergot, Bonibet Bahr Olsen, Sheila Jozwik, and Gregg Jozwik were denied the most fundamental right of U.S. citizenship.

8.       If this is the level of ballot delivery failures and disenfranchisement when a total of 1,555,263 of the state's voters—less than 50% of the registered voters—turn out to vote,[18] it is inevitable that the state's 1,850 municipal clerks' offices will not be able to handle nearly double that volume of absentee ballot requests in a timely fashion for the November 3, 2020 general election. Wisconsin had 3,397,693 registered voters as of May 1, 2020.[19] In 2016, 2,976,150 voters cast ballots for President.[20] If the same number of voters who voted in the 2016 Presidential election vote in the fall general election, and, as in the April 7 election, 61.8 percent of those ballots cast are mail-in absentee ballots, municipal clerks will need to process a *minimum* of 1,839,260 absentee ballot requests and successfully deliver the same number by mail. Assuming the 1 to 1.129 ratio of returned mail-in ballots to total issued mail-in absentee ballots holds from the April 7 election, then clerks will need to issue over 2 million mail-in absentee ballots this fall.[21] This stands in stark contrast to the 2016 fall general election, in which just 162,445 absentee ballots returned by mail and other means such as special voting deputies (but excluding in-person absentee voting), and which constitutes about one-sixth of the total such ballots cast in the April 7 election

---

[18] Wisconsin Elections Commission, Canvass Results for 2020 Spring Election and Presidential Preference Vote, https://elections.wi.gov/sites/elections.wi.gov/files/Canvass%20Results%20Summary_spring%20election%20all%20contests_4_7_2020.pdf; Wisconsin Elections Commission, May 1, 2020 Voter Registration Statistics, https://elections.wi.gov/node/6886.

[19] Wisconsin Elections Commission, May 1, 2020 Voter Registration Statistics, https://elections.wi.gov/node/6886.

[20] Wisconsin Elections Commission, Canvass Results for 2016 General Election, https://elections.wi.gov/sites/elections.wi.gov/files/Statewide%20Results%20All%20Offices%20%28post-Presidential%20recount%29.pdf

[21] This calculation assumes that all or almost all in-person absentee ballots are returned.

and just 8.83 percent of the projected total for the 2020 fall general election.[22] All but guaranteeing another unprecedented surge in absentee voting, this Wednesday Defendants voted to send absentee ballot request forms to approximately 2.7 million registered Wisconsin voters, excluding the approximately 528,000 who have already requested absentee ballots and the approximately 158,000 suspected of moving to a different municipality or state.[23]

9.      Further, many of these requests are submitted in the final days before the deadline, when municipal clerks' offices will be busy conducting in-person absentee voting and making other preparations for Election Day. The Commission notes in its report that: "Statewide, the volume of absentee requests received remained high in the week prior to April 7. Clerks received over 60,000 requests alone on the Friday before election day. Even if all these requests were mailed on Saturday, it is unknown how long those ballots took to reach voters."[24] With significant USPS delays, it is likely that a substantial portion did not arrive in time for voters to cast them. 80,593 requests were submitted on March 31, 2020, 66,482 on April 1, 79,921 on April 2, and 62,172 on April 3, which, by this Court's order, was the last day to request a *mail-in* absentee ballot. *See Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249, 2020 WL 1638374, at *22 (W.D. Wis. Apr. 2, 2020). The overwhelming majority of these 289,168 requests, which municipal clerks received on just those four days alone, were requests for mail-in absentee ballots,[25] which by law must be mailed out to voters within a day of receiving them. Wis. Stat. § 7.15(1)(cm).

---

[22] Wisconsin Elections Commission, Absentee Ballot Report (Nov. 8, 2016), https://elections.wi.gov/node/4397.

[23] Patrick Marley, *Wisconsin election officials agree to mail absentee ballot request forms to most voters*, MILWAUKEE JOURNAL SENTINEL (May 27, 2020), https://www.jsonline.com/story/news/politics/2020/05/27/wisconsin-officials-take-up-mailing-absentee-ballot-request-forms/5262753002/.

[24] *See supra* note 3, Post-Election Absentee Voting Report, at 17.

[25] *Id*.

9

10.    Absent radical funding and staffing increases, Wisconsin election officials at the state and local level will not be able to handle such an enormous increase in mail-in absentee ballot requests. Defendants seem to concur with this assessment: "If voting patterns from April hold true, the state could see more than 1.8 million requests for absentee ballots by mail. This kind of volume would present terrific challenges for Wisconsin election officials at all levels."[26] Even for the April 7th election, dozens of Milwaukee City Election Commission staffers had already worked seven days a week until 11:00 p.m. to process ballots.[27] Madison City Clerk Maribeth Witzel-Behl said there was "no way humanly possible" to keep up with the volume of requests, even though staffers were working 110 hours a week but still had a week's worth of backlogs by mid-March, and "that their computer system became so bogged down by the volume of applications that it only began working quickly after 10 p.m."[28] As the Commission noted in its post-mortem report,

> Nearly every community experienced unprecedented absentee request volume, and many hired temporary staff to cope with demand. Many small and medium size jurisdictions learned to use WisVote absentee batch processing tools for the first time, having never previously needed any automation assistance to manage their workload. Larger cities, while used to higher volumes, were forced to work around the clock and conduct much larger batch mailings then [sic] previously experienced. For all jurisdictions, the statutory requirement to mail ballots within 24 hours of receiving a request presented a significant challenge.[29]

11.    Defendants will argue that they have taken steps to address some of these problems, but, at bottom, they cannot guarantee that the labor-intensive tasks of processing over 2 million absentee ballot requests, entering data and printing labels for all those ballots, and then mailing them off will not once again cause the system to break down. Defendants also cannot guarantee that USPS will timely deliver ballots to absentee voters. Wisconsin's electoral system, as

---

[26] *Id*. at 12.
[27] *See supra* note 12, Chen et al.
[28] *Id*.
[29] *See supra* note 3, Post-Election Absentee Voting Report, at 13.

administered by Defendants, failed the test run. None of Defendants' proposals for new data entry procedures, tracking tools, and other measures can cure this shortfall in resources and staff. A presidential election is no time to leave voters without a fail-safe when Defendants' proposed measures prove insufficient to prevent another massive failure to put ballots in voters' hands.

12.     The lack of a fail-safe option for these voters also violates the First and Fourteenth Amendments to the U.S. Constitution as an undue burden on the right to vote. No legitimate state interest is advanced by the denial of the right to vote to these voters. The lack of a fail-safe option when ballots do not arrive in the mail forces voters to choose between their constitutionally-protected rights to bodily integrity and to vote in violation of the unconstitutional conditions doctrine and fails to provide a reasonable modification for voters with disabilities in violation of Title II of the Americans with Disabilities Act.

13.     Even if voters who are at risk of suffering severe complications or dying from COVID-19 and who live alone or without an adult U.S. citizen in their household manage to receive their absentee ballots, the witness requirement still severely burdens their right to vote. Plaintiffs Claire Whelan and Sylvia Gear will once again apply for a mail-in absentee ballot for the November general election. Because they live alone and are self-quarantining during the COVID-19 pandemic, given their advanced age and/or medical histories and in light of the CDC's recommendations, the extreme difficulties for these Plaintiffs to safely obtain a witness signature on their mail-in absentee ballot certificate envelopes remains a severe burden on their ability to vote.[30]

---

[30] There are over 675,000 single-member households in Wisconsin, and many other households that include only one adult. More than 250,000 of these single-member households are individuals over the age of 65. *See* U.S. Census Bureau, *2013-2017 American Community Survey 5-Year Estimates*, Table 2501, Occupancy Characteristics.

14.     By Wisconsin law, these absentee, mail-in ballots must be signed by the voter and also signed by a witness who is an adult U.S. citizen. Wis. Stat. § 6.87(4)(b)(1). This requirement poses a significant barrier to absentee, mail-in voting for any self-quarantining eligible voter who lives alone or who does not have an adult U.S. citizen in their household, particularly if they are elderly or have an underlying medical condition that puts them at higher risk from COVID-19. These voters are compelled to take unreasonable risks to satisfy the witness requirement to vote, when reasonable alternatives that equally satisfy the state's anti-fraud interest exist.

15.     Since in-person voting would pose a severe risk to the bodily integrity and lives of these individuals, that option, which must be preserved statewide, is simply not viable for voters who are at elevated risk from COVID-19. Taken together, the risks inherent in in-person voting and in securing a witness signature for an absentee mail-in ballot prevent certain eligible Wisconsin voters who live alone or without an adult U.S. citizen in the household from casting a ballot.

16.     Enforcing this statutory requirement, particularly as to voters who are at heightened risk from COVID-19, constitutes an undue burden on the right to vote not justified by any legitimate or important government interest, a violation of the First and Fourteenth Amendments to the U.S. Constitution. If no alternatives are offered, such as a reasonable efforts certification that the voter can sign in lieu of securing a witness signature or witnessing without a physical signature, the witness requirement will force voters to choose between engaging another person in an unreasonably risky exercise, in-person voting that threatens their voter's bodily integrity and health, or their disenfranchisement. This forces voters to choose between their constitutionally-protected right to bodily integrity and their right to vote in violation of the unconstitutional

12

conditions doctrine and fails to provide a reasonable modification for voters with disabilities in violation of Title II of the Americans with Disabilities Act.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this case arises under the United States Constitution and seeks equitable and other relief for the deprivation of constitutional rights under color of state law.

18.     This Court has jurisdiction to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

19.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

20.     This Court has personal jurisdiction over Defendant-Commissioners Dean Knudson, Julie M. Glancey, Mark L. Thomsen, Ann S. Jacobs, Marge Bostelmann, and Robert F. Spindell, Jr., the members of the Commission, and Meagan Wolfe, the Administrator of the Commission, who are sued in their official capacities.  Defendants Knudson, Glancey, Thomsen, Jacobs, Bostelmann, Spindell, Jr. and Wolfe are state officials who reside in Wisconsin and work in Madison, Wisconsin.

21.     Venue is appropriate in the Western District of Wisconsin, under 28 U.S.C. § 1391(b)(1), because Defendants are state officials working in Madison, Wisconsin.  A substantial part of the events giving rise to these claims occurred and continues to occur in this district, making venue also proper under 28 U.S.C. § 1391(b)(2).

## PARTIES

22.     Plaintiff Katherine Kohlbeck is 72 years old and a resident of Milwaukee, Wisconsin. She is a United States citizen and a registered Wisconsin voter. She has never lost her

right to vote by reason of a felony conviction or a court order. She wants to vote in the August primary election and the November general election. She lives alone and has been self-quarantined during the COVID-19 pandemic. On March 11th, she was diagnosed with breast cancer, and on May 12th, after a two-month delay due to the pandemic, she finally had her lumpectomy surgery. Typically, she votes in person on Election Day, but sometimes she votes early in person and she has voted by absentee ballot only on a few occasions, such as when she has gone on vacation. Because of her health condition and the uncertainty surrounding it, she attempted to vote by mail in the April 7, 2020 election. Her doctor told her not to risk getting COVID-19 and that she should absolutely not be in contact with people. She was told to stay home and stay safe, and she followed that medical advice. She was told by her surgeon that in order to have the lumpectomy, she would have to take a COVID-19 test and test negative. Fortunately, because she followed her doctors' advice, she ultimately tested negative. If she had tested positive, she could not have had this necessary surgery. That is one major reason she had to vote by mail. She could not be exposed because at any moment she could have been called up for the postponed surgery. But even if she did not have breast cancer and did not need that surgery, at her age, her odds of surviving COVID-19 are not good. And if she had managed to somehow survive COVID-19, it might well have made it impossible for her to have the lumpectomy afterwards. So, to avoid voting in person and the dangers of COVID-19, she requested an absentee ballot by mail using the website myvote.wi.gov on March 19th or 20th, but never received the ballot in the mail, even after Election Day. She managed to upload an image of her Wisconsin driver's license.  She had to take a photo of her driver's license, and then she had to send it from her phone to her email and download it onto her laptop. Finally, she uploaded it to myvote.wi.gov. She was able to track her ballot on myvote.wi.gov. She waited for almost a week and checked the website again on March 25th and

14

again on March 26th. The site showed that her ballot had been mailed out on March 23rd, but she had not yet received it. She did receive a letter from Milwaukee's Mayor Tom Barrett thanking her for requesting an absentee ballot. At the time, she had no idea what was causing the delay, but since the election she has read some of the stories of how ballots were lost or delayed in the mail or never even were mailed out due to computer problems. She did not call the Milwaukee City Election Commission at any point. She thought her ballot was delayed but still coming, and that as long as it arrived soon, she could vote it and drop it off or mail it in. She did email the city election commission and received an email back from Neil Albrecht, the head of the Commission, who informed her that another ballot would be mailed out to her. Ultimately, she did not receive either of these ballots in the mail before, on, or even after Election Day. There was no way she was going to vote in person given her health situation and her age. She is at high risk from COVID-19 and has been quarantining herself since mid-March. She has not been to church since March 15th. The risk of contracting COVID-19 is simply too high and, based on what she saw on the news, she would have had to wait in long lines for 90 to 120 minutes or longer and vote in a very crowded polling place, increasing her risk of contracting COVID-19. Instead of the usual almost-200 polling places in the city, there were only five open on April 7th. This was due to the shortage of available poll workers and the COVID-19 crisis. She saw on the news that the lines and long waits continued throughout the day. She wants to vote by mail in the August primaries and the November general election. For the November election, she wants to request an absentee ballot be delivered to her home by mail. She does not want to deal with printing off an emailed ballot and assembling the envelope for its mailing. However, if that requested ballot does not arrive by mail in time for her to cast and return it on time, then she needs a back-up because she cannot safely vote in person at the polls on or before Election Day. Because of her health, age, and the ongoing

COVID-19 crisis, voting in person is simply too high a risk to her health and life. If the cancer comes back, she might need additional surgery in the future. For the same reasons that she could not risk contracting COVID-19 by voting in person in the April 7th election, she cannot risk contracting it in the August and November elections. So, if her ballot does not arrive in the mail on time, she wants to be emailed an absentee ballot. She has access to a computer, a printer, her email account, and tape: everything she needs to print off, assemble, vote, and mail that emailed ballot back. She hopes it does not come to that and that her ballot arrives on time. If she cannot vote by mail in these elections, she will not be able to vote.

23.     Plaintiff Diane Fergot is 59 years old and a resident of Oshkosh, Wisconsin. She is a United States citizen and a registered Wisconsin voter. She has never lost her right to vote by reason of a felony conviction or a court order. She wants to vote in the August primary election and the November general election. She lives with her husband, and they have been quarantining themselves during the COVID-19 pandemic. Typically, she votes in person on Election Day, but COVID-19 poses a serious risk to her health and life. She has a history of severe blood clotting that required 14 years of medication; she also suffers from hypertension. From what she has read in the news, she understands that COVID-19 is causing blood clotting and strokes, even in healthy and younger people. She is extremely worried about COVID-19 and will only be voting by mail while the COVID-19 pandemic lasts. To avoid voting in person and the dangers of COVID-19, on March 24th, roughly two weeks before the April 7th election, she and her husband went on myvote.wi.gov and requested their absentee ballots be mailed to them, but they never received them, even after Election Day. On April 2nd, she realized that their ballots had not arrived in the mail yet, so she emailed the clerk's office. The following day, April 3, having not heard back, she went on myvote.wi.gov and saw that her ballot had been mailed out on March 24th. She also sent

16

the clerk's office a second email. Later that day, she received an email back informing her that her and husband's ballots had been reissued and mailed out that day, April 3, the Friday before the election. The clerk's office did not offer to email them their absentee ballots as a more expedient option. Ultimately, they never received our ballots in the mail, before, on, or after Election Day. They thought their ballots were delayed but still coming, and that as long as they arrived soon, they could still vote and drop them off or mail them. Due to her health conditions, she could not safely vote in person. There was no way she was going to vote in person; the risk of contracting COVID-19 was simply too high. She is at high risk from COVID-19 and has been quarantining since mid-March. She has not been to the grocery store. She has only briefly visited at 6:00 a.m. one store that requires masks for customers and employees and an outdoor garden store. Those have been her only two shopping excursions in over two months. She wants to vote by mail in the August primaries and the November general election. For the November election, she wants to request an absentee ballot be delivered to her home by mail. She does not want to deal with printing off an emailed ballot and assembling the envelope for its mailing. However, if that requested ballot does not arrive by mail in time for her to cast and return it on time, then she needs a back-up because she cannot safely vote in person at the polls on or before Election Day. Because of her health, age, and the ongoing COVID-19 crisis, voting is simply too high a risk to her health and life. If her ballot does not arrive in the mail on time, she wants to be emailed an absentee ballot. She has access to a computer, a printer, her email account, and tape: everything she needs to print off, assemble, vote, and mail that emailed ballot back. She hopes it does not come to that, and her ballot arrives on time. If she cannot vote by mail in these elections, she will not be able to vote.

24.     Plaintiff Gary Fergot is 69 years old and a resident of Oshkosh, Wisconsin. He is a United States citizen and a registered Wisconsin voter. He has never lost his right to vote by reason

of a felony conviction or a court order. He wants to vote in the August primary election and the November general election. He lives with his wife, and they have been quarantining during the COVID-19 pandemic. He always votes in person on Election Day, but COVID-19 poses a serious risk to his health and life because of his age. He has never voted absentee in his life, but he will only be voting by mail while this pandemic lasts. To avoid voting in person and the dangers of COVID-19, on March 24th, two weeks before the April 7th election, he and his wife went on myvote.wi.gov and requested their absentee ballots be mailed to them, but they never received them, even after Election Day. On April 2nd, they realized that their ballots had not arrived in the mail yet, so his wife emailed the clerk's office. On April 3rd, they received an email back informing them that their ballots had been reissued and mailed out that day, which was the Friday before the election. The clerk's office did not offer to email them their absentee ballots. Ultimately, they never received their ballots in the mail, before, on, or after Election Day. They thought their ballots were delayed but still coming, and that as long as they arrived soon, they could still vote and drop them off or mail them. Due to his age (he will be 70 this year), Gary was extremely worried about COVID-19. There was no way he was going to vote in person; the risk of contracting COVID-19 was simply too high. Gary is at high risk from COVID-19 and has been quarantining since mid-March. The only store he has been to in two months is the grocery store between 5:00 a.m. and 6:00 a.m., and he always wears a mask. The grocery store allows senior citizens two hours to shop from 5:00 a.m. to 7:00 a.m., and there is hardly anyone there when he shows up. He has not been to any other stores or visited with any people or had anyone visit him. He has not had any other interactions with any people other than a very limited interaction with grocery store cashiers. He and his wife are taking social distancing very seriously. Gary wants to vote by mail in the August primaries and the November general election. For the November election, he wants to

18

request an absentee ballot be delivered to his home by mail. He does not want to deal with printing off an emailed ballot and assembling the envelope for its mailing. However, if that requested ballot does not arrive by mail in time for him to cast and return it on time, then he needs a back-up because he cannot safely vote in person on or before Election Day. Because of his age and the ongoing COVID-19 crisis, voting is simply too high a risk to his health and life. If his ballot does not arrive in the mail on time, he wants to be emailed an absentee ballot. Gary has access to a computer, a printer, his email account, and tape: everything he needs to print off, assemble, vote, and mail that emailed ballot back. He hopes it does not come to that, but if he cannot vote by mail in these elections, he will not be able to vote.

25.     Plaintiff Bonibet Bahr Olsan is 77 years old and a resident of Appleton, Wisconsin. She is a United States citizen and a registered Wisconsin voter. She has never lost her right to vote by reason of a felony conviction or a court order. She wants to vote in the August primary election and the November general election. She lives with her husband, and they have been quarantining themselves during the COVID-19 pandemic. She has never voted absentee in her entire life, but at her age, COVID-19 poses a serious risk to her health and life. Because of her age, Bonibet attempted to vote by mail for the first time in the April 7, 2020 election. To avoid voting in person and the dangers of COVID-19, in mid-March, she requested an absentee ballot by mail using the request form, which she and her husband printed off from myvote.wi.gov. She filled her request form out and mailed in this absentee ballot request form along with a printed photo she took of her Wisconsin driver's license using her phone camera. She requested that her ballot be mailed to her. She does not recall an option on the form to select delivery by email. Bonibet never received her ballot in the mail, not even after Election Day. Her husband requested his ballot at the same time as she did and received it a week before Election Day. Before Election Day, she checked

myvote.wi.gov, and it showed that her absentee ballot had been mailed out to her on March 28th. She did not contact the Appleton city clerk's office. She thought her ballot was delayed but still coming, and that as long as it arrived soon, she could vote it and drop it off or mail it in time. She waited until the very last minute on April 7, Election Day, but the ballot still had not arrived in her mailbox and she was out of time. She was forced to make the difficult decision not to vote because the only option left to her was to vote in person and she did not want to risk the exposure. She has been self-quarantining since mid-March. She walks her dog and has been to a grocery store once, wearing a mask and gloves. There was no way she was going to vote in person given her age. The risk of contracting COVID-19 is simply too high. She wants to vote by mail in the August primaries and the November general election. For the November election, she wants to request an absentee ballot be delivered to her home by mail. She does not want to deal with printing off an emailed ballot and assembling the envelope for its mailing. However, if that requested ballot does not arrive by mail in time for her to cast and return it on time, then she needs a back-up because she cannot safely vote in person at the polls on or before Election Day. Because of her age and the ongoing COVID-19 crisis, voting is simply too high a risk to her health and life. If her ballot does not arrive in the mail on time, she wants to be emailed an absentee ballot. She has access to a computer, a printer, her email account, and tape: everything she needs to print off, assemble, vote, and mail that emailed ballot back. She hopes it does not come to that, and her ballot arrives on time. But if she cannot vote by mail in these elections, she will not be able to vote.

26.     Plaintiff Sheila Jozwik is 68 years old and a resident of Brookfield in Waukesha County, Wisconsin. She is a United States citizen and a registered Wisconsin voter. She has never lost her right to vote by reason of a felony conviction or a court order. She wants to vote in the August primary election and the November general election. She lives with her husband, Gregg

Jozwik, in Brookfield. Since March 21st, they have been self-isolating at a cabin during the COVID-19 pandemic with her 93-year-old mother. To avoid voting in person and the dangers of COVID-19, her husband Gregg and she attempted to vote by mail in the April 7, 2020 election. They both requested absentee ballots by mail using myvote.wi.gov on March 17, 2020. They requested that their ballots be mailed to their home in Brookfield, but never received them, even after Election Day. In order to request their ballots online at myvote.wi.gov, they had to upload images of their Wisconsin driver's licenses. They had to submit the images of their IDs three times before they could continue with the ballot request process. She did not receive any message confirming that the image had been successfully uploaded. Her husband had the same experience. Since March 30, her husband, mother, and she have been staying at their cabin north of Brookfield in order to self-isolate. Leading up to the April 7th election, she or Gregg would drive down and check the mail at their home in Brookfield to see if their ballots had arrived. The last time they checked was on April 5th, when Gregg went to their house to check the mail. On April 6th, they logged back onto myvote.wi.gov to see where their ballots were. It showed that they had applied to receive their ballots by mail. They never contacted the clerk's office. Ultimately, they never received their ballots, even after Election Day. They thought their ballots were delayed but still coming, and that as long as they arrived by April 7th, they could vote them and drop them off or put them in the mail so they would be postmarked by April 7th, hoping they would arrive by April 13th. She chose not to vote in person on April 7th, to protect her health and the health of her elderly mother, who is extremely vulnerable to COVID-19. It was the first time she could not vote since she first registered and voted in 1969. She wants to vote by mail in the August primaries and the November general election. For the November election, she wants to request an absentee ballot be delivered to her home by mail. She does not want to deal with printing off an emailed ballot and

assembling the envelope for its mailing. However, if that requested ballot does not arrive by mail in time for her to cast and return it on time, then she needs a back-up because she does not want to risk exposure to the coronavirus that causes COVID-19 by voting in person at the polls on or before Election Day. She herself is in a high-risk category, and my mother, at 93 years of age, is at much higher risk. If her ballot does not arrive in the mail on time in the fall, she wants to be emailed an absentee ballot. She has access to a computer, a printer, her email account, and tape—everything she needs to print off, assemble, vote, and mail that emailed ballot back. She hopes it does not come to that, and her ballot arrives on time. She feels she should not be forced to choose between voting and exposing herself to a deadly virus. If she cannot vote by mail in these elections, she will not be able to vote.

27.     Plaintiff Gregg Jozwik is a 70-year-old resident of Brookfield in Waukesha County, Wisconsin. He is a United States citizen and a registered Wisconsin voter. He has never lost his right to vote by reason of a felony conviction or a court order. He lives with his wife, Sheila Jozwik. Since March 30, 2020, they have been quarantining with Sheila's 93-year-old mother in their cabin. To avoid voting in person and the dangers of COVID-19, he and his wife attempted to vote by mail in the April 7, 2020 election. They both requested absentee ballots be sent by mail using myvote.wi.gov on March 17, 2020. They requested that their ballots be mailed to their home in Brookfield. As part of the online request process, he had to submit an image of his Wisconsin driver's license. He had to upload it three times before he could continue with the process, and he did not receive any message confirming that the image had been successfully uploaded. Since March 30th, he, his wife, and his mother-in-law have been staying at their cabin up north in Tomahawk, Wisconsin. He and Sheila have occasionally returned home to check the mail, including for the ballots they requested for the April 7th election. He last checked for their ballots

22

on April 5th. They never arrived. On April 6th, he and Sheila logged back onto myvote.wi.gov to see where their ballots were. It said that they had applied to receive their ballots by mail. They never contacted the clerk's office. Ultimately, they never received their ballots, even after Election Day. They thought their ballots were delayed but still coming, and that as long as they arrived by April 7th, they could vote them and drop them off or put them in the mail so they would be postmarked by April 7th, hoping they would arrive by April 13th. He decided to vote in person in Brookfield on April 7, although he was very worried about doing so. He wore a mask. While waiting in line to vote, he saw that all of the poll workers were wearing masks, but about half of the voters were not. He was not going to be denied his right to vote, but he does not feel he should have been forced to expose himself and potentially loved ones as well to a lethal virus. He wants to vote by mail in the August primaries and the November general election. For the November election, he wants to request an absentee ballot be delivered to his home by mail. He does not want to deal with printing off an emailed ballot and assembling the envelope for its mailing. However, if that requested ballot does not arrive by mail in time for him to cast and return it on time, then he needs a back-up because he does not want to be forced to risk exposure to the coronavirus that causes COVID-19 by voting in person at the polls on or before Election Day. He is himself in a high-risk category, and his wife's mother, at 93 years of age, is at much higher risk. If his ballot does not arrive in the mail on time in the fall, he wants to be emailed an absentee ballot. He has access to a computer, a printer, his email account, and tape everything he needs to print off, assemble, vote, and mail that emailed ballot back. He hopes it does not come to that, and that his ballot arrives on time. He feels he should not be forced to choose between voting and exposing himself to a deadly virus.

28.     Plaintiff Claire Whelan is a 64-year-old retiree who lives alone in her apartment in Appleton, Wisconsin.  She is a United States citizen, has never lost her right to vote by reason of a felony conviction or a court order, and is a registered Wisconsin voter.  Ms. Whelan is a member of the League of Women Voters of Appleton and therefore a member of Plaintiff League of Women Voters of Wisconsin.  Ms. Whelan is at high risk of severe complications or even death from COVID-19 because she has chronic asthma. When the weather changed recently and became hot and humid, she forgot to close the windows at night and woke up wheezing. Once she closed the windows, it took all day for her breathing to calm down, and she was utterly exhausted and had to just sit and wait to recover. To protect herself, she has been self-quarantining at her apartment since mid-March. She makes grocery runs at 5:30 a.m., wearing a mask and gloves, and there are only a very few other people in the store. Putting the groceries away can entail up to thirty hand washings. Ms. Whelan does not feel safe going to a laundromat or even the laundry room in her apartment building and has not been to either since March 10. To protect her health, she is handwashing her clothes in her kitchen sink. She is trying to take every precaution to minimize the chance that she is exposed to COVID-19, because she wants to maximize the chance that she can once again visit her mother, who is 93 years old and lives in a nursing home nearby. She fears bringing the virus into that facility, but also fears that her mother could rapidly decline, while the nursing home remains on lockdown, which it has been for about 2.5 months. Because Ms. Whelan is quarantining herself pursuant to federal and state government recommendations and cutting off all in-person contact unless it is <u>absolutely</u> necessary, she must vote by mail-in absentee ballot to avoid the severe risks to her health and life posed by in-person voting.  Ms. Whelan will again request mail-in absentee ballots for the August and November general elections.  In March, she requested a ballot for the April 7 election. She waited until the end of March, when she dropped

off her rent check late at night to avoid other people, to see if her ballot had arrived in her mailbox. When it arrived days before the election, she knew that this Court's preliminary injunction, affording relief to individuals who certified that they could not safely secure a witness with reasonable effort, had been stayed by the U.S. Court of Appeals for the Seventh Circuit. Therefore, Ms. Whelan was compelled to ask a friend to drive from a town 8 miles away to show up at her apartment and serve as her witness. Ms. Whelan's friend entered the apartment building, rode the elevator up to the fourth floor, and waited outside Ms. Whelan's apartment. Ms. Whelan voted her ballot inside the apartment with the door closed, took photos of herself voting, and texted them to her friend outside. She filled out and signed the certificate envelope, sealed up her ballot in its envelope, and slid it under the door to her friend. Her friend signed the certificate envelope as Ms. Whelan's witness and put down her address, texted pictures of that action to Ms. Whelan, and then drove to a post office to drop off Ms. Whelan's ballot. It is unreasonable to require that voters like Ms. Whelan engage in such a process to comply with the witness requirement, while avoiding the dangers of COVID-19 transmission, in the midst of the worst public health crisis in at least a century. There are reasonable alternatives such as this Court's own injunction providing a certification alternative or the Seventh Circuit's panel suggestion of remote witnessing with the recording of a witness name, without a physical signature by that witness.

29.     Plaintiff Sylvia Gear is an 83-year-old retired teacher who lives alone at her residence in Cudahy, Wisconsin. She is a United States citizen, has never lost her right to vote by reason of a felony conviction or a court order, and is a registered Wisconsin voter. Ms. Gear is a member of Plaintiff Wisconsin Alliance for Retired Americans. Ms. Gear is at risk of severe complications from the novel coronavirus and COVID-19 because of her age and her medical history as a cancer survivor. For this reason, she is self-quarantining at her home, and she has not

allowed anyone in her house since March. In that time, her son and a neighbor have stopped by to visit Ms. Gear, but they spoke outside of the home on Ms. Gear's porch while maintaining at least six feet of distance between them. Since March, Ms. Gear has only left her home about once a week to go grocery shopping or to obtain prescription medications, for which she always wears a mask or a face covering like a scarf. Since March, she has not been to any of her regular social activities, including Sisters of St. Francis in St. Francis, Wisconsin and gathering with her teacher friends at a weekly fish fry at a local restaurant. She has stopped going to her sister's house and had to miss her granddaughter's and grandnephew's birthdays. Because Ms. Gear has been quarantining herself pursuant to government recommendations and, until recently, Emergency Order #12, and cutting off all in-person contact unless it is <u>absolutely</u> necessary, *e.g.* to obtain medication, she must vote by mail-in absentee ballot to avoid the severe risks to her health and life posed by in-person voting. She voted by mail-in absentee ballot in the April 7, 2020 Spring Election. To satisfy the witness requirement, she asked her neighbor to serve as her witness. At risk to each other, they conducted the entire process outside on Ms. Gear's porch, using their own pens. Ms. Gear would prefer to vote in person in the August and November elections, but if the COVID-19 pandemic continues to pose a threat to public safety, she will again apply to vote by mail-in absentee ballot to protect her health. Interacting with a witness to vote absentee will once again pose a risk to her health.

30.     Plaintiff Wisconsin Alliance for Retired Americans ("Wisconsin Alliance") was founded on March 14, 2005. Wisconsin Alliance has 103,611 members, composed of retirees from public and private sector unions, community organizations and individual activists. It is incorporated in the State of Wisconsin as a 501(c)(4) social welfare organization under the Internal Revenue Code.

31.     Alliance for Retired Americans is a national organization with more than 4.3 million members in all 50 states. The national Alliance charters state organizations, such as the Wisconsin Alliance, which then elect officers, form a governing board, affiliate local chapters and organize members in the state.

32.     Wisconsin Alliance's board is presided over by Marlene Ott, a retired member of the National Education Association ("NEA").  President Ott presides over a board with a treasurer, secretary and vice president representatives from the largest affiliates. During monthly meetings, they organize activities, initiate programs, and maintain the governance of Wisconsin Alliance in the state.

33.     Wisconsin Alliance participates in an organizing calendar that resembles and reflects the national Alliance for Retired Americans, with Wisconsin-specific additions. This calendar includes engaging local, state and federal representatives about issues and laws that affect retirees and seniors, highlighting May as Older Americans Month, and celebrating the anniversaries of Social Security and Medicare.

34.     Wisconsin Alliance also engages in member education about elections. Historically, Wisconsin Alliance has provided information to members about how their elected leaders have voted on issues that impact the lives of seniors and provided information about how to cast a ballot.

35.     The interests Wisconsin Alliance seeks to protect in this action, the voting rights of its members and of all retired Wisconsinites, are germane to the organization's purpose as detailed above.  As a membership organization, Wisconsin Alliance suffers the constitutional injury of its members, like Plaintiff Sylvia Gear.

36.     The Wisconsin Alliance plans to produce, publish, and distribute educational literature and materials on voting in the November election, specifically around the process of obtaining absentee ballots, including the difficulties voters face when the ballot is not timely delivered, and the witness signature requirement. The Wisconsin Alliance Executive Director is a paid staffer and will be diverting time normally used for get-out-the-vote efforts to make and distribute these materials. The Wisconsin Alliance will distribute electronic materials through social media and email, and printed materials in person and via mail.

37.     Plaintiff League of Women Voters of Wisconsin ("LWVWI") is a nonpartisan, nonprofit, non-stock corporation organized under the laws of the State of Wisconsin with its principal office located at 612 West Main St., Suite 200, in the City of Madison, Dane County, Wisconsin.  LWVWI is an affiliate of The League of Women Voters of the United States, which has 750 state and local Leagues in all 50 states, the District of Columbia, Puerto Rico, the Virgin Islands, and Hong Kong.  LWVWI works to expand informed, active participation in state and local government, giving a voice to all Wisconsinites.

38.     LWVWI, a nonpartisan community-based organization, was formed in 1920, immediately after the enactment of the Nineteenth Amendment granting women's suffrage. LWVWI is dedicated to encouraging its members and the people of Wisconsin to exercise their right to vote as protected by the U.S. Constitution, the Voting Rights Act of 1965, and other federal laws. The mission of LWVWI is to promote political responsibility through informed and active participation in government and to act on selected governmental issues. The League seeks to maximize eligible voter participation through its voter registration efforts and encourage civic engagement through registration and voting.

39.     LWVWI impacts public policies, promotes citizen education, and makes democracy work by, among other things, removing unnecessary barriers to full participation in the electoral process. Currently LWVWI has 20 local Leagues and approximately 2,600 members, including Plaintiff Claire Whelan. LWVWI works with and through 20 local Leagues in the following cities, counties, and areas throughout Wisconsin: Appleton, Ashland/Bayfield Counties, Beloit, Dane County, Door County, the Greater Chippewa Valley, Greater Green Bay, Janesville, the La Crosse area, Manitowoc County, Milwaukee County, the Northwoods, Ozaukee County, the Ripon area, Sheboygan County, the Stevens Point area, the Upper St. Croix Valley, the Whitewater area, Winnebago County, and the Wisconsin Rapids area.

40.     LWVWI began as an organization focused on the needs of women and training women voters. It has evolved into an organization concerned with educating, advocating for, and empowering all Wisconsinites. With members in nearly every county in the State, LWVWI's local Leagues are engaged in numerous activities, including hosting public forums and open discussions on issues of importance to the community. Individual League members invest substantial time and effort in voter training and civic engagement activities, including voter registration and get-out-the-vote ("GOTV") efforts.  LWVWI has developed the statewide Election Observation Program and the Vote411 voter guide for Wisconsin.

41.     LWVWI also devotes substantial time and effort to ensuring that government at every level works as effectively and fairly as possible. This work involves continual attention to and advocacy concerning issues of transparency, a strong and diverse judiciary, fair and equal nonpartisan redistricting, and appropriate government oversight.

42.     The interests LWVWI seeks to protect in this action, the voting rights of its members and all eligible Wisconsin voters, are germane to the organization's purpose as detailed

29

above.  As a membership organization, LWVWI suffers the constitutional injury of its members, like Plaintiff Claire Whelan.

43.     For the April 7, 2020 election, LWVWI fielded calls, texts, emails, and social media messages from voters who were struggling to comply with the witness requirement, and LWVWI members offered to help voters by serving as Plaintiffs' witnesses. LWVWI also worked with partners to create educational materials around the witness requirement for voters and volunteers assisting voters. LWVWI communicated with clerks and others to identify absentee ballot drop-boxes with volunteers ready to serve as witnesses and to relay this information to voters. As changes to the witness requirement were made, LWVWI communicated them with the League of Women Voters national office ("LWVUS") to ensure their national voter education resource, VOTE411.org, was up to date with the latest information. To understand the scope of issues faced by voters during this unprecedented election, LWVWI created a survey to collect stories from voters, including challenges to finding a witness and issues with receiving an absentee ballot. LWVWI analyzed the results along with other relevant data sets to write the Wisconsin Election Protection: 2020 Spring Election Report, which highlights barriers voters faced and gives recommendations to improve future elections. Voter experiences and recommendations regarding the burdensome witness requirement and the failures to deliver absentee ballots are included in the report.   Additionally, LWVWI-Dane County and LWVWI-Ashland and Bayfield Counties worked with Meals on Wheels and educated its delivery people on how to serve as witnesses for people who live alone. LWVWI-Dane County also worked with the Dane County Voter ID Coalition to mobilize their Voter ID helpline to identify voters in need of a witness and to provide assistance as needed. All of this work was specific to and undertaken for the first time because of the COVID-19 pandemic. LWVWI had never done any of this specific work on the witness

30

requirement previously or diverted any of its resources or staff time to helping voters navigate the witness requirement. All told, LWVWI's Voter Education Manager Eileen Newcomer spent an estimated 20.5 hours, the equivalent of $512.50 in salary, working on various activities to educate voters about the witness requirement and help them navigate it.

44.     Furthermore, LWVWI responded to voters' concerns about not receiving in the mail absentee ballots they had timely requested. LWVWI worked with partners to develop educational materials around what to do if a requested absentee ballot does not arrive in the mail— including how to track an absentee ballot's status, who to contact to follow up on your ballot, and what the voters' options are to still vote in the election. LWVWI fielded calls from municipal clerks who said they could not handle the volume of absentee ballot requests and needed more resources and funding to purchase more envelopes and ballots. Additionally, the municipal clerks said they needed WEC to intervene and make up the shortfall in ballots so soon before the election. Many printers had been shut down as non-essential businesses under Executive Order #12, and only the Commission could procure the necessary hundreds of thousands of ballots on short notice. These clerks wanted LWVWI to raise awareness on the issue. In late March, when WEC realized they had an insufficient number of ballots statewide, WEC made an emergency request to print more ballots and secured a printer through the state procurement process. All told, LWVWI's Voter Education Manager Eileen Newcomer spent an estimated 35.5 hours, the equivalent of $887.50 in salary, working on various activities to educate voters about the witness requirement and help them navigate it.

45.     LWVWI's work on educating voters about and helping voters with absentee ballot delivery failures and the witness requirement will continue through the August and November elections. LWVWI intends to do more of the same for August and November elections, when they

31

reasonably anticipate the same challenges with receiving ballots on time and complying with the witness requirement will return in force.

46.     As to the witness requirement, LWVWI will be working with local Leagues and municipal clerks to identify volunteers to serve as witnesses and possibly staff absentee drop-off locations. LWVWI will also work with the Voter ID Coalition to expand their efforts to provide witness information and support statewide. LWVWI will continue to provide educational materials around the witness requirement and is exploring creating new digital resources. LWVWI will continue to respond to voter inquiries about the witness requirement. Additionally, LWVWI will continue to follow up with voters who responded to its post-election survey and identified that they had difficulty safely complying with the witness requirement and provide assistance in future elections. LWVWI will work with local League members to provide training or resources around this specific requirement. LWVWI will continue its advocacy efforts to remove or relax the witness requirement. But for the unconstitutional enforcement of the witness requirement during this COVID-19 pandemic, LWVWI would not be compelled to divert resources, money, and staff time to educating and helping voters struggling with this law.

47.     As to absentee ballot delivery failures, LWVWI will continue to follow up with voters who responded to LWVWI's survey and identified that they did not receive their ballot and provide assistance as needed. LWVWI will continue its advocacy efforts to ensure voters receive the absentee ballots they have requested and to which they are entitled by Wisconsin law. Specifically, LWVWI will support ballot tracking, which will increase transparency as ballots are in transit, and send voters absentee ballot applications. LWVWI will continue to respond to voter inquiries about ballot delivery failures, and continue to provide educational materials about this issue, and work with local League members to provide training and resources. But for the

unconstitutional dual failure to provide voters with absentee ballots in the mail or any fail-safe option in those circumstances, LWVWI would not be compelled to divert resources, money, and staff time to educating and helping voters struggling to vote by absentee ballot in a timely manner.

48.     LWVWI estimates that it will expend approximately $2,000 on its activities to educate and help voters with respect to the failures to prepare and deliver mail-in absentee ballots and the witness requirement.

49.     Defendants Dean Knudson, Julie M. Glancey, Mark L. Thomsen, Ann S. Jacobs, Marge Bostelmann, and Robert F. Spindell, Jr. are sued in their official capacities as the members of the Wisconsin Elections Commission.

50.     Defendant Meagan Wolfe is sued in her official capacity as the Administrator of the Wisconsin Elections Commission.

## FACTUAL BACKGROUND

### *The COVID-19 Pandemic*

51.     In December 2019, a novel coronavirus strain was detected, now named SARS-CoV-2, and the disease it causes became known as COVID-19. It has now spread throughout the world, including to every state in the United States.

52.     On January 30, 2020, the World Health Organization ("WHO") declared COVID-19 to be a Public Health Emergency of International Concern. On March 11, 2020, the WHO declared that it had become a pandemic.

53.     The novel coronavirus that causes COVID-19 continues to spread at an unprecedented pace around the world and within the United States.  There are currently more than

1.7 million confirmed cases in the United States, and there have been 102,761 deaths nationwide.[31] As of the evening of May 29, 2020, the Wisconsin Department of Health Services had confirmed 17,707 positive cases of coronavirus in Wisconsin, 2,499 hospitalizations, and 568 deaths.[32]

54.     COVID-19 appears to be much more contagious than other respiratory illnesses, in significant part because of its capacity for asymptomatic transmission, and highly lethal, particularly for people with underlying health conditions or comorbidities that put them at severe risk of complications or death. According to the U.S. Centers for Disease Control and Prevention, ("CDC"), individuals are at higher risk of severe complications and death from COVID-19 if they are 65 years old or older or have underlying health conditions and diseases, including chronic lung disease, moderate to severe asthma, serious heart conditions, severe obesity (body mass index ("BMI") of 40 or higher), diabetes, chronic kidney disease undergoing dialysis, liver disease, and other health conditions that suppress immune systems like HIV/AIDS.[33] The CDC's website, relying upon research from the National Center for Immunization and Respiratory Diseases ("NCIRD"), Division of Viral Diseases, notes that immunocompromised individuals are at severe risk from COVID-19: "Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications."[34]

---

[31] Mitch Smith et al, *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last accessed May 29, 2020).
[32] Wisconsin Department of Health Services, Outbreaks in Wisconsin, https://www.dhs.wisconsin.gov/outbreaks/index.htm (last accessed May 29, 2020).
[33] Coronavirus Disease 2019 (COVID-19), *People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (last updated May 14, 2020).
[34] *Id*.

55.     Severe COVID-19 cases can cause a wide variety of secondary infections and pathologies, including but not limited to: pneumonia, acute respiratory distress syndrome, kidney failure, liver failure, strokes, heart attacks, cardiac inflammation, and gastrointestinal infections, among others.[35] Furthermore, everyone is at some risk of severe complications and death from COVID-19, as health officials have recently associated COVID-19 with pulmonary embolism and stroke in younger patients without known risk factors[36] and subsequent inflammatory disease in young children.[37] Many of these clinical manifestations can and do result in death.

56.     The CDC has warned that asymptomatic COVID-19-positive individuals can transmit the disease to others.[38] As a result, individuals can spread the disease for a week or more before realizing they are infected, facilitating rapid transmission.

57.     Leading epidemiologists anticipate that the pandemic will continue into fall and winter of 2020, and potentially well into 2021. It is highly likely that COVID-19 will continue to circulate at its current level or at an even higher level in October and November of 2020. Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases, has said a second wave of infections in the United States is "inevitable," and the CDC Director Robert

---

[35] Meredith Wadman et al., *How does coronavirus kill? Clinicians trace a ferocious rampage through the body, from brain to toes,* SCIENCE (Apr. 17, 2020), https://www.sciencemag.org/news/2020/04/how-does-coronavirus-kill-clinicians-trace-ferocious-rampage-through-body-brain-toes.

[36] Robert Glatter, M.D., *Why is COVID-19 Coronavirus Causing Strokes in Young And Middle-Aged People?*, FORBES (Apr. 27, 2020), https://www.forbes.com/sites/robertglatter/2020/04/27/why-is-covid-19-coronavirus-causing-strokes-in-young-and-middle-aged-people/#598e78fe34df.

[37] Pam Belluck, *New Inflammatory Condition in Children Probably Linked to Coronavirus, Study Finds*, N. Y. TIMES (May 13, 2020), https://www.nytimes.com/2020/05/13/health/coronavirus-children-kawasaki-pmis.html.

[38] *Coronavirus 2019 (COVID-19): How to Prepare*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last updated Mar. 4, 2020).

Redfield has said that wave may "be even more difficult than the one we just went through."[39] Furthermore, experts have warned that, to avoid exceeding hospital critical care capacities, prolonged or intermittent social distancing may be necessary into 2022.[40] Currently, no therapeutic treatments or vaccinations have been shown to significantly alter the trajectory of the COVID-19 outbreak.

58.     Countless eligible Wisconsin voters will continue to self-quarantine for fear of contracting COVID-19, and/or for fear of transmitting the disease, regardless of whether they are symptomatic or not.

59.     COVID-19 will have an unprecedented impact on the nation's upcoming elections. Before the COVID-19 pandemic, the Brookings Institution predicted that "turnout in 2020 could break all records and test our election machinery as it has never been tested before."[41] Other experts also anticipate record-breaking turnout in the 2020 presidential election.[42]

---

[39] *Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing*, White House (Mar. 25, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-11/; Zack Budryk, *CDC director warns second wave of coronavirus might be 'more difficult,'* The Hill (Apr. 21, 2020), https://thehill.com/policy/healthcare/493973-cdc-director-warns-second-wave-of-coronavirus-might-be-more-difficult.

[40] Stephen M. Kissler et al., *Projecting the transmission dynamics of SARS-CoV-2 through the postpandemic period*, Science (Apr. 14, 2020), *available at* https://science.sciencemag.org/content/early/2020/04/24/science.abb5793.

[41] William A. Galston, *What does high voter turnout tell us about the 2020 elections?* Brookings Institution (Nov. 20, 2019), https://www.brookings.edu/blog/fixgov/2019/11/20/what-does-high-voter-turnout-tell-us-about-the-2020-elections/.

[42] *See, e.g.*, Susan Milligan, *Preparing for a Voter Surge*, U.S. News & World Report (Sept. 20, 2019), https://www.usnews.com/news/elections/articles/2019-09-20/experts-predict-huge-turnout-in-2020; Nate Cohn, *Huge Turnout Is Expected in 2020. So Which Party Would Benefit?* N.Y. Times (July 15, 2019), https://www.nytimes.com/2019/07/15/upshot/2020-election-turnout-analysis.html; Ronald Brownstein, Brace for a Voter-Turnout Tsunami, The Atlantic (June 13, 2019), https://www.theatlantic.com/politics/archive/2019/06/2020-election-voter-turnout-could-be-record-breaking/591607/.

60.     On March 12, 2020, Governor Tony Evers declared a public health emergency to direct all resources needed to respond to and contain COVID-19 in Wisconsin.

61.     On March 13, 2020, President Donald Trump proclaimed a National Emergency concerning COVID-19.

62.     On March 24, 2020, Wisconsin Department of Health Services Secretary-designee Andrea Palm issued Emergency Order #12, the "Safer at Home" Order, which, starting March 25th, closed all nonessential businesses in Wisconsin and required the state's residents, with limited exceptions, to stay at home in order to reduce the transmission of COVID-19.[43]  The order was in effect during the April 7 election, and expired by its own terms on April 24, 2020, when Secretary-designee Palm issued a new Emergency Order, EO#28. In an opinion issued on May 13, 2020, the Wisconsin Supreme Court ruled that EO#28 was unenforceable because it was not promulgated pursuant to statutory emergency rulemaking procedures and exceeded the Secretary-designee's authority under the statute on which it relied.  *Wisconsin Legislature v. Palm*, 2020 WI 42, ¶¶ 58-59, ___ N.W.2d ___, 2020 WL 2465677, *12-*13. The Wisconsin Supreme Court's opinion did not address EO#12.

63.     EO#12 began by stating that, "[T]he entire State of Wisconsin - including residents, businesses, community organizations, and government - need to take all possible actions to reduce further spread of COVID-19 to save lives."[44]  The order continued to state that: "[S]ocial distancing - the practice of keeping at least six feet apart from others and avoiding direct physical contact - is the only effective means of slowing the rate of infection. Despite prior emergency orders banning

---

[43] Emergency Order #12, *available at*
https://content.govdelivery.com/attachments/WIGOV/2020/03/24/file_attachments/1409408/Health%20Order%20%2312%20Safer%20At%20Home.pdf (last accessed May 29, 2019).
[44] *Id*. at 1.

mass gatherings, the rates of infection continue to drastically increase, necessitating additional measures to slow the rate of infection and save lives."[45]

64.     Emergency Order #12 mandated that "[a]ll individuals present within the State of Wisconsin are ordered to stay at home or at their place of residence, with exceptions" for certain defined "essential activities" such as those to promote individual and family health and safety including obtaining groceries and medications, "essential governmental functions," "essential businesses and operations" such as grocery stores, pharmacies and gas stations, "non-essential minimum basic operations," and "essential travel."[46]  Furthermore, the Order instructed that "[t]o the extent individuals are using shared or outdoor spaces other than their home or residence, they must at all times as reasonably possible maintain social distancing of at least six (6) feet from any other person consistent with Social Distancing Requirements," as defined.[47]  The Order mandated that "[n]on-essential business and operations must cease. All for-profit and non-profit businesses with a facility in Wisconsin, except Essential Businesses and Operations as defined below, are required to cease all activities at facilities located within Wisconsin."[48]

65.     Crucially, for purposes of the April 7 election, the order commanded that, "All public and private gatherings of any number of people that are not part of a single household or living unit are prohibited, except for the limited purposes expressly permitted in this Order."[49]  It also required that, "Elderly people and those who are vulnerable as a result of underlying health conditions should take additional precautions. People at high risk of severe illness from COVID-19 and people who are sick are urged to stay in their home or residence to the extent possible

---

[45] *Id*. at 2.
[46] *Id*. at 2.
[47] *Id*. at 2.
[48] *Id*. at 3.
[49] *Id*. at 3.

except as necessary to seek medical care."[50] For the purpose of elections during the remainder of 2020, in the wake of the Wisconsin Supreme Court's ruling striking down Wisconsin DHS Emergency Order 28, Safer at Home, it is noteworthy that a patchwork of additional orders has sprung up across the state, with municipal and county governments issuing their own orders requiring various degrees of restrictions and requirements to shelter in place.[51]

### The Law and Mechanics of Requesting, Casting, and Returning an Absentee Ballot in Wisconsin

66.     Wisconsin has no-excuse absentee voting. "An absent elector is any otherwise qualified elector who for any reason is unable or unwilling to appear at the polling place in his or her ward or election district." Wis. Stat. § 6.85.

67.     Registered voters in Wisconsin can apply for and obtain absentee ballots in a variety of ways: by a written, mail-in application;[52] in person at the municipal clerk's office or at an alternate site under Wis. Stat. § 6.855;[53] by signing a statement and filing a request to receive absentee ballots under Wis. Stat. § 6.86(2) or Wis. Stat. § 6.86(2m)(a) (indefinitely confined voters) or Wis. Stat. §§ 6.22(4), 6.24(4), or 6.25(1)(c) (military and overseas civilian voters); by agent as provided in Wis. Stat. § 6.86(3) (hospitalized voters); by delivering an application to a

---

[50] *Id.* at 4.

[51] *See, e.g.,* Howard Hardee and Riley Vetterkind, *UPDATE: 13 of 72 Wisconsin counties and the city of Racine have extended stay-at-home orders*, Wisconsin State Journal (May 15, 2020), https://madison.com/wsj/news/local/govt-and-politics/update-13-of-72-wisconsin-counties-and-the-city-of-racine-have-extended-stay-at/article_7d97c49c-8e06-518d-a25b-079f9086b023.html; *Some Wisconsin counties and cities have continued or started new stay-at-home orders, but others have been rescinded*, MILWAUKEE JOURNAL SENTINEL (May 13, 2020), https://www.jsonline.com/story/news/local/wisconsin/2020/05/13/wisconsin-stay-home-order-not-over-dane-brown-counties-milwaukee-city-racine/5188700002/.

[52] Wisconsin Elections Commission, Form EL-121, Wisconsin Application for Absentee Ballot, https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/EL-121%20Application%20for%20Absentee%20Ballot%20%282018-10%29.pdf.

[53] Wisconsin's "early voting" is in fact in-person absentee voting. Statistics on "absentee voting," therefore must be disaggregated into in-person absentee voting and mail-in absentee voting.

special voting deputy under Wis. Stat. § 6.875(6) (voters in retirement homes and residential care facilities); by email or fax as provided in Wis. Stat. § 6.86(1)(ac); and by online request through the myvote.wi.gov portal.

68.     Unless the voter is indefinitely confined, a military or overseas voter, or has a confidential listing (typical in domestic violence cases), the voter must submit or upload a copy or image of their valid photo ID the first time they submit an absentee ballot request. Wis. Stat. §§ 6.86(ac), 6.87(1). The clerk must verify the name on the absentee ballot. Wis. Stat. §§ 6.86(ac).

69.     Absentee ballots are delivered to voters in different ways: by mail, email, and in person. *See infra* at 53-55.

70.     Absentee ballots are cast and returned in different ways as well.  Many absentee voters mail their absentee ballots to the municipal clerk's office, drop the ballots off, or authorize someone to drop them off on their behalf.  Wis. Stat. § 6.87.[54]  In-person absentee voters vote prior to Election Day at designated sites, but their ballots are not processed and counted until Election Day.  Wis. Stat. §§ 6.855, 6.87, 6.88.  All absentee ballots must be returned to the municipal clerk's office by no later than 8:00 p.m. on Election Day.  Wis. Stat. § 6.87(6).

71.     Municipal clerks prepare absentee ballots for delivery to voters that request them. An absentee ballot must be sent to any voter with an absentee application already on file, no later than 47 days before a federal election, and no later than 21 days before a primary or other election. Otherwise, the municipal clerk must deliver an absentee ballot within one business day of the time the voter's request is received. Wis. Stat. § 7.15(1)(cm). Some absentee voters have requested

---

[54] *See also Uniform Instructions for Wisconsin Absentee Voters*, WIS. ELECTIONS COMM'N, https://elections.wi.gov/sites/elections.wi.gov/files/2019-02/Uniform%20Instructions%20for%20Absentee%20Voting%20-%20All%20Voters%20%20%28Rev.%202-2019%29.pdf.

ballots for a whole year or to be placed on the permanent absentee voter list because they are indefinitely confined. Wis. Stat. § 6.86(2)(a).

### *Failures to Process Absentee Ballot Requests and Deliver Absentee Ballots to Voters*

72.     The threat of contracting COVID-19, particularly in confined spaces like polling sites, and the precipitous reduction in election administration resources for in-person voting both on and before Election Day has forced a seismic shift towards mail-in absentee voting in Wisconsin. Mail-in absentee ballots have been cast by 4.8 to 8.1 percent of voters in spring and fall general elections going back to the 2016 fall general election, but in the April 7, 2020 election, they comprised a stunning 61.8 percent of votes cast.[55] In that election, voters submitted an unprecedented total of 1,239,611 absentee ballot requests to municipal clerks, clerks issued 1,282,097 absentee ballots, some replacement ballots, and voters returned 1,157,599 of them, 73.2 percent of the total turnout of 1,555,263.[56] Only a fraction of these were in-person absentee ballots, as 964,433 or 83.3 percent of the 1,157,599 absentee ballots were mail-in absentee ballots; and as noted, this was nearly 62 percent of the total turnout.[57] Based on these figures, 42,486 of the mail-in absentee ballots were replacement ballots, many chasing previously-requested ballots that were delayed or lost in the mail, and 124,498 mail-in absentee ballots were ultimately never returned.[58]

73.     Notwithstanding municipal clerks' heroic efforts to prepare and mail out an unprecedented number of absentee ballots, voters in the April 7th election nevertheless faced a catastrophic and systemic failure to timely prepare and deliver absentee ballots by mail. The total

---

[55] *See supra* note 3, Post-Election Absentee Voting Report, at 6 (Table 4).

[56] Absentee Ballot Report - April 7, 2020 Spring Election and Presidential Preference Primary (updated Apr. 21, 2020), https://elections.wi.gov/node/6862; *supra* note 3, Post-Election Absentee Voting Report, at 4 (Table 2), 5 (Table 3).

[57] *See supra* note 3, Post-Election Absentee Voting Report, at 4 (Table 1).

[58] Absentee Ballot Report - April 7, 2020 Spring Election and Presidential Preference Primary (updated Apr. 21, 2020), https://elections.wi.gov/node/6862.

number of voters disenfranchised in this way is unknown, but at least several thousand voters never received their ballots in the mail. Some voters received their ballots too late to cast and deliver or postmark them by April 7th, while some voters never received them at all, even weeks later. Absent any fail-safe alternative for these voters who diligently and timely requested absentee ballots, their remaining options were to play Russian roulette with their health at the polls or lose their right to vote.

74.    This debacle was fueled by the Legislature's and the Governor's inaction, Defendants', municipal clerks', and the USPS's systemic administrative incapacity to keep pace with the demand for absentee ballots, flaws or weaknesses in Defendants' computer systems and database management, and the burdens of enforcing Wisconsin's myriad legal requirements, such as the photo ID requirement for absentee voters. Wis. Stat. § 6.86(ac). All of these factors made it extremely difficult to process and deliver ballots to voters. Wisconsin's election administration system, from the processing of absentee ballot requests to the printing of address labels to technological glitches, and the USPS buckled under the strain of an unprecedented surge in absentee ballot requests compared with the 2016 presidential primary and spring election. As Defendants put it in their post-mortem report, "The most fundamental challenge faced by election officials was simply meeting the unprecedented demand."[59] That same report notes that:

> Absentee voting remains a largely manual, labor-intensive process administered by each individual jurisdiction across the state. While voters can request a ballot and upload a photo ID on their smart phone in just a few minutes, behind the scenes clerks must still manually verify the IDs, stuff and seal envelopes by hand, apply postage, carry boxes of envelopes to the post office, and physically check off each request. . . . When mail volume is up to ten times higher than anticipated, clerks must complete the same tasks without the benefit of having more staff, additional supplies or more hours to meet statutory deadlines.[60]

---

[59] *See supra* note 3, Post-Election Absentee Voting Report, at 13.
[60] *Id*. at 3.

Given the complex and labor-intensive procedures for processing and mailing out absentee ballots, Wisconsin election offices are simply not adequately staffed or funded to cope with such a widespread shift to mail-in absentee voting. Absent the kind of massive allocation of funding and resources to permit election officials to scale up staff and supplies to meet demand, which only Congress and/or the Wisconsin Legislature can provide, it is far more likely than not that Wisconsin election officials will remain unable to satisfy a much greater demand for mail-in absentee ballots in the fall.

75.     The April 7, 2020 election set the record for most mail-in ballots cast in any Wisconsin election ever.[61] The Commission reports that "[a]s the enormous quantity of absentee ballots began entering the mail system, voters began asking more questions and expressing concerns about ballot deliveries. With nearly six times more ballots in circulation, the number of complaints and concerns increased by a similar amount. Some voters also reported not receiving their absentee ballots . . . ."[62] Voters who requested their mail-in absentee ballots weeks in advance of April 7th like Plaintiffs Katherine Kohlbeck, Diane Fergot, Gary Fergot, Bonibet Bahr Olsen, Sheila Jozwik, and Gregg Jozwik never received their ballots in the mail—not before, on, or after Election Day. All of these Plaintiffs were in Wisconsin at the time of the election. Many voters like Plaintiffs Katherine Kohlbeck, Diane Fergot, and Gary Fergot contacted their municipal clerk's offices to inquire about their missing absentee ballots, all to no avail; none were offered any alternative such as email delivery.

76.     The Post-Election Absentee Voting Report recounts the multifarious and alarming failures to put absentee ballots in voters' hands. In one such incident, "the City of Oshkosh and

---

[61] *Id.*
[62] *Id.* at 12.

other Fox Valley communities all reported voters complaining that their ballots were arriving late or not arriving at all."[63]  Even after an investigation, Defendants have not been able to explain why so many completed absentee ballot requests yielded so many unreturned ballots:

> The WEC also investigated reports from the City of Oshkosh suggesting that ballot requests were received but not fulfilled. While many of the cases involved incomplete requests (e.g. no photo ID provided) other records appeared complete. WEC staff researched several dozen Oshkosh area ballot requests that were entirely valid, including those of Assembly Representative Gordon Hintz (D – Oshkosh) and his spouse. The ballot records in question were generated as part of a batch on March 24, and analysis of the ballots associated with it showed that a large part of the batch was not returned by voters. Of the first quarter of records generated, more than 90% were returned. Of the remaining three- quarters of records, less than 1% were returned. This suggests that something happened to the ballots in the latter portion of the batch.
>
> WEC and Oshkosh staff could find no evidence of a technical failure. The Oshkosh batch was produced very quickly by the system (two minutes and seven seconds), did not include any unexpected applications, and occurred during normal operating hours when no system maintenance was underway. Furthermore, the City of Oshkosh Clerk reports with confidence that the ballots were mailed to voters. Thus, in this case, there is no evidence of a system error and no evidence of a printing problem. Instead, one of two events are possible: either a user did not apply the mailing labels to ballot envelopes, or these ballots were bundled together and collectively encountered an issue in the mailing process.[64]

Furthering the latter theory, USPS notified Defendants that it had found three tubs of absentee ballots destined for Appleton and Oshkosh in a processing center.[65] But this alarming report has raised more questions than it has answered, and it has not yet been adequately investigated:

> On the morning of April 8, 2020, WEC staff received a telephone call from a Political and Election Mail Coordinator at the Great Lakes Regional office of the USPS in Chicago. The USPS official reported that the post office had located "three tubs" of absentee ballots for the Appleton/Oshkosh area and that the ballots were being processed. The official was unable to confirm how many ballots were in the three tubs but stated that "it could be quite a lot" as they were large two-handled tubs. In a follow up communication, the USPS indicated that there were approximately 1,600 ballots in the batch.
>
> WEC staff attempted to follow up with the USPS to further identify the ballots and determine what happened but did not receive any further information about these ballots.

---

[63] *Id.* at 16.

[64] *Id.*

[65] *See supra* note 14, Luthern.

Written inquiries to the USPS did not produce any specific information about these ballots. Wisconsin's two U.S. Senators have asked the USPS Inspector General to investigate, but WEC staff have been unable to learn anything about the status of the inquiry.[66]

77.     Additional alarming stories of mail ballot preparation and delivery failures abound:

Scott Botcher, Fox Point village manager, said his staff worked hard to quickly send ballots to all 2,877 residents who requested them. But something strange happened ahead of Election Day: USPS repeatedly returned unsent ballots without explanation. 'The ballots are not stamped "undeliverable" or anything. They just never got mailed,' . . . But on Election Day — the deadline for voters to postmark their ballots — he received a white plastic bin filled with 175 ballots local voters never received. . . . Botcher said he and Pedersen took the returned, unopened ballots back to their branch post office seeking an explanation and got none. Village officials asked them to be redelivered — and some were returned to the sender, the village of Fox Point — more than once, Botcher said.[67]

The Commission investigated and corroborated this story:

As with the larger cities, smaller municipalities also reported issues with ballots reaching residents or being returned to the clerk in a timely fashion. The Village of Fox Point was among them and experienced an unusual chain of events that garnered some media attention. For two weeks, absentee ballots that were supposed to be mailed to Fox Point residents were repeatedly returned to the Fox Point Village Hall by the post office before reaching voters.

The village reported receiving anywhere from 20 to 50 of these returned absentee ballots per day two weeks ahead of the election. The problem continued to grow as election day neared. In the week prior to the election, 100 to 150 ballots per day were returned to the village. On the morning of Election Day, Fox Point Village Hall received a plastic mail bin with 175 ballots. In each case, the returned ballots were unopened, unmarked and had not been received by voters. The postage was not cancelled, and no explanation was provided.

Each time they received a batch of absentee ballots, village officials immediately drove the ballots back to the nearest post office. They asked post office supervisors what was wrong with the ballots, but they did not receive any explanation. Fox Point Village Clerk Kelly Meyer reports it is unclear how many voters were affected by the undelivered ballots. Residents who did not receive an absentee ballot in the mail were advised to vote in person at their polling place on Election Day. Residents who called village hall inquiring about their absentee ballot on Election Day could retrieve their ballot from village hall if the ballot still un-sent and the resident could confirm their identity with a photo ID.[68]

---

[66] *See supra* note 3, Post-Election Absentee Voting Report, at 16.
[67] *See supra* note 15, Returned to Sender.
[68] *See supra* note 3, Post-Election Absentee Voting Report, at 16-17.

78.     In Milwaukee, officials have asked USPS to investigate absentee ballots that were never received.[69] Neil Albrecht, executive director of the City of Milwaukee Election Commission, said because of worker shortages, postal officials told him it could take seven to 10 days to deliver a ballot.[70] Albrecht said the date recorded as the "ballot mailing date" in myvote.wi.gov actually reflects the date the mailing label is generated by staff, not the date a ballot was mailed.[71] Reportedly, it typically takes employees another three to seven days to assemble, mail and deliver the ballot, depending on the backlog's size.[72] Albrecht also said the city heard from an "extraordinary number" of voters on March 22 and 23 who reported to the Election Commission that they had not received their ballots and that "many voters were just disenfranchised by waiting for absentee ballots to arrive in the mail."[73] Again, WEC's report investigated and discovered that a combination of human and computer errors likely resulted in a large batch of absentee ballot requests going unfulfilled:

> As in Oshkosh, there was a sharp decline in ballot return rates for a specific subset of ballots. Of the 5,913 ballot records created on or before 10:42:32 p.m. on March 22, 5,237 were recorded as having returned in some way to the clerk's office. This is an 88.5% return rate. Of the 2,693 ballots generated after 10:42:32 p.m., only one was recorded as returned. Further investigation disclosed several factors unique to Milwaukee. In particular:
>
> • It was the largest batch processed by WisVote; ultimately including 8,607 absentee ballot request records. The median batch size for the same day was 32 records.
> • It started at 5:16 p.m. on March 22 and did not complete until 1:31 a.m. on March 23. Typically, batches complete within a few minutes.
> • Of the absentee application records associated with the batch, many were created after the batch was generated. Since the first thing the batch does is select the absentee application records that match its criteria, this should not be possible.

---

[69] *See supra* note 14, Luthern.
[70] *See supra* note 15, Returned to Sender.
[71] *See supra* note 12, Chen et al.
[72] *Id*.
[73] *See supra* note 15, Returned to Sender.

Upon review, it was determined that the timeframe of this particular batch overlapped with maintenance on a known server issue. On March 22, WEC staff observed high utilization rates in some WisVote servers that could potentially cause user interface degradation, such as slow page loads or poor performance of some tasks. In consultation with Microsoft, plans were made to implement server improvements to prevent further issues. In the interim, system resources were freed by restarting the servers that process background jobs, called asynchronous servers. Background jobs are intended to be short-running, and by restarting one server at a time during a period when few users would be interacting with the system, staff believed that WisVote's load balancing would shuffle background jobs as needed and there would be no impact. That has been staff's experience in past server restarts, and in testing no impact was observed. However on subsequent code review it was determined that it is possible, if a batch workflow is restarted, for that workflow to select applicable ballot requests a second time, which would generate ballot tracking records for absentee applications not originally associated with the batch.

It is staff's belief that an extraordinary confluence of events resulted in additional ballot records being generated after MEC staff printed their mailing labels, leading MEC to believe those ballots had already been sent when in fact they had not. First, Milwaukee's extraordinarily large batch of more than 8,000 ballots, exacerbated by the high user load on the system in the run up to the April election, resulted in the processing of this batch taking several hours, instead of a few minutes. Second, unbeknownst to MEC, Commission staff conducted an unscheduled restart of the asynchronous servers to address an unrelated issue, interrupting this long-running job. Third, an oversight in the development of this process meant that the system failed to handle the restart gracefully, selecting an entirely new collection of absentee applications instead of continuing from where it had been interrupted.

Since the database contained detailed information tracking batch creation, staff could develop precise criteria to determine the impact and review transactions across the state. As a result, staff can conclusively determine that this restart issue only impacted this one batch in the City of Milwaukee. **As a result of this issue, staff believes that 2,693 requested ballots were never sent to City of Milwaukee residents. Of the affected voters, 52.5% voted in the election either on a replacement absentee ballot or at the polls on election day.**[74]

This shocking incident disenfranchised approximately 1,279 voters, who could not participate in the election despite their diligence. They had timely requested their ballots more than two weeks before Election Day and, believing that the mail was delayed and that they had no other alternatives for ballot delivery, watched the days elapse and finally Election Day go by without an absentee

---

[74] *See supra* note 3, Post-Election Absentee Voting Report, at 19-20 (emphasis added).

ballot arriving in the mail. Absent any fail-safe, these voters and voters like them, including Plaintiffs Katherine Kohlbeck, Diane Fergot, Gary Fergot, Bonibet Bahr Olsen, Sheila Jozwik, and Gregg Jozwik, were denied the most fundamental right of U.S. citizenship.

79.     If this is the level of ballot preparation and delivery failures and resulting disenfranchisement when a total of 1,555,263 of the state's voters turn out to vote,[75] it is inevitable that the state's 1,850 municipal clerks' offices will not be able to handle nearly double the volume of absentee ballot requests in a timely fashion this fall. Wisconsin had 3,397,693 registered voters as of May 1, 2020.[76] In 2016, 2,976,150 voters cast ballots for President.[77] If the same number of voters vote in November and if, as in April, 61.8 percent of those voters cast mail-in absentee ballots, municipal clerks will need to process a *minimum* of 1,839,260 absentee ballot requests and successfully deliver the same number by mail in the fall. Assuming the 1 to 1.129 ratio of returned mail-in ballots to total issued mail-in absentee ballots holds from the April 7th election, then clerks will need to issue over 2 million mail-in absentee ballots this fall.[78] This stands in stark contrast to the 2016 fall general election, in which just 162,445 absentee ballots returned by mail and other means such as special voting deputies (but excluding in-person absentee voting), and which

---

[75] Wisconsin Elections Commission, Canvass Results for 2020 Spring Election and Presidential Preference Vote,
https://elections.wi.gov/sites/elections.wi.gov/files/Canvass%20Results%20Summary_spring%20election%20all%20contests_4_7_2020.pdf.
[76] Wisconsin Elections Commission, May 1, 2020 Voter Registration Statistics,
https://elections.wi.gov/node/6886.
[77] Wisconsin Elections Commission, Canvass Results for 2016 General Election,
https://elections.wi.gov/sites/elections.wi.gov/files/Statewide%20Results%20All%20Offices%20%28post-Presidential%20recount%29.pdf.
[78] This calculation assumes that all or almost all in-person absentee ballots are returned.

constitutes about one-sixth of the comparable absentee ballots cast in the April 7 election and a mere 8.83 percent of the projected total for the 2020 fall general election.[79]

80.     Further, many of these requests are submitted in the final days before the deadline when municipal clerks' offices will be busy conducting in-person absentee voting and making other preparations for Election Day. The Commission notes in its report that: "Statewide, the volume of absentee requests received remained high in the week prior to April 7. Clerks received over 60,000 requests alone on the Friday before election day. Even if all these requests were mailed on Saturday, it is unknown how long those ballots took to reach voters."[80] With significant USPS delays, it is likely that a substantial portion did not arrive in time for voters to cast them. 80,593 requests were submitted on March 31, 2020, 66,482 on April 1, 79,921 on April 2, and 62,172 on April 3, which, by this Court's order, was the last day to request a *mail-in* absentee ballot. *See Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249, 2020 WL 1638374, at *22 (W.D. Wis. Apr. 2, 2020). The overwhelming majority of these 289,168 requests which came in over just four days, were mail-in absentee ballots and by law had to be mailed out to voters within a day.[81] Wis. Stat. § 7.15(1)(cm).

81.     Absent radical increases in funding, staffing, and supplies, Wisconsin election officials at the state and local level will not be able to handle such an enormous increase in mail-in absentee ballot requests. Defendants seem to concur with this assessment: "If voting patterns from April hold true, the state could see more than 1.8 million requests for absentee ballots by mail. This kind of volume would present terrific challenges for Wisconsin election officials at all

---

[79] Wisconsin Elections Commission, Absentee Ballot Report (Nov. 8, 2016), https://elections.wi.gov/node/4397
[80] *See supra* note 3, Post-Election Absentee Voting Report, at 17.
[81] *Id*. at 17 (Table 11).

levels."[82] Even for the April 7th election, dozens of Milwaukee City Election Commission staffers had already worked seven days a week until 11 p.m. to process ballots.[83] Madison City Clerk Maribeth Witzel-Behl said there was "no way humanly possible" to keep up with the volume of requests, even though staffers were working 110 hours a week but still had a week's worth of backlogs by mid-March, and "that their computer system became so bogged down by the volume of applications that it only began working quickly after 10 p.m."[84] As the Commission noted in its post-mortem report,

> Nearly every community experienced unprecedented absentee request volume, and many hired temporary staff to cope with demand. Many small and medium size jurisdictions learned to use WisVote absentee batch processing tools for the first time, having never previously needed any automation assistance to manage their workload. Larger cities, while used to higher volumes, were forced to work around the clock and conduct much larger batch mailings then [*sic*] previously experienced. For all jurisdictions, the statutory requirement to mail ballots within 24 hours of receiving a request presented a significant challenge.[85]

82.     Defendants' proposals for new procedures, tracking tools, and other measures cannot cure this shortfall in resources and staff. In WEC's recent report on the April 7th election, the only proposal to reform the absentee ballot request process that could potentially have any impact on the administrative burden is automatic data updates to WisVote, the statewide voter registration system, when voters use myvote.wi.gov: "[I]nformation submitted to clerks through MyVote should not require manual data entry into the voter registration system or rely on an email-based process for most users."[86] Updates to Form EL-121, the statewide absentee ballot request form, and myvote.wi.gov, as well as other measures to make the absentee process more user-

---

[82] *Id*. at 12.
[83] *See supra* note 12, Chen et al.
[84] *Id*.
[85] *See supra* note 3, Post-Election Absentee Voting Report, at 13.
[86] *Id*. at 21-24.

friendly and intuitive, can help reduce some calls to municipal clerks' offices, but that will not solve the problem of an overwhelming demand for mail-in absentee ballots and a lack of staff and resources to meet that demand.[87] Finally, applying Intelligent Mail Barcodes to absentee ballots will not meaningfully help municipal clerks' offices meet the unprecedented demand to prepare and mail out absentee ballots or to speed up a congested postal service.[88]

83.     Notably, Plaintiffs' proposed remedies of email delivery of absentee ballots and/or authorizing domestic civilian voters to use the Federal Write-in Absentee Ballot will significantly alleviate the burden on municipal clerks statewide through the deadline to request mail-in absentee ballots and while in-person voting through Election Day is under way. However, if those alternatives are not made available to voters and election officials alike (who both stand to benefit), Defendants cannot and will not be able to guarantee that the labor-intensive tasks of processing over 2 million absentee ballot requests, entering data and printing labels for all those ballots, and then mailing them off will not once again cause the system to break down. Defendants, of course, also cannot guarantee that USPS will timely deliver ballots to absentee voters. Given the concrete evidence of a systemic failure to keep up with the demand for absentee ballots in a much lower turnout election, this Court must intervene and safeguard voters' constitutional rights.   A presidential election is no time to leave voters without a fail-safe when election officials and the postal service fail to put ballots in voters' hands.

84.     The lack of a fail-safe option for such voters violates the First and Fourteenth Amendments to the U.S. Constitution as an undue burden on the right to vote. No legitimate state interest is advanced by this denial of these voter's rights to vote, and the burden is the most severe

---

[87] *Id*.
[88] *Id*. at 22-23.

possible: disenfranchisement. The lack of a fail-safe option when ballots do not arrive in the mail forces voters such as Plaintiffs to choose between their constitutionally-protected rights to vote and to bodily integrity in violation of the unconstitutional conditions doctrine. It also fails to provide a reasonable modification for voters with disabilities in violation of Title II of the Americans with Disabilities Act.

### *Fail-Safe Remedies for Ballot Preparation and Delivery Failures*

85.    The following proposed remedies for the disenfranchisement caused by ballot preparation and delivery failures are intended to serve as last resorts or fail-safes for voters such as Plaintiffs. They should not be used by voters or election officials in the first instance, but rather only after a timely-requested mail-in absentee ballot fails to arrive in the mail. In that event, voters such as Plaintiffs must be afforded a fail-safe alternative: (a) delivery of the ballot by email, or (b) permission to vote the Federal Write-In Absentee Ballot ("FWAB") used already by overseas civilian voters. Granted, these solutions to the constitutional problem of ballot preparation and delivery failures that continue to threaten Wisconsin voters with disenfranchisement, given the massive shift to voting by mail during the COVID-19 pandemic, will not work for all voters. Voters who lack access to a computer, a printer, the Internet, or friends, family, and neighbors with the same will not be able to avail themselves of either of these proposed remedies. However, these remedies would cure the constitutional violation as to *many* voters and allow those voters to cast a ballot safely and timely.

### A. *Email Delivery of Absentee Ballots*

86.    Mail-in absentee ballots are delivered to voters in a few different ways, but not all of these methods are communicated to voters in a uniform way. If a voter uses myvote.wi.gov, then mail delivery of the absentee ballot is the default and only option. If, however, a voter fills

out the statewide absentee ballot request form, Form EL-121, seeking a mail-in absentee ballot, then the voter is offered a selection of three methods of delivery: mail, fax, or email.[89] For each delivery option, the voter is required to write in the address to which the ballot should be mailed, their fax number, or their email address.[90] Some registered voters will have already provided their email address upon registering to vote, such that it is in their voter registration record.[91] Upon information and belief, the statewide absentee ballot request form is not accessible through myvote.wi.gov. It is only accessible through WEC's website or a municipal clerk's website, if the municipality posts it.

87.     Wisconsin's municipal clerks gained the authority to deliver mail-in absentee ballots to domestic civilian voters by email or fax in this Court's decision in *One Wisconsin Institute v. Thomsen* in 2016. 198 F. Supp. 3d 896, 946 (W.D. Wis. 2016), which invalidated the statutory ban on emailing or faxing mail-in absentee ballots to domestic civilian voters. This ruling appears to have left the decision as to whether to email or fax ballots or not to the sole discretion of Wisconsin's 1,850 municipal clerks—it struck down a ban, but did not mandate anything.[92]

---

[89] Wisconsin Elections Commission, Form EL-121, Wisconsin Application for Absentee Ballot, https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/EL-121%20Application%20for%20Absentee%20Ballot%20%282018-10%29.pdf; *see also* Wisconsin Elections Commission, Faxing or Emailing Absentee Ballots, https://elections.wi.gov/sites/elections.wi.gov/files/memo/20/faxing_or_emailing_absentee_ballots_to_uocava_vote_83593.pdf.

[90] Wisconsin Elections Commission, Form EL-121, Wisconsin Application for Absentee Ballot, https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/EL-121%20Application%20for%20Absentee%20Ballot%20%282018-10%29.pdf.

[91] Wisconsin Elections Commission, Form EL-131, Wisconsin Voter Registration Application, https://elections.wi.gov/sites/default/files/publication/154/el_131_voter_registration_application_pdf_23730.pdf.

[92] Wisconsin Elections Commission, Uniform Instructions for Absentee Voting, at 2, https://elections.wi.gov/sites/elections.wi.gov/files/2019-02/Uniform%20Instructions%20for%20Absentee%20Voting%20-%20All%20Voters%20%20%28Rev.%202-2019%29.pdf.

Even though it appears from the face of Form EL-121 that a voter can request email delivery upon their initial request, *i.e.* in the first instance and not just as a back-up, upon information and belief, WEC construes these emailed ballots as replacement ballots and, therefore, only permits requests for email or fax delivery up until the regular deadline for mail-in absentee ballots, *i.e.* 5:00 p.m. on the Thursday before Election Day.[93]

88.     The procedure for emailing absentee ballots requires municipal clerks to "print their initials in the endorsement section of the ballot and on the face of the ballot and scan the initialed ballot" and then email the voter the initialed ballot, the absentee ballot certificate envelope, and the Uniform Instructions for Absentee Voters.[94] WEC's instructions on how the voter should be directed to print, cast, and mail the ballot state:

> The elector should be instructed to print the ballot, vote the ballot in the presence of a witness, fold the ballot and seal it inside a regular, non-window envelope, complete and sign the absentee certificate. An adult U.S. citizen witness must sign and provide his or her address on the certificate. Military or permanent overseas voters should provide their birthdate. The certificate should be affixed (with glue or tape) to the envelope containing the voted ballot. The envelope with the certificate attached should be placed into another, larger, envelope, sealed and mailed to the municipal clerk. The ballot must be received by 8 p.m. on Election Day.[95]

The WEC's instructions continue to explain that "[t]he absentee elector must return the hard copy of the ballot and the completed certificate to the municipal clerk in time so that the clerk can deliver the ballot to the polling place before the close of the polls."[96]

---

[93] *Id.* ("*A voter may request that a replacement ballot be faxed or emailed to him or her.* The ballot must be returned to the municipal clerk no later than 8:00 p.m. on Election Day. The ballot may not be returned to the municipal clerk by fax or email.") (emphasis added).

[94] Wisconsin Elections Commission, Faxing or Emailing Absentee Ballots, https://elections.wi.gov/sites/elections.wi.gov/files/memo/20/faxing_or_emailing_absentee_ballots_to_uocava_vote_83593.pdf.

[95] *Id.*

[96] *Id.*

89.    The WEC's instructions on email delivery of ballots notes that USPS does not think it can guarantee on-time delivery unless it is afforded a week. The USPS recommends that ballots be mailed one week prior to the date of the Election to arrive on time.[97] The elector may choose overnight delivery to assure that their ballot arrives on time.[98] The municipal clerk is not responsible for return postage of a faxed or e-mailed absentee ballot.[99] "When absentee ballots are returned to the clerk's office, the municipal clerk records the information is recorded in WisVote or their WisVote Provider."[100] "The municipal clerk records the date absentee ballots are faxed or e-mailed to voters in WisVote or forwards the information to their WisVote Provider."[101] The clerk encloses the envelope holding the ballot into a certificate envelope and attaches the completed certificate to the outside. The clerk then delivers the ballot to the appropriate polling place in a carrier envelope."[102] "At the polling place, the election inspectors follow the procedures for processing absentee ballots. The ballot may be remade by 2 election inspectors in order for the ballot to be accepted by electronic tabulating equipment."[103]

90.    Upon information and belief, every one of Wisconsin's 1,850 municipal clerks exercises their discretionary authority on email delivery of absentee ballots differently. Some advertise this delivery option; some do not. Some will deliver ballots by email; some will not, even close to Election Day or the effective deadline to mail the ballot so that it is received in time to be counted. And there are of course variances between staff members within a municipal clerk's office.

---

[97] *Id*.
[98] *Id*.
[99] *Id*.
[100] *Id*.
[101] *Id*.
[102] *Id*.
[103] *Id*.

91.     Nevertheless, in the 2016 fall general election, Wisconsin municipal clerks emailed voters 9,619 absentee ballots, and 7,231 voters returned those absentee ballots by mail.[104]

92.     The municipal clerk is required to enter absentee applications and ballot information into the WisVote system maintained by the Commission within 48 hours after mailing or receiving an in-person absentee ballot application. Wis. Stat. § 6.33(5). Or, in the case where the municipality relies on the county or another municipality, the clerk shall submit the information to the clerk's WisVote provider, and the provider shall enter the absentee information into the WisVote system within 24 hours. Wis. Stat. § 6.33(5).

93.     The failures of Defendants, municipal clerks, and the USPS to keep up with the unprecedented, gargantuan demand for mail-in absentee ballots during this COVID-19 pandemic cries out for the alternative option of email delivery of absentee ballots. It need not and should not be a first resort; it is a last resort. However, to prevent disenfranchisement when ballots fail to arrive timely in the mail such that voters can timely vote and return them, Plaintiffs respectfully request that this Court order Defendants to instruct municipal clerks to email absentee ballots to voters who timely requested those ballots be delivered by mail but did not receive them in time to return them.

94.     Email delivery will greatly alleviate the administrative burden on municipal clerks' offices in mailing out replacement absentee ballots for those previously-issued ballots that did not arrive timely in the mail.

        B. *Federal Write-In Absentee Ballots*

---

[104] Wisconsin Elections Commission, Absentee Ballot Report (Nov. 8, 2016), https://elections.wi.gov/node/4397.

95.     There is one other element of absentee voting in Wisconsin that is relevant to the relief Plaintiffs request: the Federal Write-in Absentee Ballot ("FWAB").[105] This is another fail-safe option that would solve the problem of disenfranchisement by delayed delivery. Federal law and Wisconsin law set forth a procedure for military and overseas civilian voters to request and cast absentee ballots. Under the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20301 *et seq.*, military and overseas civilian voters are able to register to vote and request an absentee ballot with a federal postcard application. 52 U.S.C. § 20301(b)(2).[106] Under UOCAVA, military and overseas voters also must be permitted to cast FWABs as an "Official Backup Ballot"[107] or "back-up measure"[108] to vote in federal races if they do not receive their regular absentee ballot. 52 U.S.C. §§ 20302(a)(3), 20303(a)(1) ("The Presidential designee shall prescribe a Federal write-in absentee ballot (including a secrecy envelope and mailing envelope for such ballot) for use in general, special, primary, and runoff elections for Federal office by absent uniformed services voters and overseas voters who make timely application for, and do not receive, States, absentee ballots."). State legislatures have the discretion to permit UOCAVA voters to use FWABs to vote in state and local offices or not. 52 U.S.C. § 20303(a)(1).

96.     The    ballot    is    downloadable    and    printable    from    this    url: https://www.fvap.gov/uploads/FVAP/Forms/fwab2013.pdf. The envelope must be assembled by the voter, and the voter fills out both a voter information sheet and the official back-up ballot.  "[A] Federal write-in absentee ballot shall be submitted and processed in the manner provided by law

---

[105] Federal Write-in Absentee Ballot, https://www.fvap.gov/uploads/FVAP/Forms/fwab2013.pdf.
[106] Federal Postcard Application, https://www.fvap.gov/uploads/FVAP/Forms/fpca2013.pdf.
[107] Federal Write-in Absentee Ballot, https://www.fvap.gov/uploads/FVAP/Forms/fwab2013.pdf, at 3.
[108] 52 U.S.C. § 20303(a)(2).

for absentee ballots in the State involved." 52 U.S.C. § 20303(b). If the voter later casts an official

state absentee ballot after casting their FWAB, they are instructed to "make every reasonable effort

to inform the appropriate State election official that the voter has submitted more than one ballot."

52 U.S.C. § 20303(d). Wisconsin law requires a military or overseas voter first apply for an

absentee ballot with the federal postcard application before using the FWAB.  *See* Wis. Stat. §

6.25(1)(a);       Federal       Write-in       Absentee       Ballot,       at       1,

https://www.fvap.gov/uploads/FVAP/Forms/fwab2013.pdf.

97.    Because these are write-in ballots, federal law sets forth specific rules for

processing and counting FWABs, specifically:

> (1) In completing the ballot, the absent uniformed services voter or overseas voter may
> designate a candidate by writing in the name of the candidate or by writing in the name of
> a political party (in which case the ballot shall be counted for the candidate of that political
> party).

> (2) In the case of the offices of President and Vice President, a vote for a named candidate
> or a vote by writing in the name of a political party shall be counted as a vote for the electors
> supporting the candidate involved.

> (3) Any abbreviation, misspelling, or other minor variation in the form of the name of a
> candidate or a political party shall be disregarded in determining the validity of the ballot,
> if the intention of the voter can be ascertained.

52 U.S.C. § 20303(c).

98.    Wisconsin law tracks the federal requirement but adds one restriction. First, the

statute states that

> [a]ny individual who qualifies as a military elector under s. 6.22(1)(b) and who transmits
> an application for an official absentee ballot for any election, including a primary election,
> no later than the latest time specified for the elector in s. 6.86(1)(b) may, in lieu of the
> official ballot, cast a federal write-in absentee ballot prescribed under 42 USC 1973ff-2 for
> any candidate for an office listed on the official ballot or for all of the candidates of any
> recognized political party for the offices listed on the official ballot at that election if the
> federal write-in absentee ballot is received by the appropriate municipal clerk no later than
> the applicable time prescribed in s. 6.87(6).

Wis. Stat. § 6.25(1)(a). Next, subsection (b) authorizes the same for "overseas electors." Wis. Stat. § 6.25(1)(b). However, there is an exception to this default rule that a FWAB voter can vote in all federal, state and local races. Under Wisconsin Statutes Section 6.24, an "overseas elector" is defined as

> a U.S. citizen who is not disqualified from voting under s. 6.03, who has attained or will attain the age of 18 by the date of an election at which the citizen proposes to vote and who does not qualify as a resident of this state under s. 6.10, but who was last domiciled in this state or whose parent was last domiciled in this state immediately prior to the parent's departure from the United States, and who is not registered to vote or voting in any other state, territory or possession.

Wis. Stat. § 6.24(1). Wisconsin law does draw a distinction between those who are permanently overseas and those who are temporarily overseas, *i.e.* those who maintain Wisconsin residence. The latter group can vote for state and local contests, but the former cannot:

> An overseas elector may vote in any election for national office, including the partisan primary and presidential preference primary and any special primary or election. *Such elector may not vote in an election for state or local office unless the elector qualifies as a resident of this state under s. 6.10.* An overseas elector shall vote in the ward or election district in which the elector was last domiciled or in which the elector's parent was last domiciled prior to departure from the United States.

Wis. Stat. § 6.24(2) (emphasis added). Regardless, both Wisconsin residents who are temporarily overseas and permanently overseas voters who were last domiciled in Wisconsin can both use FWABs as ballots, at least for federal races, while domestic civilian voters cannot cast FWABs for any race. The principle behind this is that a voter who is overseas will face hardship or potential disenfranchisement if this back-up option is not made available to them. The COVID-19 pandemic now threatens many *domestic* civilian voters with hardship and potential disenfranchisement— their right to vote is entitled to the same protection, given these extreme circumstances.

99.     Affording domestic civilian voters the right to cast FWABs to the same extent as overseas civilian voters and allowing them to use the FWAB for all federal, state, and local races

would also cure the constitutional and federal statutory violations caused by the lack of a fail-safe option for voters who request absentee ballots during this pandemic because they cannot safely vote in person and whose absentee ballots never arrive in the mail. Plaintiffs respectfully request that this Court order this as relief in the alternative or in addition to the email delivery of ballots in the narrow circumstance where a voter timely requests a mail-in absentee ballot be delivered by mail but does not receive that ballot.

### The Witness Requirement

100.    All absentee ballots must be witnessed and signed by an adult U.S. citizen (other than those cast by military and overseas voters, whose absentee ballots may be witnessed by an adult who is not a U.S. citizen), but that individual need not be a resident of Wisconsin or a registered voter in the state.  Wis. Stat. § 6.87(4)(b)1.[109]  The witness signature requirement applies to all absentee voters, regardless of the particular method by which the voter cast that absentee ballot.   *Id*.   The absentee ballot certificate contains both a voter certification and a witness certification, which the voter and witness must respectively sign under penalty of perjury.[110]

101.    For in-person absentee voting, the municipal clerks serve as the witnesses, and they must put down the clerk's office address, but, upon information and belief, they can just use a stamp.[111]   Other forms of absentee voting, such as for hospitalized voters and voters in nursing homes, through an agent or special voting deputy ("SVD") require the agent or SVD to serve as the witness.

---

[109] *See also* Wisconsin Elections Commission, Form EL-122, Standard Absentee Ballot Certificate, WIS. ELECTIONS COMM'N, *available at* https://elections.wi.gov/sites/elections.wi.gov/files/gab_forms/4/el_122_standard_absentee_ballot_certificate_portra_17554.pdf.
[110] *Id*.
[111] Wisconsin Elections Commission, Absentee Voting 101, (Sept. 7, 2016), https://elections.wi.gov/node/4086.

102.    Because Wisconsin law requires that mail-in absentee ballots' certifications be signed by the voter and by a witness who is an adult U.S. citizen,[112] this requirement constitutes an insurmountable hurdle for many eligible Wisconsin voters under self-quarantine.  All eligible Wisconsin voters under self-quarantine who live alone or who do not have an adult U.S. citizen in their household will be unable to satisfy the state's witness signature requirement and cast a mail-in absentee ballot.

103.    According to the U.S. Census Bureau, there are over 675,000 single-member households in Wisconsin, and many other households that include only one adult.[113] More than 250,000 of these single-member households are individuals over the age of 65.[114]

104.    Additionally, upon information and belief, at least 735 mail-in absentee ballots in Milwaukee were rejected for lack of a witness signature.

105.    Since in-person voting would pose a severe risk to the bodily integrity and lives of these individuals, that option, which must be preserved statewide, is simply not viable for voters who are at elevated risk from COVID-19. Indeed, in-person voting, which requires the gathering of many poll workers (or "election inspectors") and voters in a single polling place, would seem to violate social distancing guidance.  Under the current circumstances, given the acknowledged public health hazard of contracting COVID-19 from in-person voting, the witness signature requirement preventing certain eligible Wisconsin voters from casting a mail-in ballot constitutes an undue burden on the right to vote not justified by any legitimate or important government interest.

---

[112] As noted previously, for military and overseas voters, the witness need not be a U.S. citizen.
[113] *See supra* note 30, U.S. Census Bureau.
[114] *Id.*

106.    Plaintiffs Sylvia Gear and Claire Whelan, both of whom must vote by mail-in absentee ballot to safeguard their lives during this pandemic, challenged this requirement back in March and April. Because they live alone and are self-quarantining during the COVID-19 pandemic, given their advanced age and medical histories, the CDC's recommendations, and the now-enjoined Emergency Order #12, they have no way to reasonably and safely obtain a witness signature on their mail-in absentee ballots' certifications and are therefore effectively disenfranchised by Wis. Stat. § 6.87(4)(b)1. For example, Plaintiff Claire Whelan was compelled to ask a friend to drive from a town 8 miles away to Ms. Whelan's apartment in order to serve as her witness. There, because Ms. Whelan is at high risk from COVID-19 due to her asthma, she and her friend were forced to pass the ballot underneath a closed door and text each other photos showing the completed acts that constitute the witnessing process. It is patently unreasonable to require voters like Ms. Whelan to engage in such a process to comply with the witness requirement when there are reasonable alternatives such as this Court's own injunction providing a certification alternative or the Seventh Circuit's panel suggestion of remote witnessing with the recording of a witness name, without a physical signature from that witness. Absent a court order enjoining the witness signature requirement for the November 3, 2020 general election, at least in part, Plaintiffs Whelan and Gear will be denied their right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution.

107.    The burdens imposed on voters forced to comply with the witness requirement during the COVID-19 pandemic far outweigh any benefit Defendants derive from it in seeking to deter, prevent, detect, or prosecute electoral fraud. The prevention of voter fraud is an important regulatory interest of Wisconsin state government officials, including Defendants, but any law designed to prevent voter fraud must be tailored to the burdens it imposes. *See Norman v. Reed*,

502 U.S. 279, 289 (1992); *Fish v. Schwab*, 957 F.3d 1105, 1132 (10th Cir. 2020) (observing that "the Secretary points to no concrete evidence that '[its] interests make it necessary to burden the plaintiff's rights' in this case"). Here, the witness requirement is not an effective tool to safeguard election integrity and, therefore, the state's interest is greatly attenuated. The witness requirement also undermines the state's strong public health interest in limiting the spread of COVID-19. If absentee voting is closed off to individuals who live alone or do not have an adult U.S. citizen in their household, some may well resort to in-person voting, thereby running the risk of contracting and spreading COVID-19 and further worsening the pandemic in Wisconsin. Others who are at severe risk, like Plaintiffs, will be prevented from voting altogether, an unconstitutional result that this suit seeks to prevent.

108.   On April 1, 2020, this Court presided over a hearing on Plaintiffs' motion for a preliminary injunction. Ruling in Plaintiffs' favor, the Court blocked the witness requirement in part: "Defendants are enjoined from enforcing Wis. Stat. § 6.87(2) as to absentee voters who have provided a written affirmation or other statement that they were unable to safely obtain a witness certification despite reasonable efforts to do so, provided that the ballots are otherwise valid." 20-cv-249, dkt. 171.

109.   Defendant-Intervenors Republican Party of Wisconsin and Republican National Committee appealed the preliminary injunction and moved for and obtained a stay of the above-excerpted part of the preliminary injunction. *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, Nos. 20-1538 & 20-1546 (7th Cir. Apr. 3, 2020), *stayed in part*, No. 19A1016, 2020 WL 1672702 (U.S. Apr. 6, 2020). The Seventh Circuit's motions panel concluded "that the district court did not give adequate consideration to the state's interests in suspending this requirement." *Id*. at *3. But notably, in seeking to strike a balance between the voters' burdens and the state's anti-fraud

interest, the Court suggested that witnesses could observe voters casting their ballots remotely without actually physically signing the ballot:

> So, too, do we have every reason to believe the Commission, in keeping with the forward-leaning action it has taken thus far to accommodate voters' interests while also striving to ensure their safety, will continue to consider yet other ways for voters to satisfy the statutory signature requirement (if possible, for example, by maintaining the statutory presence requirement but not requiring the witness's physical signature).

*Id*. at *4. While this was a mere suggestion in dicta, Plaintiffs now seek this as a remedy in addition to or in the alternative to this Court's own reasonable efforts certification. The Seventh Circuit panel did not rule on the merits and has dismissed the appeals, so both forms of relief remain viable.

## CLAIMS

### COUNT ONE
### *FAILURES TO PREPARE AND DELIVER MAIL-IN ABSENTEE BALLOTS*
**(Plaintiffs Katherine Kohlbeck, Diane Fergot, Gary Fergot, Bonibet Bahr Olsan, Sheila Jozwik, Gregg Jozwik, LWVWI, and Wisconsin Alliance)**
**(Denial of Right to Vote in Violation of the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983)**

110.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this First Amended Complaint and the paragraphs in the counts below as though fully set forth herein.

111.    Under the First and Fourteenth Amendments to the U.S. Constitution, any burden on the right to vote must be balanced against a state's interest in that requirement.  The Supreme Court has set forth the following test:

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the

restrictions. *Anderson*, 460 U.S., at 788, 103 S.Ct., at 1569–1570; *see also id*., at 788–789, n. 9, 103 S.Ct., at 1569–1570, n. 9.

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also One Wisconsin Institute, Inc. v. Thomsen*, 15-cv-324-jdp, 2016 WL 4059222 at *3 (W.D. Wis. July 29, 2016) ("This analysis proceeds under what is known as the *Anderson–Burdick* framework, which sets out a three-step analysis. First, I determine the extent of the burden imposed by the challenged provision. Second, I evaluate the interest that the state offers to justify that burden. Third, I judge whether the interest justifies the burden.").

112.    Wisconsin's election administration system, as managed by Defendants, is not equipped to handle the unprecedented surge in mail-in absentee balloting that the COVID-19 pandemic is causing. The November general election will be conducted under substantial COVID-19 transmission and will see an estimated 2 million-plus absentee ballot requests. Given the current systems, procedures, laws, and resources for absentee voting and mail delivery, there is simply no way that Defendants, the municipal clerks who take their marching orders from them, and USPS can meet that demand. Inevitably, some portion of voters who must vote by mail due to the risk COVID-19 poses to their health and the health of their family members will not receive a ballot in the mail.

113.    Plaintiffs Katherine Kohlbeck, Diane Fergot, Gary Fergot, Bonibet Bahr Olsan, Sheila Jozwik, and Gregg Jozwik were all disenfranchised in the April 7 election and stand to be disenfranchised again in the November general election, because of Defendants' failure to provide them with a fail-safe option if their absentee ballots do not arrive in the mail on time. Organizational Plaintiffs LWVWI and Wisconsin Alliance are also injured because they have diverted and will continue to divert resources, staff time, and money to educate and help voters who do not receive a requested absentee ballot in the mail.

114.    In-person voting of course is not a reasonable alternative, as that would require these Plaintiffs to enter a confined and crowded space where they run a significant risk of contracting COVID-19.

115.    The failure to prepare and deliver absentee mail-in ballots timely or at all constitutes a complete denial of a voter's right to cast a ballot, where voters cannot safely vote in person or will be traveling or otherwise away from their ward on Election Day.

116.    The burden on the right to vote is the most severe imaginable, while the state has zero legitimate interest in disenfranchising a voter who does not timely receive an absentee ballot in the mail. Under the circumstances of the COVID-19 pandemic, which has already led both the federal and Wisconsin state governments to declare emergencies, there is no "compelling," "important," or "legitimate" interest, *Burdick*, 504 U.S. at 434, that can justify this disenfranchisement or failing to afford voters a fail-safe option that is already in use in the state.

117.    Plaintiffs, and all voters who timely request an absentee ballot by mail delivery but who do not receive that ballot in the mail, must be granted one or both of two fail-safes, either (a) the option to request that an absentee ballot be emailed to them, and/or (b) the option to cast a Federal Write-in Absentee Ballot.

118.    Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of their rights under the First and Fourteenth Amendments to the U.S. Constitution.

119.    For the foregoing reasons, Defendants have deprived and will continue to deprive Plaintiffs of their rights to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution as enforced by 42 U.S.C. § 1983.

## COUNT TWO
## *WITNESS REQUIREMENT*
**(Plaintiffs LWVWI, Wisconsin Alliance, Claire Whelan, and Sylvia Gear)**
**(Undue Burden on the Right to Vote in Violation of the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983)**

120.   Plaintiffs reallege and reincorporate by reference all prior paragraphs of this First Amended Complaint and the paragraphs in the counts below as though fully set forth herein.

121.   Under the First and Fourteenth Amendments to the U.S. Constitution, any burden on the right to vote must be balanced against a state's interest in that requirement.  The Supreme Court has set forth the following test:

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S., at 788, 103 S.Ct., at 1569–1570; *see also id*., at 788–789, n. 9, 103 S.Ct., at 1569–1570, n. 9.

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also One Wisconsin Institute, Inc. v. Thomsen*, 15-cv-324-jdp, 2016 WL 4059222 at *3 (W.D. Wis. July 29, 2016) ("This analysis proceeds under what is known as the *Anderson–Burdick* framework, which sets out a three-step analysis. First, I determine the extent of the burden imposed by the challenged provision. Second, I evaluate the interest that the state offers to justify that burden. Third, I judge whether the interest justifies the burden.").

122.   The witness signature requirement for absentee mail-in ballots requires mail-in absentee voters to obtain an adult U.S. citizen's signature certifying that the voter cast the mail-in ballot themselves.  Wis. Stat. § 6.87(4)(b)1.

123.    Under the circumstances of the COVID-19 pandemic, which led both the federal and Wisconsin state government to declare emergencies, it is not safe, reasonable, or even logical to require mail-in absentee voters who live alone or do not have an adult U.S. citizen living in their household to seek out and obtain a witness's signature in order for the ballot to be validly cast and counted. This required action puts the health of Plaintiffs Claire Whelan and Sylvia Gear in jeopardy. They, and other similarly situated voters, are compelled to take an unreasonable risk to satisfy the witness requirement, when reasonable alternatives that equally satisfy the state's anti-fraud interest exist.

124.    Not only does continuing to require a witness signature on a mail-in ballot in the face of this fast-spreading pandemic lack support from a legitimate government interest that is "compelling" or "important," *Burdick*, 504 U.S. at 434, but it would also directly contradict the state's proffered interest in maintaining social distancing.

125.    Given the circumstances of the COVID-19 pandemic, eligible Wisconsin voters who are at higher risk from COVID-19 and who live alone or who do not have an adult U.S. citizen living in their household, like Plaintiffs Claire Whelan and Sylvia Gear, cannot safely comply with the requirements of Wis. Stat. § 6.87(4)(b)1. through reasonable efforts and cast a mail-in absentee ballot that will count.

126.    Organizational Plaintiffs LWVWI and Wisconsin Alliance are also injured because Plaintiffs Whelan and Gear are members of LWVWI and Wisconsin Alliance, respectively, and because these organizations have diverted and will continue to divert resources, staff time, and money to educate and help voters who are struggling and/or unable to safely comply with the witness requirement through reasonable efforts.

68

127.    Therefore, under these circumstances, Section 6.87(4)(b)1. now creates an undue burden on mail-in absentee voters' right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution as construed in *Anderson* and *Burdick*.

128.    In-person voting of course is not a reasonable alternative, as that would require these eligible Wisconsin voters to enter a confined space with even more people than would be required to witness the casting of a mail-in absentee ballot and seriously jeopardize their health and life.

129.    Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of their rights under the First and Fourteenth Amendments to the U.S. Constitution.

130.    For the foregoing reasons, Defendants have deprived and will continue to deprive Plaintiffs of the right to be free of undue burdens on their right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution as enforced by 42 U.S.C. § 1983.

## COUNT THREE
### *FAILURES TO PREPARE AND DELIVER MAIL-IN ABSENTEE BALLOTS; WITNESS REQUIREMENT*
**(All Plaintiffs)**
**(Unconstitutional Condition on Right to Vote Compelling Forfeiture of Right to Bodily Integrity in Violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983)**

131.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this First Amended Complaint and the paragraphs in the counts below as though fully set forth herein.

132.    Under the unconstitutional conditions doctrine, the government may not require an individual to forfeit one constitutional right in order to exercise another. *See Lefkowitz v. Cunningham*, 431 U.S. 801 (1977); *Simmons v. United States*, 390 U.S. 377, 394 (1968); *Howard*

*v. Walker*, 406 F.3d 114, 129 (2nd Cir. 2005); *Bourgeois v. Peters*, 387 F.3d 1303, 1324 (11th Cir. 2004); *Green v. Brigano*, 123 F.3d 917, 921 (6th Cir. 1997).

133.    "[W]hen a condition on a government benefit burdens a constitutional right, it generally triggers the same scrutiny as a direct penalty would." *McCabe v. Sharrett*, 12 F.3d 1558, 1562 (11th Cir. 1994). Government actions that threaten the right to bodily integrity are subject to strict scrutiny. *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1064 (6th Cir. 1998). The Supreme Court has invalidated voting requirements or conditions that require the forfeiture of another fundamental right. *See Dunn v. Blumstein*, 405 U.S. 330, 342 (1972) (finding that durational residency requirement for voter registration placed unconstitutional condition on fundamental right to interstate travel) ("Durational residence laws impermissibly condition and penalize the right to travel by imposing their prohibitions on only those persons who have recently exercised that right. In the present case, such laws force a person who wishes to travel and change residences to choose between travel and the basic right to vote.  Absent a compelling state interest, a State may not burden the right to travel in this way." (internal citation and footnotes omitted)).

134.    The Fourteenth Amendment guarantees the right to bodily integrity, and this right is violated if government officials are deliberately indifferent to the violation of the plaintiff's bodily integrity. *See Missouri v. McNeely*, 569 U.S. 141, 159 (2013); *Guertin v. State*, 912 F.3d 907, 919 (6th Cir. 2019). "Involuntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value . . . is a classic example of invading the core of the bodily integrity protection." *Guertin*, 912 F.3d at 921–22.

135.    Plaintiffs Katherine Kohlbeck, Diane Fergot, Gary Fergot, Bonibet Bahr Olsan, Sheila Jozwik, and Gregg Jozwik were all disenfranchised in the April 7 election and stand to be disenfranchised again in the November general election, because of Defendants' failure to provide

them with a fail-safe option if their absentee ballots do not arrive in the mail on time. Without a fail-safe option, they must either lose their right to vote or vote in person which threatens them with a violation of their bodily integrity. In-person voting would require these Wisconsin voters to enter a confined space with many people, risking contracting COVID-19.

136. By failing to provide a fail-safe option for voters who request but do not receive an absentee ballot in the mail and by requiring Plaintiffs Claire Whelan and Sylvia Gear to engage a witness to observe the voting of their mail-in ballots and to sign the certification, which cannot be reasonably and safely accomplished, Defendants effectively require Plaintiffs to choose between a severe risk to their right to bodily integrity and losing their right to vote.

137. Organizational Plaintiffs LWVWI and Wisconsin Alliance are also injured because they have diverted and will continue to divert resources, staff time, and money to educate and help voters who do not receive a requested absentee ballot in the mail and to educate and help voters who are struggling and/or unable to safely comply with the witness requirement through reasonable efforts. Additionally, Plaintiffs Whelan and Gear are members of LWVWI and Wisconsin Alliance, respectively.

138. Because in-person voting and the witness requirement both severely threaten to violate Plaintiffs' bodily integrity by subjecting them to the significant risk of contracting COVID-19, Defendants force Plaintiffs to forfeit their right to bodily integrity in order to exercise their right to vote. Should Plaintiffs exercise their right to vote under these circumstances, Defendants will have knowingly subjected Plaintiffs to a foreign substance—the novel coronavirus that causes COVID-19—without a therapeutic basis or Plaintiffs' consent.

139.     Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of their rights under the Fourteenth Amendment to the U.S. Constitution, by requiring them to forfeit their right to bodily integrity in order to exercise their right to vote.

140.     For the foregoing reasons, Defendants have deprived and will continue to deprive Plaintiffs of the right to be free of unconstitutional conditions on their rights to vote in violation of the Fourteenth Amendment to the U.S. Constitution as enforced by 42 U.S.C. § 1983.

**COUNT FOUR**
*FAILURE TO PREPARE AND DELIVER MAIL-IN ABSENTEE BALLOTS; WITNESS REQUIREMENT*
**(Plaintiffs Katherine Kohlbeck, Diane Fergot, Claire Whelan, and League of Women Voters of Wisconsin)**
**(Failure to Provide Reasonable Modifications in Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, et seq.)**

141.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this First Amended Complaint and the paragraphs in the counts below as though fully set forth herein.

142.     Under Title II of the Americans with Disabilities Act, state and local governments must not impose requirements on participation in public services, programs, or activities, including exercise of the fundamental right to vote, that screen out individuals with disabilities from fully and equally enjoying those services and programs and must make reasonable modifications in policies, practices, or procedures, including voting and election procedures, when the modifications are necessary to avoid discrimination on the basis of disability.

143.     "The obligation to make 'reasonable modifications' parallels the obligations to make 'reasonable accommodations' in the context of Titles I and III." *Lacy v. Cook Cty.*, 897 F.3d 847, 853 (7th Cir. 2018). To accommodate a disability in the employment context is to "make some change that will enable [a] disabled person to work." *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995). To accommodate a disability in the context of a public service

72

requires a modification that would enable a disabled person to "participat[e] in or [enjoy the] benefits of services, programs, or activities of a public entity." 42 U.S.C.S. § 12132.

144.    The CDC has deemed that individuals who suffer from the impairments that Plaintiffs Katherine Kohlbeck, Diane Fergot, and Claire Whelan possess are at higher risk for severe illness from COVID-19. Because of these high risks, Plaintiffs Katherine Kohlbeck, Diane Fergot, and Claire Whelan are substantially affected and unable to enjoy at least one major life activity: exercising their fundamental right to vote. Additionally, Claire Whelan's chronic asthma substantially limits the operation of her respiratory function, a major bodily function and a major life activity.

145.    Individuals who suffer a significant medical vulnerability that places them at high risk of serious bodily injury or death should they be forced to vote in person or secure a witness—including Plaintiffs Katherine Kohlbeck, Diane Fergot, and Claire Whelan, whose health conditions put them at high risk of severe illness or death should they contract COVID-19—have a disability within the meaning of the ADA.

146.    Plaintiffs Katherine Kohlbeck, Diane Fergot, and Claire Whelan's medical conditions substantially affect their major life activities because they cannot safely exercise their fundamental right to vote without risking their lives. Plaintiffs Katherine Kohlbeck, Diane Fergot, and Claire Whelan must be afforded reasonable fail-safe options if their absentee ballots do not arrive in the mail on time and provided some relief from the witness requirement.

147.    Plaintiffs Katherine Kohlbeck, Diane Fergot, and Claire Whelan are unable to reasonably and safely obtain a witness signature without ignoring the CDC's guidelines and putting themselves at risk of contracting COVID-19 and suffering serious health consequences, including death. Plaintiffs Katherine Kohlbeck, Diane Fergot, and Claire Whelan would be unable

to safely vote by absentee ballot through reasonable efforts unless they are afforded relief from the witness requirement.

148.    Defendants' failure and refusal to ensure that Plaintiffs with disabilities are given the ability to vote without risks of serious illness or death constitute a failure to make a reasonable modification for those, such as Plaintiffs Katherine Kohlbeck, Diane Fergot, and Claire Whelan, whose health conditions limit their ability to have contact with others during this public health emergency created by COVID-19, in violation of the ADA.

149.    The failure to provide a reasonable modification for these voters constitutes a condition on access to the ballot box that has the effect of screening out such individuals from participating in the November 3, 2020 general election, in violation of Title II of the Americans with Disabilities Act.

150.    For the foregoing reasons, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of their statutory rights under the ADA as enforced by 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

(a) Assume jurisdiction over this matter;

(b) Declare that the lack of a fail-safe option for voters who previously and timely requested a mail-in absentee ballot by mail delivery but who do not receive that ballot in the mail in time to cast it such that it will be counted in the November general election, violates the First and Fourteenth Amendments to the U.S. Constitution and Title II of the Americans with Disabilities Act, as enforced through 42 U.S.C. § 1983;

(c) To remedy the constitutional and federal statutory violations caused by the lack of a fail-safe option for voters who previously and timely requested a mail-in absentee ballot by mail delivery but who do not receive that ballot in the mail, for the November general election, order:

 1. Defendants to permit voters who previously and timely requested a mail-in absentee ballot by mail delivery but who do not receive that ballot in the mail, to request via email, myvote.wi.gov, or Form EL-121, the statewide uniform absentee ballot application, that a mail-in absentee ballot and its certificate envelope be emailed to such voters;

 2. Defendants to email mail-in absentee ballots, upon request via email, myvote.wi.gov, or Form EL-121, the statewide uniform absentee ballot application, to voters who previously and timely requested a mail-in absentee ballot by mail delivery but who do not receive that ballot in the mail;

 3. Defendants to process and count email-delivered absentee ballots that are timely returned in any way permitted under Wisconsin law or court orders by voters who previously and timely requested a mail-in absentee ballot by mail delivery but do not receive that ballot in the mail; and

 4. Preliminary and permanent injunctive relief prohibiting Defendants from rejecting and/or refusing to count email-delivered absentee ballots that are timely returned in any way permitted under Wisconsin law or court orders by voters who previously and timely requested a mail-in absentee ballot by mail delivery but do not receive that ballot in the mail;

(d) In the alternative or in addition to the relief outlined in subsection (c), for the November general election, order:

1.    Defendants to permit voters who previously and timely requested an absentee ballot by mail delivery, to download, vote, and return in any way permitted under Wisconsin law or court orders the Federal Write-in Absentee Ballot;

2.    Defendants to process and count Federal Write-in Absentee Ballots that are timely returned in any way permitted under Wisconsin law or court orders by voters who previously and timely requested a mail-in absentee ballot by mail delivery; and

3.    Preliminary and permanent injunctive relief prohibiting Defendants from rejecting and/or refusing to count Federal Write-in Absentee Ballots cast by voters who previously and timely requested a mail-in absentee ballot by mail delivery and that are timely returned in any way permitted under Wisconsin law or court orders, but only if they are postmarked or dropped off at a municipal clerk's office on or after the seventh day before Election Day through the deadline for returning absentee ballots;

(e) Declare that Wis. Stat. § 6.87(4)(b)1. violates, in part, the First and Fourteenth Amendments to the U.S. Constitution and Title II of the Americans with Disabilities Act, as enforced through 42 U.S.C. § 1983, for the November general election;

(f) To remedy the constitutional and federal statutory violations caused by enforcement of the witness requirement, Wis. Stat. § 6.87(4)(b)1., without reasonable modification during the course of the COVID-19 pandemic, preliminarily and permanently enjoin Defendants from enforcing Wis. Stat. § 6.87(4)(b)1., in part, for the November general election and from rejecting and/or refusing to process and count an absentee mail-in ballot cast in the November general election on the basis that it lack a witness signature on the certificate envelope, if the mail-in

76

absentee voter signs a certification on the absentee ballot certificate envelope or on a pre-printed insert to be enclosed with the absentee ballot, that affirms that the voter was unable to safely obtain a witness certification through reasonable efforts, provided that the ballot is otherwise valid;

(g) In the alternative or in addition to the relief outlined in subsection (f), preliminarily and permanently enjoin Defendants from enforcing Wis. Stat. § 6.87(4)(b)1., in part, for the November 3, 2020 general election and from rejecting and/or refusing to process and count an absentee mail-in ballot cast in the November general election on the basis that it lacks a witness signature on the certificate envelope, if the witness observes the voter casting the ballot remotely, *e.g.* by videoconference or through a glass window, and the voter records in writing on the absentee ballot certificate envelope or on a pre-printed insert to be enclosed with the absentee ballot the full name of the witness who witnessed the voting of the ballot and enough of the witness's address to identify the correct residential address and contact that witness, provided that the ballot is otherwise valid;

(h) Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

(i) Grant Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and as otherwise permitted by law; and

(j) Grant such other relief as this Court deems just and proper.

DATE: May 29, 2020                                    Respectfully submitted,

                                                     /s/ Jon Sherman

                                                     Jon Sherman*
                                                     D.C. Bar No. 998271
                                                     Michelle Kanter Cohen*
                                                     D.C. Bar No. 989164
                                                     Cecilia Aguilera*
                                                     D.C. Bar No. 1617884
                                                     FAIR ELECTIONS CENTER
                                                     1825 K St. NW, Ste. 450

Washington, D.C. 20006
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
caguilera@fairelectionscenter.org
(202) 331-0114

Douglas M. Poland
State Bar No. 1055189
David P. Hollander
State Bar No. 1107233
RATHJE WOODWARD LLC
10 E Doty Street, Suite 507
Madison, WI 53703
Phone:  608-960-7430
Fax:  608-960-7460
dpoland@rathjewoodward.com
dhollander@rathjewoodward.com

*Counsel for Plaintiffs*

*\*Admitted to the U.S. District Court for the
Western District of Wisconsin*